# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 2, 2015        Decided March 1, 2016

No. 06-3190

UNITED STATES OF AMERICA,
APPELLEE

v.

KEITH B. MCGILL,
APPELLANT

———

Consolidated with 06-3193, 07-3001, 07-3003, 07-3065,
07-3124

———

On Appeals from the United States District Court
for the District of Columbia
(No. 02cr00045-01)
(No. 00cr00157-12)
(No. 00cr00157-18)
(No. 00cr00157-19)
(No. 00cr00157-20)
(No. 00cr00157-21)

———

*Gregory Stuart Smith*, *Dennis M. Hart*, *Richard K. Gilbert*, *Manuel J. Retureta*, *David B. Smith*, and *Mary E. Davis*, all appointed by the court, argued the causes for

appellants. With them on the briefs was *Kristen Grim Hughes*, appointed by the court.

*Leslie A. Gerardo*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney at the time of the filing, and *Elizabeth Trosman* and *Chrisellen R. Kolb*, Assistant U.S. Attorneys. *Mary B. McCord*, Assistant U.S. Attorney, entered an appearance.

Before: SRINIVASAN and MILLETT, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: In November 2000, a grand jury returned a 158-count superseding indictment against sixteen defendants. The indictment alleged that, during the late 1980s and throughout the 1990s, those defendants conspired to run a large-scale and violent narcotics-distribution business centered in Washington, D.C. The defendants were charged with an array of offenses including narcotics conspiracy and racketeering conspiracy, as well as numerous counts of first-degree murder, assault with intent to murder, tampering with a witness or informant by killing, continuing-criminal-enterprise murder, and violent crime in aid of racketeering conspiracy.

Many of the indicted defendants pleaded guilty to the charges, while the others went to trial in two separate groups. "Group One" consisted of six defendants, including the conspiracy's alleged leaders, Kevin Gray and Rodney Moore. The Group One trial culminated in guilty verdicts and substantial sentences for each defendant. We affirmed most of those verdicts and sentences in *United States v. Moore*, 651

F.3d 30 (D.C. Cir. 2011), *aff'd in part sub nom. Smith v. United States*, 133 S. Ct. 714 (2013).

"Group Two" consisted of five defendants from the November 2000 indictment: Deon Oliver, Franklin Seegers, Kenneth Simmons, James Alfred, and Ronald Alfred. Before their trial, the government obtained a separate six-count indictment against Keith McGill arising from his participation in the same conspiracy. The district court joined McGill for trial with the other Group Two defendants.

On October 16, 2003, the Group Two trial commenced. Nearly six months later, on March 31, 2004, the jury began its deliberations. In April and May 2004, the jury found Oliver, Simmons, James Alfred, Ronald Alfred, and McGill guilty on all counts and found Seegers guilty on seven of the charged counts. After denying their posttrial motions, the district court sentenced all defendants to lengthy prison terms. Each received at least one term of life imprisonment, with the exception of Seegers, whose combined sentence of imprisonment amounted to forty years to life.

The six Group Two defendants now appeal. Appellants challenge the sufficiency of the evidence against them on many of the charges. They also raise various claims concerning the conduct of the trial, including challenges to the district court's dismissal of a juror during deliberations and to certain of the court's evidentiary rulings. Appellants also allege prosecutorial misconduct and ineffective assistance of counsel, and one appellant (McGill) challenges his sentence.

Upon review, we conclude that the evidence was sufficient to convict on all of the challenged counts. We also reject most of the claims of error or find that the alleged errors were harmless under the appropriate standard of review. We reverse the convictions on two counts against Seegers,

however, and we also remand to the district court to determine whether any of appellants' conspiracy convictions must be vacated because of a Confrontation Clause violation. Certain of McGill's sentencing arguments have merit, moreover, and we remand for examination of claims by Simmons and Ronald Alfred that they received ineffective assistance of counsel before the district court.

Appellants' consolidated briefing to this court is organized under discrete issue headings designated by Roman numerals. Our section headings conform to appellants' presentation of the issues (although we omit those section numbers denoting instances in which one appellant merely joined other appellants' arguments). Detailed discussions of the facts, evidence, and proceedings will be set forth as necessary to address each issue appellants raise.

We now proceed to address each issue raised by appellants. While certain of their arguments on each issue do not merit separate discussion, any arguments not directly addressed were fully considered and their disposition is so directly dictated by precedent as to not merit individualized discussion.

## I. Removal of Juror

In their first joint argument, appellants challenge the district court's dismissal of a juror for misconduct during deliberations. Appellants argue that the dismissed juror was inclined to vote for acquittal and that his dismissal violated their Sixth-Amendment right to conviction only by a unanimous jury. We find no error. We review the circumstances giving rise to the juror's dismissal in some detail because the facts bear substantially on our review of the district court's decision and our rejection of appellants' challenge.

5

## A.

### *1.*

The circumstances leading to the juror's dismissal are as follows. On April 1, 2004, one day after its deliberations began, the jury sent a note to the district court indicating that it was experiencing some difficulties with one juror. The note reported that "[o]ne juror has stated categorically that he does not believe in any testimony from any of the cooperating witnesses." J.A. 1049. That juror had also told the others "that there is no other evidence presented by the prosecution either direct, circumstantial, non-cooperating [witnesses], et[c]. that would likely lead to an unanimous decision." *Id.* The district court instructed the jury to continue its deliberations.

After the next day of deliberations, the jury sent another note to the court relating to "one juror." *Id.* at 1052. That note relayed that the juror "ha[d] stated from the beginning of our deliberation that he does not believe any testimony of or by the prosecution, defense or any law enforcement witness." *Id.* Once again, the district court told the jury to continue its deliberations.

On April 8, the jury sent a third note to the court, stating that it had "had serious and productive discussion." *Id.* at 1064. The note further reported that "[o]ne juror continues to refuse to accept any evidence and discuss or consider any verdict but not guilty or not proven for any count or charge for any defendant." *Id.* In response, the court instructed the jury that, although "each juror is entitled to his or her opinions[,] [e]ach juror should . . . exchange views with his or her fellow jurors[,] . . . discuss and consider the evidence, . . . consult with one another, and . . . reach an agreement based solely and wholly on the evidence." *Id.* at 1076.

On April 14, the jury sent back two more notes in quick succession. The first note requested portions of the trial testimony. It also stated: "In addition, we have one juror #9, that refuses to participate in any and all deliberations for this trial." *Id.* at 1078.

The second April 14 note raised a separate issue concerning the same juror (Juror #9). It stated:

> On April 13, 2004, I Juror [#12] observed Juror #9 throughout deliberations writing notes or things out of his jury book [with] all defendants['] charges, then at (April 13) the end [of] deliberations he pull[ed] 3 pieces of paper from that tablet (yellow)[,] fold[ed] them in half and placed them in his eye glass case.

*Id.* at 1079. Another paragraph followed in different handwriting:

> Note as Foreman [Juror #10] I am very disturb[ed] and concern[ed] by th[ese] actions on Juror #9. If an alternate is available that would make me feel safer.

*Id.*

The district judge read the notes aloud when defense and government counsel gathered in the courtroom that day. The judge also shared additional information about what had transpired the previous evening. The judge stated that, as the jurors exited the van that transported them to a secure location at the end of each day, the foreman, Juror #10, took aside the accompanying marshal and told him that Juror #12 had witnessed Juror #9 removing notes from the jury room. According to the judge, Juror #10 spoke with the marshal

because the jurors had received instructions to take nothing out of the jury room. Juror #10 suggested that the marshal search Juror #9, which the marshal declined to do. Later that night, Juror #10 called the marshal on his cell phone, expressing fear "[t]hat the jurors might be compromised by whatever it was that was taken out of the room." *Id.* at 5547-48.

The court asked the two sides for their views on how to proceed. The government expressed concern about Juror #9's potential misconduct in removing notes from the jury room and the fact that Juror #9 had apparently made the foreman "feel unsafe"; the government also worried that Juror #9 may have "given the impression to the jurors that their anonymity ha[d], perhaps, been compromised." *Id.* at 5539-40. The government suggested that the court conduct individual voir dires of the three jurors involved: Juror #12, who claimed to have witnessed Juror #9 writing and hiding the notes; Juror #10, whom Juror #12 had told about the incident; and Juror #9. The government stressed the heightened security precautions the court had employed for the trial and explained that maintaining a "continued sense of safety, security, and anonymity . . . is all important as [the jurors] move forward in their deliberations." *Id.* at 5564. In addition, the government argued that the first April 14 note provided more evidence that one juror—most likely Juror #9—had continuously refused to deliberate with the others. But the government suggested that the court defer consideration of that issue for the time being and instead focus on Juror #9's alleged removal of notes from the jury room.

The defendants, for their part, moved for a mistrial. They argued that the jury's notes had established that Juror #9 was a holdout for the defense on at least some charges. In addition, counsel for Simmons asked the district court

whether it had specifically instructed "the jurors not to take any paper out of the jury room." *Id.* at 5554. The court responded, "The marshals informed them they could not remove anything from the room." *Id.* The court further explained that "their own notes have to be sealed. The room is locked each night after they leave, and they are told they can't take anything out," including notes. *Id.* Counsel asked, "That wasn't an instruction given by the Court, that was something given by the marshals?" *Id.* at 5554-55. The court answered, "Right. It's a standard instruction from the marshals, don't take anything out of the room." *Id.* at 5555.

The district court decided to conduct individual voir dires of Jurors #12, #10, and #9. The court first questioned Juror #12. Juror #12 described witnessing Juror #9 "taking notes out of" and "copying stuff" from his juror notebook, which contained the indictments, the jury instructions, and the verdict forms. *Id.* at 5572. Juror #12 recounted that, after the conclusion of deliberations for the day, Juror #9 took three pieces of paper from his notepad containing "whatever he wrote," "folded them up," and "slid them in his eyeglass case." *Id.* Juror #12 admitted that he did not know what Juror #9 had written on those pieces of paper. But when the court asked whether Juror #9 may have written "a grocery list or something like that," Juror #12 said he "d[id]n't think it was," because he had observed Juror #9 "going through . . . the middle of the [juror note]book, and he was just taking little segments out of the book and just jotting them down, taking little segments out of the book, jotting them down, taking little segments out of the book, jotting them down." *Id.* at 5576.

Juror #12 also told the court that, when Juror #9 folded the pieces of paper and put them in his eyeglass case, he was "kind of looking out the side of his eye to see if anybody saw

him." *Id.* at 5578. "That's what made me suspicious," Juror #12 said, "because he concealed it." *Id.* Juror #12 also stated that he was in the best position to observe Juror #9's actions because Juror #12 was sitting beside Juror #9. Finally, Juror #12 mentioned that he reported Juror #9's actions because they contravened the court's "instructions that we were not supposed to take anything home." *Id.* at 5579.

Next up was Juror #10, the foreman. The court asked Juror #10 to "walk [it] through" Juror #12's statements to Juror #10 and the events leading up to the latest note. *Id.* at 5580. After doing so, Juror #10 explained that he and Juror #12 had safety concerns because "[w]e don't know what [Juror #9] [is] doing. He's not participating." *Id.* at 5581. When the court pressed further on why Juror #9's nonparticipation created a safety issue, Juror #10 responded, "Well, because he's distant. He's been very distant, and I don't know what's in his mind. He's been kind of stand-offish, and, again, everybody, to a certain degree, I think, feeling for the rest of the ten jurors, they're very uneasy because they don't know what to expect from that individual." *Id.* at 5582. Juror #10 added that he "didn't sleep too well last night" and was "disturbed" by Juror #9's removing his notes because the jurors received "firm instructions not to remove any of the evidence or our notes. If he's taking notes and putting it in his eyeglass case, that's a problem and that's against the rules." *Id.* at 5585-86. "That brings a red flag to me," Juror #10 continued, "and I'm concerned about, you know, the other jurors [and] myself as it relates to this case. We don't know what he's doing. We don't know what his intentions are." *Id.* at 5586.

The court next questioned Juror #9. Juror #9 readily admitted that he had put something from his juror notepad into his eyeglass case. He stated, however, that it was a single

sheet of paper containing a "grocery list." *Id.* at 5598. When asked about the list, Juror #9 said he had written "'[m]ilk, eggs, bread' and 'fruit.'" *Id.* at 5598-99. Juror #9 confirmed that he had been sitting at the back of the room and away from the juror table when he wrote the note, though he denied that he had been trying "to be secretive about it in any way." *Id.* at 5604. When the court asked whether he still had the note, Juror #9 answered that he had thrown it away.

The district court also told Juror #9 that there had been "some concern about the way deliberations are going" and asked whether Juror #9 wanted to disclose anything in that regard. *Id.* at 5599-5600. The court made clear, however, that it did not want Juror #9 to discuss matters such as "guilty or not guilty, nothing like that." *Id.* at 5600. Juror #9 told the court that "whenever someone expresses an opinion that's not the majority, they get shouted down. They don't get a chance to express their opinion." *Id.* Juror #9 also stated that he had been looking at the evidence and expressing his opinions about the case to the others, but that "[t]hey don't want to hear it. . . . They don't want to listen." *Id.* at 5605.

After the court concluded its questioning of Juror #9, it again heard from both sides about how to proceed. Defense counsel renewed their requests for a mistrial. No one suggested that the court should voir dire additional jurors.

### 2.

The next day, on April 15, the court orally granted the government's motion to remove Juror #9 for good cause under Federal Rule of Criminal Procedure 23(b). The court, at the time, based its dismissal of Juror #9 solely on his refusal to deliberate. The court's statement from the bench referenced our court's decision in *United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987), which held that the dismissal of a

juror on the basis of the juror's views about the government's evidentiary case had infringed the defendants' Sixth-Amendment right to be convicted only by a unanimous verdict. The district court understood *Brown* to require it to make a factual finding, beyond a reasonable doubt, that Juror #9 had refused to consider the law and the evidence at all (as opposed to considering the evidence and forming a decision in favor of acquittal). Based on the facts reported in the jury's notes and the jurors' voir dire testimony, the court concluded that Juror #9 had been totally unwilling to consider the evidence or discuss the case with the others, in violation of his oath as a juror and the court's instructions.

The court also observed that its decision to remove Juror #9 was not based on his removal of notes from the jury room. The court stated that, while it found it "likely that [Juror #9] was writing some notes," the court could not "resolve[] beyond a reasonable doubt" whether "it was a grocery list" or "something about the case." J.A. 5623. The government asked the court to reconsider its decision, arguing that the note-removal incident afforded an independent basis to remove the juror for misconduct. The government also offered its understanding that the factual findings underlying that ground for dismissal need not be made beyond a reasonable doubt. The court responded, "If the standard is preponderance of the evidence, I would agree with you." *Id.* at 5625. But the court at the time was "not clear that that is the proper standard. If that's the proper standard, then I think you're right." *Id.*

When the jury returned the next day, on April 16, the court informed the jurors that Juror #9 had been excused for reasons not relevant to their deliberations and that an alternate would be joining them. The court told the reconstituted jury to begin its deliberations anew.

12

One week later, on April 23, following a motion by the government, the court issued an order determining that Juror #9's removal of notes from the jury room constituted an independent basis to remove the juror for good cause. While the court had previously been uncertain whether it needed to make findings supporting that ground for dismissal under a more stringent standard than a preponderance standard, it now "found by a preponderance of the evidence that Juror #9's misconduct of removing notes" afforded a "basis to remove him for good cause." *Id.* at 1088.

The court made factual findings concerning the note-removal incident in which it credited Juror #12's "observations of the conduct of Juror #9." *Id.* at 1087. The court thus found, consistent with Juror #12's account, that Juror #9 had "cop[ied] passages from his juror notebook onto his note pad" and had "then removed three pages from his note pad and placed them in his eyeglass case." *Id.* The court also credited Juror #12's testimony that Juror #9 had acted in a "secretive, covert manner, attempting to avoid being seen by other jurors." *Id.* The court observed that it did "not believe" and did "not credit the testimony of Juror #9 regarding this incident." *Id.* at 1088. And the court stated that Juror #9's actions were "a violation of the court's instructions to the jurors that they must not remove anything from the jury room." *Id.* at 1087.

The court noted that safety considerations also informed its finding of good cause to excuse Juror #9 based on his removal of notes from the jury room. "Needless to say," the court explained, "the safety and security of the jurors are matters that are of the utmost importance in this case," especially given the unique "security procedures that are in place in this trial and the nature of the charges." *Id.* at 1088. The court recounted Juror #10's statement that "this incident

'disturb[ed]' him" and his resulting request that Juror #9 be replaced with an alternate so that he would "feel safer." *Id.*

The court concluded "that Juror #9's misconduct of removing notes from the jury room constitutes an alternative and independent basis to remove him for good cause." *Id.* The court explained that "[t]his misconduct, standing alone, would have required his removal from the jury panel, even absent the evidence of his refusal to deliberate." *Id.*

On April 26, the reconstituted jury returned guilty verdicts on all counts for four of the defendants—Oliver, Simmons, James Alfred, and Ronald Alfred. On May 4 and 10, the jury returned its verdicts for the remaining two defendants, McGill and Seegers, finding McGill guilty on all counts and Seegers guilty on six counts.

**B.**

Federal Rule of Criminal Procedure 23(b) provides that, "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." Fed. R. Crim. P. 23(b)(3). Here, instead of proceeding with eleven jurors, the district court replaced Juror #9 with an alternate and instructed the reconstituted jury to begin its deliberations anew. *See* Fed. R. Crim. P. 24(c)(3) & advisory committee's note to 1999 amendment. Appellants challenge the dismissal of Juror #9 as a violation of their Sixth-Amendment rights (but do not separately challenge the decision to replace him with an alternate rather than proceed with eleven jurors).

A variety of issues that may arise in the course of jury deliberations can constitute "good cause" to excuse a juror under Rule 23(b), including illness, family emergency, or, as

here, jury misconduct. *See United States v. Vartanian*, 476 F.3d 1095, 1098 (9th Cir. 2007). "Jury misconduct" consists of "action by jurors that is contrary to their responsibilities." 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.9(f) (4th ed. 2004). "Much of the jury behavior considered to be misconduct is prohibited specifically in preliminary instructions," such as removing materials, discussing the merits of the case with a coworker or family member, giving false testimony during voir dire, or refusing to deliberate. *Id.*

"[A] district court, based on its unique perspective at the scene, is in a far superior position than [a court of appeals] to appropriately consider allegations of juror misconduct." *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006); *see United States v. Sobamowo*, 892 F.2d 90, 95 (D.C. Cir. 1989). As a result, we review a district court's decision to excuse a juror only for an abuse of discretion. *United States v. Ginyard*, 444 F.3d 648, 651 (D.C. Cir. 2006).

In certain circumstances, the Sixth Amendment constrains the district court's discretion to remove a juror under Rule 23(b). In *United States v. Brown*, we held that "a court may not dismiss a juror during deliberations if the [juror's] request for [his or her own] discharge stems from doubts the juror harbors about the sufficiency of the government's evidence." 823 F.2d at 596. Dismissal of a juror on grounds of her unwillingness to convict based on the evidence, we reasoned, would plainly violate a defendant's Sixth-Amendment right to be convicted only by a unanimous jury. *Id.* But we noted "the problem" that the precise reason for a juror's request to be dismissed—or, equivalently, for one juror's suggestion that another juror be dismissed, *see United States v. Symington*, 195 F.3d 1808, 1086 (9th Cir. 1999)— "will often be unclear." *Brown*, 823 F.2d at 596. The high premium our system puts on the secrecy of jury deliberations

precludes a trial court from "delv[ing] deeply into a juror's motivations." *Id.*; *see Symington*, 195 F.3d at 1086. A court thus may "prove unable to establish conclusively the reasons underlying" a juror's request to be dismissed. *Brown*, 823 F.2d at 596.

The *Brown* court adopted an approach erring on the side of Sixth-Amendment caution. "[I]f the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence," we stated, "the [trial] court must deny the request." *Id.* Applying that approach to the facts before us, we found that the record revealed a "substantial possibility" that the juror in question had "requested to be discharged because he believed that the evidence offered at trial was inadequate to support a conviction." *Id.* In light of that possibility, we concluded that the juror should not have been dismissed, and we reversed the convictions. And although *Brown* dealt specifically with a juror's own request to be discharged, our court and other courts applying *Brown*'s approach (or a variant thereof) have adhered to the same analysis when a juror's removal stems from another juror's allegations or from circumstances that otherwise come to the court's attention. *See United States v. Carson*, 455 F.3d 336, 352 (D.C. Cir. 2006) (per curiam); *Symington*, 195 F.3d at 1085-87; *United States v. Kemp*, 500 F.3d 257, 304-05 (3d Cir. 2007); *United States v. Abbell*, 271 F.3d 1286, 1302 (11th Cir. 2001); *United States v. Thomas*, 116 F.3d 606, 622 (2d Cir. 1997).

Appellants contend that *Brown* controls this case and mandates a new trial. They argue that, by the time of the jury's April 14 notes to the district court—and certainly after the court completed its individual voir dires of Jurors #12, #10, and #9—the record revealed a likelihood that Juror #9 was a holdout for the defense. They further submit that there

was a possibility that the other jurors' allegations about Juror #9's refusal to deliberate stemmed from Juror #9's substantive view of the government's case—that is, when the other jurors accused Juror #9 of nonparticipation in deliberations, they in fact were condemning him for his inclination to acquit based on the evidence. In those circumstances, appellants conclude, *Brown* obligated the district court either to keep Juror #9 or to declare a mistrial.

The government, on the other hand, argues that Juror #9 could be dismissed notwithstanding *Brown* because, rather than form a conclusion about the sufficiency of the government's evidence, he refused to deliberate altogether. An outright refusal to deliberate, the government submits, constitutes a valid basis for dismissal notwithstanding *Brown*. In the alternative, the government contends that the dismissal of Juror #9 can be sustained based on what the district court explained was an "alternative and independent basis" for the juror's discharge, J.A. 1088—*viz.*, that Juror #9 had removed case-related notes from the jury room in violation of the court's instructions.

We agree with the latter argument and rest our decision exclusively on that ground. We therefore have no occasion to assess whether, had the district court based its good-cause dismissal solely on Juror #9's refusal to deliberate, its decision would have run afoul of our decision in *Brown*.

In resting our decision on the district court's "alternative and independent" finding that Juror #9's removal of case-related notes from the jury room constituted misconduct justifying his dismissal, we take guidance from our decision in *United States v. Ginyard*, 444 F.3d 648. *Ginyard* clarified that *Brown* does not stand in the way of dismissing a known

holdout juror for reasons independent of his views about the evidence. *Id.* at 652.

The jurors in *Ginyard* told the trial court that their deliberations had been "heated" and that they were "deadlocked." *Id.* at 650 & n.1. One note asked the court how they should handle "*a juror* who has stated that they do not believe the testimony of several witnesses and does not offer reasons based on evidence." *Id.* The next day, Juror 429 asked to be relieved from service to pursue a job opportunity through his rehabilitation program that might soon elapse. *Id.* After briefly questioning Juror 429 about the employment issue, the court announced that it would dismiss Juror 429 for good cause—i.e., to assure preservation of his job opportunity. *Id.* at 651. But before the court implemented the dismissal, it received information revealing that Juror 429 was likely the holdout referenced in the earlier communications and might have doubts about the government's evidentiary case. *Id.* at 651-52. The court proceeded to dismiss him anyway, and the remaining jurors found the defendants guilty. *Id.*

On appeal, the government conceded that Juror 429's dismissal was in error under *Brown* because the court discharged the juror despite learning that he may have been a holdout for the defense. Notwithstanding the government's concession, we found that *Brown* "does not control." *Id.* at 652. We acknowledged that, by the time of Juror 429's dismissal, the record revealed a "'possibility that' Juror 429 believed that 'the government had failed to present sufficient evidence to support a conviction.'" *Id.* (quoting *Brown*, 823 F.3d at 597) (brackets omitted). We explained, however, that the Sixth-Amendment interests safeguarded by *Brown* do not *always* preclude a district court from exercising its discretion to dismiss a known holdout juror for good cause. "Were a

holdout juror to request dismissal because he was experiencing a heart attack," for instance, "*Brown* would not prevent a district court from excusing that juror under Rule 23(b) for good cause, even if the record suggested that the juror independently had doubts about the sufficiency of the evidence." *Id.*

Instead, *Brown* bars a juror's dismissal "only [in] those situations where the 'request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence.'" *Id.* (quoting *Brown*, 823 F.2d at 596). We found "no evidence that Juror 429 sought dismissal, or was dismissed, because of his doubts about the government's evidence." *Id.* Rather, "the record indicate[d] that his request stemmed entirely from an employment-related need." *Id.* We nonetheless ultimately vacated the convictions because we concluded that the district court had conducted an inadequate inquiry into whether Juror 429's employment needs in fact rendered him unable to continue. *Id.* at 653-55. But what is critical for present purposes is our explanation that "*Brown* is not implicated" unless "there is some causal link between a juror's holdout status and the juror's dismissal." *Id.* at 652.

*Ginyard* thus establishes that, even if a trial court knows a juror may harbor doubts about the government's evidentiary case, the Sixth Amendment does not always insulate the juror from removal. *See id.*; *accord United States v. Edwards*, 303 F.3d 606, 634 (5th Cir. 2002). Rather, if the court forms an independent, good-cause justification for removing the juror that bears no "causal link" to the juror's "holdout status," the court may excuse the juror even if the juror "independently had doubts about the sufficiency of the evidence." *Ginyard*, 444 F.3d at 652. That understanding applies here.

Initially, the district court based Juror #9's dismissal solely on his refusal to deliberate. Regardless of whether that ground would have involved the sort of "causal link between [the] juror's holdout status and the juror's dismissal" that would implicate *Brown*, *id.*, the court later found that Juror #9's misconduct in taking notes from the jury room "constitute[d] an alternative and independent basis to remove him for good cause." J.A. 1088. Because that distinct ground bore no "causal link" to Juror #9's "holdout status," the court could dismiss the juror on that basis even if he "independently had doubts about the sufficiency of the evidence." *Ginyard*, 444 F.3d at 652. As we explained in another juror-dismissal case, "[t]he judge plainly stated his reasons for the dismissal"—Juror #9's secreting notes out of the jury room in violation of the court's instructions—and those reasons "had nothing to do with the juror's view of the case." *Carson*, 455 F.3d at 352.

That kind of misconduct—unlike a juror's refusal to deliberate or a juror's intent to nullify—poses no inherent potential for confusion with a juror's evidence-based inclination to acquit. Like the juror's job-related availability at issue in *Ginyard*, 444 F.3d at 562, or the juror's mental condition and possible deception at issue in *Carson*, *see* 455 F.3d at 350-52, the dismissal of Juror #9 for clandestinely taking case-related notes out of the jury room bears no connection to any ideas he might have formed about the strength of the government's case. That misconduct instead "was a violation of the court's instructions to the jurors," and, the court noted, also raised safety concerns in the minds of the other jurors who knew about it. J.A. 1087-88. The court thus concluded that "[t]his misconduct" independently justified Juror #9's "removal from the jury panel," regardless of Juror #9's refusal to deliberate with other jurors. *Id.* at 1088.

Of course, if an ostensibly independent basis for a juror's dismissal in fact amounts to a pretext, and the actual ground for dismissal involves the juror's views about the adequacy of the government's evidence, our decision in *Brown* would be directly implicated. *See Carson*, 455 F.3d at 352 (considering defendants' argument that the district court's good-cause finding was pretextual). Here, appellants suggest such a pretext by seeking to cast doubt on the district court's reliance on Juror #9's removal of notes from the jury room as a "*post hoc* rationalization." Appellants' Br. 102. We are unpersuaded.

It is true that, when the court initially announced its decision to dismiss Juror #9 in an oral ruling from the bench, the court declined to rely on the note-removal ground, instead relying solely on Juror #9's refusal to deliberate. But even at that time, the court indicated its inclination to "agree" with the government that Juror #9's taking of notes provided an "independent" ground for "remov[ing] him from these deliberations." J.A. 5625. The court observed that, if its factual findings supporting that ground for dismissal could be made by a "preponderance of the evidence," it "would agree" that Juror "Number 12, over Number 9," has the correct "version of the facts" and that Juror #9's misconduct would justify his dismissal. *Id.* But the court was "not clear" at that time whether it would need to choose Juror #12's version of the incident over that of Juror #9 under a more stringent, "beyond a reasonable doubt" standard, in which event the court could not definitively resolve the factual dispute in favor of Juror #12's account. *Id.* By the time of the court's written ruling several days later, however, the court concluded that preponderance-based findings would be adequate, enabling it to make "additional findings" that "credit[ed] the testimony of Juror #12," and ultimately to determine that "Juror #9's misconduct of removing notes from the jury room

constitute[d] an alternative and independent basis to remove him for good cause." *Id.* at 1087-88.

We see no basis for questioning the court's determination in that regard—or its good faith in reaching that conclusion—based merely on the sequence of events. The court was plainly concerned about Juror #9's alleged removal of notes from the outset—as soon as it first heard about the incident from the marshal and from the jury's second April 14 note describing what Juror #9 had done. The allegations about Juror #9's removal of notes, not his alleged nonparticipation in deliberations, provided the impetus for the court's decision to conduct voir dires of the jurors aware of the incident. As in *Ginyard*, "there is no evidence that Juror [#9] . . . was dismissed" on this independent ground "because of his doubts about the government's evidence." *Ginyard*, 444 F.3d at 652. "On the contrary, the record indicates that" this basis for Juror #9's dismissal "stemmed entirely" from his removal of case-related notes from the jury room. *Id.* The district court accordingly found that "[t]his misconduct, *standing alone*," justified "his removal from the jury panel, even absent the evidence of his refusal to deliberate." J.A. 1088 (emphasis added). That was because "[t]his misconduct"—entirely independent of his refusal to deliberate with the other jurors—amounted to "a violation of the court's instructions to the jurors" and also raised safety concerns in the minds of those jurors who knew about it. *Id.* at 1087-88.

Nor do we think the district court erred in reaching its factual conclusions underlying that ground for dismissal—in particular, in crediting Juror #12's account of the note-removal incident instead of Juror #9's own version—under a preponderance standard. Because our decisions have established no explicit standard-of-proof threshold for factual findings undergirding a court's dismissal of a juror for

misconduct, the district court's initial uncertainty is understandable. But the court was correct in ultimately concluding that it could find that Juror #9 had committed the misconduct of removing notes from the jury room under a preponderance standard rather than some more stringent standard. When a juror's alleged misconduct justifying her dismissal is unconnected to her possible "doubts about the government's evidence," *Ginyard*, 444 F.3d at 652—the only situation we have occasion to consider here—there is no cause for requiring the court to conclude that the misconduct occurred by any heightened evidentiary threshold beyond the usual preponderance standard. *See, e.g.*, *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

To be sure, even in cases involving a potential ground for a juror's dismissal that is fully independent of her known status as a possible holdout for the defense, the court must still conduct an adequate inquiry before finding the existence of the independent basis warranting her discharge. As we explained in *Ginyard*, while "[o]ur holding in *Brown* may not control the outcome" when there is no connection between the ground for dismissal and a juror's "view of the evidence, the district court, upon having reason to believe the juror is a holdout, has an enhanced duty to determine the precise circumstances of the juror's availability lest the action of the court interfere with a defendant's Sixth Amendment right to a unanimous verdict." 444 F.3d at 654 (internal citation omitted). And in *Ginyard*, we ultimately reversed the convictions because the district court had "never determined" the "precise circumstances" of the juror's potential inability to serve due to employment-related reasons—i.e., whether the juror in fact would relinquish an employment opportunity if he continued his service. *Id.* We noted that the juror himself "had indicated that he might be able to serve several additional days without losing the job opportunity." *Id.* "Yet

the district court made no attempt to ascertain whether or not this was true." *Id.* The court, we concluded, should have inquired into the matter further. *Id.* at 654-55.

Here, by contrast, the district court did not "rely on an unexamined state of uncertainty to draw the inference" that Juror #9 had committed disqualifying misconduct by removing case-related notes from the jury room. *Id.* Rather, the court conducted a fully adequate factual inquiry. Upon receiving Juror #10's (the foreman's) written account of what had transpired, the district court questioned every juror with information about the incident. Juror #10 testified that he had no reason to believe any other juror saw what Juror #9 was doing, and nothing said by the other two jurors—Jurors #9 and #12—called that assertion into doubt. Under those circumstances, the court reasonably decided against asking additional jurors about the episode. Any such inquiry ran the risk of fueling rumors or further unsettling or distracting the jury. Based on the court's voir dire of the three jurors, it found that Juror #9 copied "passages from his juror notebook onto his note pad" and then removed those notes in a "secretive, covert manner, attempting to avoid being seen," in "violation of the court's instructions to the jurors that they must not remove anything from the jury room." J.A. 1087.

The court's findings to that effect, by necessity, were based on its credibility determinations about the voir dire testimony of the three jurors. And we have emphasized that "[t]he district court, having observed the demeanor of [a] juror [during voir dire questioning], is in the best position to determine the credibility of" the juror's statements. *United States v. Gartmon*, 146 F.3d 1015, 1029 (D.C. Cir. 1998). For that reason, we are highly reluctant "to second guess the conclusion of [an] experienced trial judge," when, as here, that conclusion was "based in large measure upon personal

observations that cannot be captured on a paper record." *United States v. Ruggiero*, 928 F.2d 1289, 1300 (2d Cir. 1991).

That is particularly so when nothing in that paper record calls the court's credibility assessments into question. The district court was under no obligation to accept Juror #9's account that he merely wrote down "[a] grocery list" containing only the words "[m]ilk, eggs, bread" and "fruit." J.A. 5598-99. Juror #12 described Juror #9 as repeatedly copying down information for some period of time from his jury notebook and then removing three pieces of paper from his notepad while attempting to avoid detection, all of which would be inconsistent with merely jotting down a short, innocuous grocery list. That testimony directly conflicted with Juror #9's statements that he wrote down just four words, removed but one piece of paper, and made no attempt to conceal what he was doing. Keeping in mind that the district judge was in a position to observe the jurors' demeanor, we cannot say that the judge was wrong to "credit[] the testimony of Juror #12 regarding his observations of the conduct of Juror #9," and to "not credit the testimony of Juror #9 regarding this incident." *Id.* at 1087-88.

Perhaps recognizing the difficulty of questioning the district court's credibility determinations, appellants argue that, even if Juror #9 had furtively removed case-related notes from the jury room, that conduct should not have led to his dismissal. Appellants initially contend that the district court (as opposed to the marshals) never instructed the jurors that their notes must remain in the jury room. Assuming that a distinction between an instruction from the district court and one from the marshals should matter, it is true that the court, in an exchange with counsel immediately preceding its voir dire of the jurors, stated that the marshals were the ones to

instruct the jury that they could not remove materials from the jury room. But regardless of the court's recollection at that moment, the court in fact had told the jury at the outset of trial that, "[a]t the end of each day, you will take [any notes] with you to the jury room and seal them" and that those items would be kept in the locked jury room overnight. *Id.* at 1824-25. The instructions also explained that "[n]o one . . . will ever look at any of your notes" and that the materials would "be destroyed" following the jury's delivery of the verdict, *id.* at 1825—making all the more clear that the prohibition's aim was to preserve the notes' secrecy. Indeed, two other jurors shared their (unprompted) understanding that Juror #9's removal of case-related notes violated the judge's instructions.

We are also unpersuaded by appellants' contention that the prohibition itself was misguided because a juror's removal of notes from the jury room is no different than her retention of her own memories of the evidence. A trial court can readily conclude that a juror's removal of written material from the jury room carries a greater risk that the material could be inadvertently seen by—or intentionally shared with—someone else. Even assuming Juror #9 did nothing more than copy passages out of his juror notebook verbatim, "[a]llowing the jury to take home the indictment or the jury instructions 'leaves the deliberative process needlessly vulnerable to a variety of potential problems' by 'increasing the chances that individual jurors may want to discuss these matters with family members or friends' and by 'making it easier for jurors to research legal issues on their own.'" *United States v. Esso*, 684 F.3d 347, 354 (2d Cir. 2012) (quoting *State v. Morgan*, 33 A.3d 527, 539 (N.J. Super. Ct. App. Div. 2011)). Moreover, appellants' effort to challenge the need for a bar against removing notes from the jury room disregards that Juror #9 not only violated the court's

instruction to that effect, but then compounded his misconduct by also giving false testimony about the incident under oath.

Appellants further argue that, even if Juror #9 committed misconduct, the court should have re-instructed the jurors not to remove their notes rather than dismiss the juror straightaway. We are unable to conclude that the court abused its discretion under Rule 23(b) by choosing the latter course. A trial court's zone of discretion under Rule 23(b) includes considerable leeway to determine the appropriate response to a finding of juror misconduct based on the court's firsthand assessment of the nature and degree of misconduct and the effect on the trial proceedings.

In that regard, the circumstances here are unlike those in *Ginyard*. There, we found fault in the district court's failure to conduct a further inquiry before discharging the juror, especially given that the juror himself suggested that he could continue to serve without losing his job opportunity. *See* 444 F.3d at 654-55. Whether he should be dismissed turned on a factual question warranting further examination—i.e., whether the juror's employment opportunity in fact would be relinquished if he were to continue to serve. Here, by contrast, whether Juror #9's misconduct should lead to his dismissal did not turn on any such factual question warranting further inquiry. Instead, it turned on the district court's contextual assessments about the gravity of the misconduct and the consequences of allowing him to continue to serve. We see no abuse of discretion in the court's determination that, by removing jury notes in violation of the court's instructions and then giving false testimony about the incident, Juror #9 committed misconduct warranting his dismissal. *See, e.g.*, *United States v. Vega*, 72 F.3d 507, 512 (7th Cir. 1995) (finding no abuse of discretion in a court's

dismissing a juror who disobeyed instructions, including by removing notes from the jury room); *United States v. Fryar*, 867 F.2d 850, 853 (5th Cir. 1989) (finding no abuse of discretion in a court's dismissing a juror who lied to the judge under oath).

Moreover, the court noted that its decision to discharge Juror #9 for good cause was additionally informed by the incident's implications for the jurors' sense of safety and security. As the court referenced in its written findings, the scale of the criminal enterprise and the nature of the charges against the defendants—including murder, attempts to intimidate potential witnesses through killings, and RICO conspiracy involving multiple acts of violence—caused the court to employ unusually stringent security measures to protect the jurors. The court had empaneled an anonymous jury, which entailed a conclusion that "there is a strong reason to believe the jury needs protection." *Moore*, 651 F.3d at 48 (quoting *United States v. Edmond*, 52 F.3d 1080, 1090 (D.C. Cir. 1995)). The jurors were seated behind a locked bulletproof wall during trial, and they were assembled and dropped off in private locations, escorted each way by the marshals. Even with those protections in place, some potential jurors expressed fear during jury selection about being picked for duty and worried that their anonymity could be compromised.

Those concerns came to the fore once Juror #9's misconduct came to light. Neither the district court nor the jurors knew exactly what Juror #9 had written down or what he had done with it. But Juror #12 observed that, whatever it was, Juror #9 had tried to hide it. And the district court credited the observation that Juror #9 had acted "in a secretive, covert manner, attempting to avoid" detection. J.A. 1087. As a result of Juror #9's behavior, Juror #10 felt

"disturbed" and expressed concerns for his and other jurors' anonymity and safety; he shared that he had lost sleep over the incident. *Id.* at 5585-86.

The court considered that testimony against the backdrop of prior incidents raising concerns about the security and independence of the jurors. Previously, the court had learned that the supervisor of one of the alternate jurors had been regularly attending the trial and maintaining contact with the alternate juror; the supervisor had grown up with one of the defendants, Ronald Alfred, knew him well, and was seen gesturing to Alfred during trial. The court dismissed that alternate juror. There was also a likely instance of witness intimidation (discussed in greater detail below) involving a defense witness's receipt of a folder containing a photo of his murdered son shortly before the witness was to take the stand at trial. In that context, the district court understandably noted that "the safety and security of the jurors are matters that are of the utmost importance in this case" when it ruled that Juror #9's removal of notes from the jury room warranted his dismissal. J.A. 1088.

In the end, subject to constitutional limitations, a "trial court has a great deal of discretion in deciding to excuse a juror for cause," and "[a]n appellate court ordinarily will not second-guess such a determination." *United States v. Essex*, 734 F.2d 832, 845 (D.C. Cir. 1984). We find that the district court's alternative rationale for Juror #9's dismissal based on his removal of jury notes amounted to a good-cause ground for his discharge. We thus perceive no abuse of discretion in the court's dismissal of Juror #9 under Rule 23(b).

## II. Government Overview Testimony

In reviewing the trial of the Group One defendants in *Moore*, we condemned the government's use of an FBI agent

as an "overview witness." *See* 651 F.3d at 54-61. In appellants' trial—which took place before we released our decision in *Moore*—the government used that same FBI agent in substantially the same manner. We reiterate *Moore*'s disapproval of such an overview witness and its conclusion that overview testimony might be, in certain circumstances, sufficiently prejudicial to warrant reversal of a defendant's convictions. Those circumstances are absent here, however. Appellants forfeited their objections to the overview witness's testimony by failing to raise them at trial, leaving us to review only for plain error. As in *Moore*, we discern no reversible error under that forgiving standard of review.

## A.

As in the Group One trial reviewed in *Moore*, the government began its case-in-chief in the Group Two trial with the testimony of FBI Agent Daniel Sparks, the lead agent investigating the narcotics conspiracy at issue in both cases. Agent Sparks testified as an overview witness, presenting background information in support of the government's case.

Sparks highlighted the crucial role that cooperating witnesses can perform in unraveling a conspiracy. Narcotics conspiracies, Sparks explained, are in large part "based on everybody keeping quiet." J.A. 1862. "[O]nce you penetrate that conspiracy" with cooperating witnesses, Sparks stated, "you get an inside[r] that can tell you what's going on." *Id.* At that point, a conspiracy is "like a house of cards[.] [I]t begins to crumble." *Id.* Sparks also testified that, due to their value to the prosecution, cooperating witnesses may be threatened by their coconspirators and often require witness protection.

A basic "ground rule[]" for cooperating witness testimony, Sparks explained, is that the cooperator must

provide "[t]ruthful information." *Id.* at 1866-67. Though cooperators are assured that any information provided will not be used against them—a rule designed to make them "feel comfortable to provide the information"—Sparks noted that law enforcement still works to vet any cooperating witness for truthfulness. *Id.* at 1865, 1867. Officers do not "take [information] at face value," Sparks explained; rather, they work to "corroborate or verify" that information by cross-referencing it with police reports, historical homicide files, and testimony from other witnesses. *Id.* at 1867-68. He then further described how cooperators may earn leniency in exchange for their cooperation, including via "5(K)" letters (requests for sentencing departures under U.S.S.G. § 5K). The sentencing judge would be the one to evaluate "the full extent" of a witness's cooperation, Sparks observed. *See id.* at 1874-76.

At the close of his testimony, Sparks presented two exhibits designed to tie the facts of the case together for the jury. He first showed the jury an exhibit with pictures of twenty-two individuals under indictment for the alleged conspiracy and identified which individuals (i) were on trial in the instant proceeding; (ii) were on trial in separate proceedings; and (iii) had pleaded guilty and would serve as cooperating witnesses in the current trial. Finally, Sparks introduced a map of the District of Columbia showing the site of each murder and attempted murder allegedly connected to the conspiracy.

**B.**

In *Moore*, the government used Agent Sparks in essentially the same fashion. Sparks "testified as the first witness in the government's case-in-chief," and "[h]is testimony provided an overview of the government's case,

setting forth for the jury the script of the testimony and evidence the jury could expect the government to present in its case-in-chief." *Moore*, 651 F.3d at 54-55. "Further, [Sparks] expressed his opinion, based on his training and experience, about the nature of the investigation conducted in th[e] case." *Id.* at 55.

Of particular relevance, Agent Sparks testified in the trial of the Group One defendants "that it was important, in his view, to use cooperating witnesses in this case because it was 'the only way' to gain 'access to the inside information.'" *Id.* at 59. While acknowledging that cooperating witnesses are "criminals," he also testified that those witnesses "know what's going on," and that their testimony is "the only way to put these kinds of cases together." *Id.* (brackets omitted). Sparks further noted that cooperating witnesses were debriefed "to 'get complete and truthful information,'" and that the FBI worked "to 'try and verify' the information 'just to make sure the person is truthful.'" *Id.* (brackets omitted).

At trial and on appeal, the *Moore* defendants objected to Sparks's testimony. They argued that his overview testimony "improperly permitted the government . . . to elicit FBI Agent Sparks's opinions about the charged crimes, the reasons for appellants' actions in various circumstances, the nature of the charged conspiracy and the relationships between co-conspirators, including the cooperating co-conspirators who testified as government witnesses, and the strength of the evidence—all before the government had presented such evidence." *Id.* at 55.

We agreed. Sparks's testimony, we found, "crossed the line in a number of instances." *Id.* at 59. While he "could properly describe, based on his personal knowledge, how the gang investigation in this case was initiated, what law

enforcement entities were involved, and what investigative techniques were used," what "he could not do was present lay opinion testimony about investigative techniques in general," "opine on what generally works and what does not," "anticipate evidence that the government would hope to introduce at trial," or "express an opinion, directly or indirectly, about the strength of that evidence or the credibility of any of the government's potential witnesses, including the cooperating co-conspirators." *Id.* at 61. We noted that the "clear implication" of Sparks's testimony "was that the government had selected only truthful co-conspirator witnesses for the pre-indictment investigation, from whom the jury would hear during the trial." *Id.* at 59-60.

We found that result to be highly problematic, and we therefore joined the other courts of appeals "that have addressed the issue in condemning" the government's use of overview witness testimony. *Id.* at 60. We noted that there were several "obvious" problems posed by the government's use of an overview witness. *Id.* at 56. "First, the jury might treat the summary evidence" from the overview witness "as additional or corroborative evidence that unfairly strengthens the government's case." *Id.* Second, the overview witness might serve as a conduit for the introduction of "otherwise inadmissible evidence." *Id.* And third, an overview witness "might permit the government to have an extra [opening] argument." *Id.* We also determined that the "[a]voidance of those dangers is largely beyond the ability of the district court, much less the defense." *Id.* at 60.

Ultimately, however, we found no reversible error. We concluded that "the prejudice resulting from the admission of FBI Agent Sparks's overview testimony, to the extent it was inappropriate, was ameliorated." *Id.* at 61. We noted several mitigating factors, including that "[e]ach instance of FBI

Agent Sparks's improper testimony identified by appellants was later confirmed by admissible evidence at trial"; that the district court employed limiting instructions; and that the trial produced "overwhelming evidence of appellants' guilt." *Id.* Accordingly, we concluded that "the error did not 'affect the outcome of the district court proceeding,' and hence appellants are not entitled to reversal of their convictions because of improper overview testimony by FBI Agent Sparks." *Id.* (quoting *United States v. Sumlin*, 271 F.3d 274, 281 (D.C. Cir. 2001)) (internal citation and brackets omitted). In a subsequent decision, we again noted the problems associated with overview testimony (again by Agent Sparks), but we concluded that the admission of the testimony was harmless error due to the lack of prejudice. *United States v. Bostick*, 791 F.3d 127, 145-47 (D.C. Cir. 2015).

## C.

Both parties agree that *Moore* establishes the appropriate framework for our review today. Given that appellants raise on appeal substantially the same objections made at trial in *Moore*, to what was substantially the same testimony by the same witness, we agree. In *Moore*, we recognized that challenges to overview witness testimony could be framed as objections to the introduction of otherwise-inadmissible evidence or as assertions of prosecutorial misconduct. *See* 651 F.3d at 55. We assume that appellants make both claims, though—as in *Moore*—our conclusions are unaffected by any distinctions between the two. *Id.*

Our standard of review depends on whether appellants properly preserved any objections to Sparks's overview testimony. Failure to raise an objection at trial results in the forfeiture of the objection, yielding review only under the more forgiving "plain error" standard. *United States v.*

*Wilson*, 605 F.3d 985, 1022 (D.C. Cir. 2010). Appellants argue that they preserved their challenge to Sparks's overview testimony by lodging a number of objections during the course of Sparks's testimony. But the objections identified by appellants were not objections to Sparks's testimony *qua* overview witness. They instead were objections to various discrete pieces of Sparks's testimony—for instance, an objection to Sparks's testimony about his military background. Accordingly, appellants' objections at trial "gave 'no indication to the judge that the defense was claiming that the entire line of questioning was improper.'" *United States v. Ramirez-Fuentes*, 703 F.3d 1038, 1042 (7th Cir. 2013) (quoting *United States v. McMahan*, 495 F.3d 410, 418 (7th Cir. 2007)) (brackets omitted). Our review thus is for plain error only.

The first two elements of the plain-error standard are met—i.e., that a "legal error" exists and that the error is "clear." *United States v. Brown*, 508 F.3d 1066, 1071 (D.C. Cir. 2007) (quoting *United States v. Sullivan*, 451 F.3d 884, 892 (D.C. Cir. 2006)). The key hallmarks of Sparks's testimony—in particular, his opining on the truthfulness of cooperating witnesses as a whole—mirrored the testimony we condemned in *Moore*. But plain-error inquiry does not end there. To satisfy the third prong of the plain-error standard—i.e., that appellants' "substantial rights" were violated—"the Supreme Court has indicated that 'in most cases'" appellants must show that the error "affected the outcome of the district court proceedings." *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). That inquiry hinges on "the centrality of the issue affected, the severity of the [error], the steps taken to mitigate the [error], and the closeness of the case." *Id.* (quoting *United States v. Venable*, 269 F.3d 1086, 1091 (D.C. Cir. 2001)). In *Moore*, we likewise asked whether the errors from Sparks's testimony affected the outcome of the Group

One defendants' trial. 651 F.3d at 61. We concluded that it did not. We ask the same question today, and we reach the same conclusion.

Initially, we note that several of appellants' challenges to purportedly inadmissible evidence introduced via Sparks's testimony were not, in fact, part of Sparks's overview testimony. They instead came later in the trial, when Sparks testified about the execution of a specific search warrant. For example, appellants note that, "while explaining items seized during a search of R. Alfred's apartment, [Sparks] testified, over objection, that he seized what he thought to be crack cocaine. . . . [T]he substance was never confirmed by the DEA to be narcotics." Appellants' Br. 112 (citing J.A. 4029-31). But in *Moore*, we of course did not condemn the government's use of *any* testimony by FBI agents; rather, we cast doubt on the permissibility of such testimony only when presented as *overview* testimony raising the concerns we highlighted in our discussion. *See* 651 F.3d at 60. Sparks's testimony about the seizure of crack cocaine, given later in the trial and in connection with a specific search, was plainly not part of his overview testimony.

Second, as in *Moore*, to the extent that appellants identify problematic parts of the actual overview testimony, admissible evidence later confirmed many of those portions of Sparks's testimony. For example, appellants take issue with his assertion that law enforcement worked to "corroborate or verify" any information from cooperating witnesses. J.A. 1867. Appellants argue that Sparks's assertion amounted to impermissible vouching for the government's witnesses. We too recognize the problem: those statements might well suggest that a "highly trained FBI agent had determined that the cooperating co-conspirators who would testify at trial were to be treated as credible witnesses." *Moore*, 561 F.3d at

59. But the cooperating witnesses also testified that they were required to tell the truth in their FBI debriefings and detailed the government's efforts to verify their testimony. For example, cooperating witness Omar Wazir agreed that law enforcement agents told him they "would investigate the information that [he] provided . . . [t]o find out if it was factual or not," J.A. 2443-44, and further noted that "[t]hey did a good job investigating." *Id.* at 2419. Similar scenarios played out with many cooperating witnesses. Overview testimony can wrongly suggest to jurors that they should "place greater weight on evidence perceived to have the imprimatur of the government," *Moore*, 651 F.3d at 57 (quoting *United States v. Casas*, 356 F.3d 104, 120 (1st Cir. 2004)), but the testimony to the same end by the witnesses themselves mitigated much of that potential prejudice here.

Finally, as in *Moore*, the jury was presented with overwhelming evidence of appellants' guilt, some of which we outline below in assessing appellants' challenges to the sufficiency of the evidence supporting their convictions. *See* Parts XV, XX, XXII-XXV, XXVIII, XXX, *infra*. While appellants argue that "the government's case, built as it was upon cooperating witnesses, could hardly be called 'overwhelming,'" Appellants' Br. 114, we must disagree. In *Moore* as well, the government's case was built on an "almost exclusive reliance on co-conspirator cooperators' testimony." 651 F.3d at 60. And in that case, we could not conclude that any error associated with Sparks's overview testimony "affect[ed] the outcome of the district court proceeding." *Id.* at 61 (quoting *Sumlin*, 271 F.3d at 281). We reach the same result today.

Under plain-error review, we find that "appellants are not entitled to reversal of their convictions because of improper overview testimony by FBI Agent Sparks." *Id*. While an

overview witness might well trigger reversal in a future case presenting circumstances less favorable to the government, it does not do so here.

### III.  The Admission of "Other Crimes" Evidence

Convictions are supposed to rest on evidence relevant to the crime charged, not on evidence of other, unrelated bad acts suggesting nothing more than a tendency or propensity to engage in criminality.  All six appellants in this case argue that the prosecution crossed that line by introducing extensive evidence of prior criminal activity, which is generally barred by Federal Rule of Evidence 404(b).  The bulk of the evidence to which appellants object, however, was admissible because it documented activities intrinsic to the charged conspiracy or proved "motive, opportunity, intent, preparation, plan, knowledge, [or] identity[.]"  Fed. R. Evid. 404(b)(2).  But appellants are correct that some evidence of prior criminal conduct was wrongly admitted.  Those admissions, while erroneous, were harmless given the overwhelming weight of admissible evidence against appellants.[1]

### A.

Rule 404(b) generally bars the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid.

---

[1] While Rule 404(b) applies to all manner of prior bad acts and not just prior crimes, this case largely involves evidence of prior criminal activity, and for that reason the opinion frequently uses "other crimes" evidence as a shorthand reference to Rule 404(b)'s operation.

404(b)(1). That same evidence, however, may "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). That means that, in practice, Rule 404(b) "does not prohibit character evidence generally, only that which lacks any purpose but proving character." *United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000). A prosecutor seeking to use evidence of other criminal or bad acts for one of those permitted purposes must, upon request, provide the defendant with reasonable notice, usually pretrial, of the anticipated evidence. Fed. R. Evid. 404(b)(2).

A threshold question in determining the admissibility of evidence of other crimes and bad acts is whether the evidence, in actuality, relates to acts unconnected with those for which the defendant is charged, or instead is intertwined with the commission of charged crimes. Acts "extrinsic" to the crime charged are subject to Rule 404(b)'s limitations; acts "intrinsic" to the crime are not. *See Bowie*, 232 F.3d at 927; *see also United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010). In other words, Rule 404(b) only applies to truly "other" crimes and bad acts; it does not apply to "evidence . . . of an act that is part of the charged offense" or of "uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime." *Bowie*, 232 F.3d at 929.

In conspiracy prosecutions, the prosecution is "usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000) (quoting *United States v. Williams*, 205 F.3d 23,

33-34 (2d Cir. 2000)). In addition, "where the incident offered is a part of the conspiracy alleged[,] the evidence is admissible under Rule 404(b) because it is not an 'other' crime." *United States v. Hemphill*, 514 F.3d 1350, 1357 (D.C. Cir. 2008) (quoting *United States v. Mejia*, 448 F.3d 436, 447 (D.C. Cir. 2006)). We have also permitted the introduction of "other acts" evidence in conspiracy cases (i) to link a defendant to other defendants and drug transactions for which the conspiracy was responsible, *United States v. Gaviria*, 116 F.3d 1498, 1532 (D.C. Cir. 1997); (ii) to show the nature of a conspiracy and "the kind of organizational control" a defendant exercised, *Mahdi*, 598 F.3d at 891; and (iii) to show the defendants' intent to act in concert, *Mathis*, 216 F.3d at 26; *see also United States v. Straker*, 800 F.3d 570, 590 (D.C. Cir. 2015) (evidence of uncharged hostage takings was "relevant to . . . how those defendants started to work together as kidnappers").

However, in defining the contours of intrinsic evidence that is not subject to Rule 404(b), we have rejected the rule embraced by some of our sister circuits that evidence is intrinsic if it "complete[s] the story" of the charged crime. *Bowie*, 232 F.3d at 928 (citing *United States v. Hughes*, 213 F.3d 323, 329 (7th Cir. 2000); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)). That is because "all relevant prosecution evidence explains the crime or completes the story" to some extent, and the fact that "omitting some evidence would render a story slightly less complete cannot justify circumventing Rule 404(b) altogether." *Bowie*, 232 F.3d at 929. Instead, if the government wishes to introduce such "other crimes" evidence, we "see no reason to relieve the government and the district court from the obligation of selecting from the myriad of non-propensity purposes available to complete most any story." *Id.*

Beyond Rule 404(b)'s specific limitations on the admission of prior bad acts, Federal Rule of Evidence 403 permits a court to exclude otherwise-relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. As relevant here, this court has recognized that "[e]vidence of other crimes or acts having a legitimate nonpropensity purpose," and thus unaffected by Rule 404(b), may nevertheless "contain the seeds of a forbidden propensity inference." *Bowie*, 232 F.3d at 931. As a result, Rule 403's balancing of prejudice and probativeness may still bar the introduction of evidence, even if Rule 404(b) by itself would not. *Id.*; *see also Mathis*, 216 F.3d at 26.

We review the district court's admission of evidence under both Rule 403 and Rule 404(b) for an abuse of discretion. *See United States v. Johnson*, 519 F.3d 478, 483 (D.C. Cir. 2008) (Rule 404(b)); *United States v. Clarke*, 24 F.3d 257, 265 (D.C. Cir. 1994) (Rule 403). This court is "extremely wary of second-guessing the legitimate balancing of interests undertaken by the trial judge" in this context. *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (quoting *Henderson v. George Washington Univ.*, 449 F.3d 127, 133 (D.C. Cir. 2006)). An erroneous admission of "other crimes" evidence must be disregarded as harmless error unless it had a "substantial and injurious effect on the jury's verdict." *United States v. Clark*, 747 F.3d 890, 896 (D.C. Cir. 2014) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)) (ellipsis and brackets omitted).

**B.**

Prior to trial, each Appellant filed a motion under Rule 404(b)(2) seeking notice of any evidence of other crimes or prior bad acts that the government intended to introduce against them. In addition, the Alfreds filed motions *in limine* seeking to exclude evidence relating to the murder of Kairi Ball, a crime in which they had allegedly participated prior to joining the charged conspiracy. Ronald Alfred also moved to dismiss a portion of the indictment relating to a 1989 drug possession charge that preceded his entry into the conspiracy.[2]

The district court denied the motions. With respect to Alfred's preconspiracy possession charge, the court ruled that the preconspiracy timing was not dispositive, although the government would ultimately have to demonstrate the incident's relevance. J.A. 863-64. The court also ruled that evidence relating to the Kairi Ball murder was admissible because the government argued that the crime was an impetus for the Alfreds' entry into the conspiracy. *Id.* at 874-75. Other than that, the government represented that it did not intend to introduce any evidence under Rule 404(b), but rather would introduce only evidence directly relating (intrinsic) to the conspiracy itself. *Id.* at 873-74.

The government subsequently filed its own motion *in limine* seeking permission to introduce evidence of Seegers's preconspiracy conviction for possession of cocaine with intent to distribute. The district court granted the motion, concluding that the conviction helped show both that Seegers was "able and ready to enter into the charged conspiracy,"

---

[2] Additional objections to the treatment of this incident are addressed in Part III(C)(3), which addresses Ronald Alfred's individual challenges.

and that he was geographically linked to locations at which alleged crimes in the conspiracy were committed. *Id.* at 937. The conviction thus was admissible for a permissible Rule 404(b) purpose: to show Seegers's "intent, plan and knowledge as it related to the distribution of cocaine and other narcotics in a particular area of Washington, D.C." *Id.* at 939. In a separate order, the court denied Ronald Alfred's motion to exclude evidence relating to a 1994 firearms charge. *Id.* at 946.

Ronald Alfred, Oliver, and Seegers each filed posttrial motions for a new trial arguing that, contrary to its pretrial representation, the government had introduced extensive "other crimes" evidence barred by Rule 404(b). The district court denied the motions, concluding in each case that the evidence either was direct evidence of the conspiracy and appellants' entry into it, or was so inextricably intertwined with such direct evidence as to be "intrinsic" evidence of the charged offenses. *United States v. Simmons*, 431 F. Supp. 2d 38, 58, 63, 72 (D.D.C. 2006).

## C.

The government's representation that it did not intend to rely on any Rule 404(b) evidence and certain aspects of the district court's rulings both relied on an overly capacious understanding of what can be introduced as intrinsic evidence. Nevertheless, even when viewed through the proper analytical lens, the bulk of the evidence was properly admitted, and the evidence that was wrongly admitted was harmless.[3]

---

[3] We limit our review to those challenges actually identified by appellants on appeal, notwithstanding their efforts to claim that the objections presented are merely illustrative. Appellate judges are not bloodhounds who need only be put on the scent to go hunting

### *1. Direct Evidence of the Charged Crimes*

Much of the evidence to which appellants object did not trigger Rule 404(b) at all because it qualified as direct evidence of the crimes charged, including acts of violence committed or threatened by appellants during their participation in the conspiracy. As a general matter, "[w]hen [the] indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994). The conspiracy charged in this case had a broad scope that encompassed acts of violence for multiple purposes, such as enriching the conspiracy's members, enhancing their reputations, safeguarding them from apprehension by law enforcement or prosecution, protecting them from violence threatened by third parties, collecting debts, and enforcing internal discipline.

Admission of evidence bearing on such violence accordingly was admissible as direct evidence of the conspiracy, without Rule 404(b) coming into play. Properly admitted on that ground then was evidence that (i) James Alfred tried, with the aid of other conspiracy members, to shoot individuals who had been threatening him and his brother; (ii) McGill sought to enlist other conspiracy members to help him kill an individual to protect his reputation and to prevent interference with his drug dealing; (iii) Simmons attempted to have Oliver kill two individuals in retaliation for their involvement in the murder of Oliver's brother; and (iv) Oliver asked other conspiracy members to kill different individuals, in at least one instance to forestall retaliation.

---

for errors on their own. *See United States v. Laureys*, 653 F.3d 27, 32 (D.C. Cir. 2011) ("It is not our duty to sift the trial record for novel arguments a defendant could have made but did not.").

Simmons also objects to the introduction of evidence suggesting that he had attempted to have James Alfred killed because of an unpaid debt. While Simmons does not appear to have tried to enlist other conspiracy members in that attempt, it was not an abuse of discretion to admit the evidence because the use of violence to collect debts and enforce discipline was specifically alleged to be a goal of the conspiracy.

Also admissible as intrinsic to the conspiracy itself was evidence of violence committed during the course of the conspiracy and involving multiple individuals linked to the conspiracy. That included evidence showing that Oliver purportedly had "somebody in the . . . trunk of [a] car," J.A. 3268, had his gun jam when he attempted to shoot someone, and offered to commit acts of violence for Walter Fleming, a coconspirator turned government cooperator.[4]

Another goal of the charged conspiracy was the acquisition and distribution of cocaine, crack cocaine, heroin, and marijuana. Evidence relevant to such drug trafficking thus also fell outside Rule 404(b)'s operation. That includes evidence of preconspiracy drug dealing as long as it continued after appellants entered into the charged conspiracy, because such evidence became direct evidence of the drug dealing

---

[4] To the extent that appellants' objections turn on witnesses interpreting things that had been said to them or that they had overheard, a participant to a conversation may provide his or her own interpretation of that conversation if there is a nonspeculative basis for doing so. *See United States v. Murphy*, 768 F.2d 1518, 1535 (7th Cir. 1985); *cf. Wilson*, 605 F.3d at 1026 (lay witness testimony on terminology used in drug operations may be permissible where witness had firsthand experience with the drug-dealing group in question).

within the conspiracy. There was thus no Rule 404(b) bar to the admission of testimony suggesting that James Alfred supplied heroin to Omar Wazir, or that Simmons supplied crack cocaine to Bethlehem Ayele.

Finally, while the Alfreds, Simmons, and McGill object to evidence of their failure to pay taxes during the course of the conspiracy, "[i]t is well settled that in narcotics prosecutions, a defendant's possession and expenditure of large sums of money, as well as his or her failure to file tax returns, are relevant to establish that the defendant lacked a legitimate source of income and that, in all probability, the reason for the failure to report this income is due to the defendant's participation in illegal activities." *United States v. Briscoe*, 896 F.2d 1476, 1500 (7th Cir. 1990); *see also United States v. Chandler*, 326 F.3d 210, 215 (3d Cir. 2003) (same).

That rationale holds true here. Simmons, McGill, and Ronald Alfred all suggested that they were operating a business or otherwise supporting themselves through legitimate means. Their failure to pay taxes thus was relevant to show that they were in fact getting income from illicit activities like drug trafficking that they assuredly did not want to report to the IRS. With respect to James Alfred, he failed to object to the tax-filing evidence in district court, and the court's failure to *sua sponte* exclude that evidence of his lack of a licit income source while in the drug conspiracy was not plain error. *See United States v. Spriggs*, 102 F.3d 1245, 1257 (D.C. Cir. 1996) ("Because appellants did not make a timely objection to [admitting evidence], we review its admission for plain error.").

### 2.  *Evidence Admissible for a Nonpropensity Purpose*

Other evidence, while not direct evidence of the charged conspiracy, was nevertheless properly admitted for a nonpropensity purpose expressly permitted by Rule 404(b).

### a.  *Evidence of the Kairi Ball murder*

The government offered evidence that Ronald Alfred, with the help of his brother James Alfred, orchestrated the killing of Kairi Ball for robbing Ronald Alfred's store.  Kevin Gray, an associate of Ball's and a key participant in the charged conspiracy, then sought to retaliate against Ronald Alfred for his role in Ball's killing.  Evidence showed, however, that Gray and Ronald Alfred agreed to meet after the killing to sort out their differences, and out of that meeting came an agreement to deal drugs together.  The government argues that this evidence was admissible because "[t]he murder of Kairi Ball in 1995 was the catalyst for the Alfreds' membership" in the drug conspiracy with Gray.

The district court admitted the evidence of Kairi Ball's murder as "intrinsic to the conspiracy, rather than extrinsic 'other crimes' evidence under 404(b)."  That was error. Intrinsic evidence is limited to acts that are "part of the charged offense" itself or that are "performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime."  *Bowie*, 232 F.3d at 929.  The Kairi Ball murder was not itself part of the charged conspiracy, and the murder occurred before the charged conspiracy began, not contemporaneously with it.  To be sure, the murder may have some relevance to showing a conspiracy, but "it cannot be that all evidence tending to prove the crime is part of the crime."  *Id.*

That mislabeling of the basis for admission is of no moment because the underlying rationale is sound: evidence of the murder was relevant for the nonpropensity purpose of showing the Alfreds' motive for joining the conspiracy, which was to help heal the rift caused by the murder of Gray's friend. Establishing motive has long been recognized as a permissible purpose for the introduction of "other crimes" evidence. *See United States v. Edmonds*, 69 F.3d 1172, 1175-76 (D.C. Cir. 1995); *see also* Fed. R. Evid. 404(b)(2) ("proving motive" is a permissible nonpropensity purpose). The Kairi Ball murder was also relevant because it tied the Alfreds to the murder of Joseph Thomas, an act that occurred during the conspiracy and that was specifically charged in the indictment. Thomas was an associate of Ball who attempted to retaliate for his murder. The bad blood engendered by Ball's murder thus provided motive evidence for the Thomas murder as well.

To be sure, once appellants raised the objection, Federal Rule of Evidence 403 separately required the district court to balance the probativeness of the evidence of the Kairi Ball murder and the resulting Thomas feud against the risk of unfair prejudice to appellants. *See United States v. Lavelle*, 751 F.2d 1266, 1279 (D.C. Cir. 1985) (requiring a district court "to make an on-the-record determination" of whether the probative value of other-bad-acts evidence outweighs its prejudicial impact). The district court did not explicitly do so here. That failure, however, does not require reversal because "the factors upon which the probative value/prejudice evaluations were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling." *Id.* (internal quotation marks omitted). In particular, the direct causal relevance of the evidence of the Kairi Ball murder to the Alfreds' decision to join the conspiracy and to murder Thomas outweighed any unfair

prejudice that may have resulted from its introduction. That is especially true because the trial already included admissible evidence of the Alfreds' involvement in other acts of violence, thereby dissipating any prejudice associated specifically with this evidence.

### b.    *Impeachment evidence*

"[O]ther crimes" evidence may properly be introduced to impeach a witness. *See United States v. Brawner*, 32 F.3d 602, 604 (D.C. Cir. 1994). During the cross-examination of defense witness Larry Steele, the government introduced evidence that Steele previously attempted to shoot someone on Simmons's behalf. Simmons did not raise any Rule 404(b) challenge to that cross-examination. Since it is reasonable to think that a witness who conspired with a defendant to commit murder might be inclined to slant his testimony in that defendant's favor, the court did not commit plain error in allowing the government to expose that potential bias. *See United States v. Boone*, 279 F.3d 163, 175 (3d Cir. 2002) ("Evidence that Moore and Weston had been drug dealing partners was relevant to Moore's possible bias in favor of Weston.").[5]

### c.    *Preconspiracy drug dealing*

Much of the evidence of preconspiracy drug dealing by various appellants was properly admitted. Seegers's previous conviction for possession of crack cocaine with the intent to distribute was admissible to show that, at least for the crack cocaine found on his person when he was arrested during the conspiracy, he intended to distribute it. *See United States v.*

---

[5]  McGill's challenge to the use of "other acts" evidence to impeach him is addressed in Part X, *infra*.

*Douglas*, 482 F.3d 591, 597 (D.C. Cir. 2007).[6]   The past conviction was also relevant to rebut Seegers's claim that drugs found in an area where he was sleeping belonged to his brother.  *See id.*; *see also United States v. Latney*, 108 F.3d 1446, 1448 (D.C. Cir. 1997) ("Given Latney's involvement in the crack cocaine trade in May 1995, it was less likely that he was merely a bystander in the September 1994 transaction, as his counsel sought to persuade the jury.").   Given that evidentiary value, the district court's decision that the probative value of this evidence outweighed its prejudicial impact was not an abuse of discretion.  Because we affirm on that basis, we need not decide whether the district court's additional rationale for admitting this evidence—that it tied Seegers to a particular neighborhood—also represents a permissible nonpropensity purpose.

We note, though, that the district court also concluded that this evidence was admissible to show Seegers's "readiness and ability to join the conspiracy."  J.A. 1341.  That, however, is just forbidden propensity evidence by another name.  *See United States v. Daniels*, 770 F.2d 1111, 1116-17 (D.C. Cir. 1985) (Rule 404(b) "bar[s] the introduction of evidence of prior misconduct to prove that an accused was *likely as a matter of disposition* to have committed the offense for which he or she is on trial") (emphasis added).  Presumably that is why the government makes little effort to defend that basis for the district court's ruling on appeal.

---

[6] A similar rationale permits the admission of evidence that Oliver—who was arrested in 1997 with 75 ziplock bags of crack cocaine hidden on his person—was seen by witness Bethlehem Ayele making hand-to-hand drug sales in the early 1990s.

Evidence of preconspiracy drug dealing was also admissible for the nonpropensity purpose of proving the relationships among coconspirators. *See, e.g.*, *Gaviria*, 116 F.3d at 1532 (prior drug transactions relevant to "link" the defendant to other conspirators); *see also United States v. Burwell*, 642 F.3d 1062, 1067 (D.C. Cir. 2011), *reh'g en banc granted, judgment vacated* (Oct. 12, 2011), *opinion reinstated and aff'd* 690 F.3d 500 (D.C. Cir. 2012) ("Because evidence of the three carjackings, the stolen cars, the use of false names, and the marijuana cultivation and distribution was relevant to prove Appellants' association, we see no error in admitting this evidence under Rule 404(b).").

That rationale supports the admission of evidence of Simmons's drug-trafficking relationship with Walter Fleming, and James Alfred's preconspiracy sales of crack cocaine to Frank Howard.[7] It also includes the evidence of McGill's drug dealing in the 1980s to the extent that it showed McGill's relationships with his coconspirators.

### d. Lack of advance notice

Finally, for several pieces of evidence admissible under Rule 404(b), appellants fail to make any showing of prejudice resulting from the government's failure to provide them with the requisite notice below. That eliminates any basis on which to predicate error. *See United States v. Watson*, 409 F.3d 458, 465 (D.C. Cir. 2005) ("Even assuming *arguendo*

---

[7] Evidence of Simmons's close relationship with Fleming also helped to establish Simmons's motive for having Richard Simmons (no relation) killed. The evidence at trial indicated that Simmons commissioned that murder because he believed that Richard Simmons was spreading a rumor that Fleming was cooperating with the police.

that the prosecution failed to bear its Rule 404(b) notice obligation, . . . [the defendant] failed to show prejudice from the error.").

### 3. *Improperly Admitted "Other Acts" Evidence*

While much of the challenged evidence was admissible, we agree with appellants that, on a handful of occasions, "prior bad acts" evidence should have been excluded.

*First*, the government has conceded that evidence of McGill's involvement in the 1980s in a shooting into the home of a rival's relative was wrongly admitted. The district court also erroneously allowed in some evidence of 1980s drug dealing and other misconduct by McGill that went far beyond what could plausibly be argued as demonstrating McGill's intent, knowledge, or relationships with other conspiracy members. For instance, the district court wrongly admitted evidence that McGill "knew how to cook coke" in the "early eighties," and was "out on 15th place in the late eighties" selling drugs.

Similarly, some testimony regarding McGill's preconspiracy interactions with other conspirators may have been admissible to establish their relationship at the time McGill joined the conspiracy. *See, e.g.*, *Gaviria*, 116 F.3d at 1532. But the government makes no serious effort to defend testimony from a witness who had grown up with McGill stating that they had stolen things from a nearby shopping mall years before McGill joined the charged conspiracy. Given its inability to articulate any plausible defense for this evidence, the government had no business using it in the first instance.

*Second*, the district court allowed in evidence of Ronald Alfred's drug dealing that took place long before the

conspiracy, including both an alleged possession of a kilogram of cocaine in 1989 and a cocaine trafficking relationship with Alberto Martinez that ended in 1991. The government's theory for admission was, in part, that Alfred "brought a lot to the table" entering the conspiracy as a drug supplier. But the evidence the government used showed at most that Alfred *previously* had access to a supply of cocaine, which came to an abrupt end when Martinez went to jail in 1991, four years before Alfred's alleged entry into the charged conspiracy. To contend that Alfred was a cocaine supplier in 1995 because he had cocaine dealings years earlier is precisely the type of naked propensity argument that Rule 404(b) forbids.

*Third*, the government also admitted evidence showing that Ronald Alfred had been convicted on firearms charges in 1991 and 1994. As to the 1994 charge, the government's theory was that Alfred had told his probation officer that he was carrying a gun to protect himself because of robberies at his place of business. The government argued that those robberies were linked to the Alfreds' feud with Kairi Ball and his associates. And from that, the government surmised, the evidence of the 1994 firearms charge would somehow explain Alfred's motive for murdering Ball and Thomas.

That pushes the logical limits of what even our deferential abuse-of-discretion review can stomach. To make matters worse, the district court did not conduct any express balancing of the probativeness of that tangential evidence against its unfair prejudice, and we are hard-pressed to see how the balance could come out in favor of admission.

The explanation for admitting the 1991 firearm charge fares still worse. It is hard to even discern what the government's theory of admissibility is. The government

simply wraps the charge up with its discussion of Alfred's 1989 arrest in which he was found with a kilogram of cocaine. Beyond that, the government makes no effort to link the firearm charge with Alfred being a drug supplier in 1991, much less four years later when he was alleged to have entered the charged conspiracy. Nor does the government even hint that any hypothetically probative value of such stale and remote evidence could outweigh the unfair prejudice arising from a gun charge.

Wrongly admitted evidence, however, does not always compel reversal. In evaluating the impact of those errors on a six-month trial, the test is "not whether evidence was sufficient to convict notwithstanding the error, but whether the court can say that the error did not affect the jury's verdict." *United States v. Watson*, 171 F.3d 695, 700 (D.C. Cir. 1999) (quoting *Kotteakos*, 328 U.S. at 764-65). If the record leaves a judge "in grave doubt as to the harmlessness of an error," reversal is warranted. *United States v. Smart*, 98 F.3d 1379, 1392 (D.C. Cir. 1996) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)).

While we strongly disapprove of the government's overreaching arguments and tactics under Rule 404(b), we are confident that the erroneously admitted evidence did not affect the jury's verdict. "The most significant factor that negates the error's impact is the weight and nature of the evidence against [the defendant]." *United States v. Williams*, 212 F.3d 1305, 1311 (D.C. Cir. 2000). Here, the wrongful admissions against McGill formed a small part of what was otherwise an overwhelming case against him, including extensive testimony from numerous cooperating witnesses of his involvement in the charged acts of violence and narcotics trafficking, as well as wiretap evidence linking McGill to drug transactions.

Though the improperly admitted evidence against Ronald Alfred was more substantial, the previously admitted, extensive, and powerful evidence against him overwhelmed those wrongful admissions.  At least four separate witnesses linked Alfred to drug trafficking in significant quantities over the course of the conspiracy, while corroborating accounts from at least two cooperating witnesses linked Alfred to the three murders for which he was convicted.  The record thus does not permit the conclusion that the jury's judgment was "substantially swayed by the error" made in wrongfully admitting "other crimes" evidence.  *Williams*, 212 F.3d at 1310.  But going forward the government would do well to step more carefully when introducing prior bad acts evidence.

## D.

Appellants also object to the instructions explaining to the jury how it could permissibly use the "other crimes" evidence, as well as the use the government made of such evidence in its closing arguments.

### 1.  *Rule 404(b) Jury Instructions*

At numerous points over the course of the trial, the district court gave the jury a limiting instruction after the admission of "other crimes" evidence that told the jury to consider that evidence only for a purpose permitted by Rule 404(b).  For example, after one witness testified about prior bad conduct by McGill and the Alfreds, the district court told the jury that the testimony about "some of the defendants' alleged conduct prior to the time periods when they [we]re charged with joining the alleged conspiracy" was "admitted to explain why and how those defendants joined the alleged conspiracy and their relationships with other members of the alleged conspiracy."  J.A. 2318-19.  The court then reminded the jurors that, to find appellants guilty of the alleged

conspiracy, they "must find that [the Defendants] participated in the conspiracy during the time period as charged in the indictment," highlighting the relevant timeframe. *Id.* at 2319. Similar instructions, occasionally referencing the specific "prior acts" evidence to which the judge was referring, followed the testimony of several other witnesses. Appellants did not object to those midtrial instructions.

For the final jury instructions, Seegers (joined by McGill and both Alfreds) requested that, in cautioning the jury about permissible uses of the evidence, the instruction specifically catalogue the preconspiracy conduct that was at issue. The district court denied that request on the ground that such a listing would be unduly burdensome, and that a general instruction would suffice. The final jury instruction provided:

> You have heard testimony of criminal acts purportedly committed by one or more of the defendants with which they are not formally charged in these indictments. That evidence was admitted for various collateral purposes, such as to show the relationship between the defendants and others involved in their activities, or to show motive, opportunity, intent, preparation, planning, knowledge, identity or absence of mistake or accident with respect to those crimes with which a defendant is actually charged here.

> You are instructed that if you find that a defendant did engage in criminal activity not charged to him here, you are not to draw an inference from such a finding that the defendant is a person of bad character and that he must therefore be guilty of the crimes with which he is charged.

In other words, the fact that a defendant broke the law on other occasions not charged in these indictments is not by itself evidence that he committed any offense for which he is now on trial.

J.A. 5451-52. The instruction then referenced several specific examples of other crimes evidence, including the Kairi Ball murder, Ronald Alfred's two previous firearms convictions and 1989 drug possession charge, and Seegers's pre-1996 conduct. The final instruction explained that the evidence was introduced to help the jury determine whether the Alfreds became members of the charged conspiracy and to explain "how and why Mr. Seegers joined the alleged conspiracies." *Id.* at 5452-53.

In reviewing a challenge to jury instructions, the central question is "whether, taken as a whole, they accurately state the governing law and provide the jury with sufficient understanding of the issues and applicable standards." *United States v. Washington*, 106 F.3d 983, 1002 (D.C. Cir. 1997). A claim that the court improperly omitted an instruction is reviewed *de novo*, *United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008), while a challenge to the language of an instruction is reviewed for abuse of discretion, *United States v. Dickerson*, 163 F.3d 639, 641 n.3 (D.C. Cir. 1999). Finally, "[o]ur review of allegedly improper prosecutorial arguments is for substantial prejudice where the defendants lodged an objection, but we apply the plain error standard where they failed to object." *Moore*, 651 F.3d at 50.

With respect to Seegers's and Ronald and James Alfred's requests for a jury instruction that listed all of the Rule 404(b) evidence point by point, we find no reversible error. The court's final instruction did specifically identify the majority of the Rule 404(b) evidence—including the most potentially

prejudicial evidence like the Kairi Ball murder. Taken as a whole, that instruction, combined with the midtrial instructions cautioning the jury as evidence was introduced, adequately guided the jury's consideration. *Cf. Ring*, 706 F.3d at 465 ("In reviewing challenges to instructions, our task is to determine whether, taken as a whole, the instructions accurately state the governing law.") (internal quotation marks omitted, alterations adopted).[8]

McGill, however, does have more substantial grounds for complaint. While midtrial limiting instructions given after the testimony of Maurice Andrews and Frank Howard specifically referenced that testimony, the final instruction makes no mention at all of any of the preconspiracy conduct evidence introduced against him. That wholesale omission is troubling. Because the dividing line between direct or intrinsic conspiracy evidence and "other crimes" evidence was far from self-evident in this case, the selective identification of "other crimes" evidence pertaining to other appellants risked confusing the jury about Rule 404(b)'s limitations with respect specifically to the evidence introduced against McGill. Indeed, a "limiting instruction given for some but not other 'bad acts' evidence may enhance [the] latter's influence on [the] jury." *Williams*, 212 F.3d at 1311 (citing *United States v. Spinner*, 152 F.3d 950, 961-62 (D.C. Cir. 1998)). We accordingly hold that the district court

---

[8] While Simmons and Oliver claim to have made the same jury-instruction request, they cite nothing in the record to corroborate that claim. Because no circuit precedent mandated a point-by-point enumeration of all of the Rule 404(b) evidence employed in a case, we find no plain error in the court's failure to *sua sponte* reference the evidence of their preconspiracy drug dealing in its jury instructions, given both the midtrial and final jury instructions.

abused its discretion in how it formulated this aspect of the Rule 404(b) instruction.

That error, however, is not reversible error. Such an instructional error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). In this case, the "other crimes" evidence played a bit role in the powerful case against McGill. *See* Part III(B)(3), *supra*. We thus have no doubt that the error did not sway the jury's deliberations.

The problems with the Rule 404(b) instruction did not stop there, unfortunately. The court's final jury instruction identified a litany of potentially relevant purposes for the Rule 404(b) evidence (such as absence of mistake or accident) that had never previously been mentioned and that were not at issue in the case. *See* J.A. 5451-52 (stating that this evidence could be used "to show the relationship between the defendants and others involved in their activities, or to show motive, opportunity, intent, preparation, planning, knowledge, identity or absence of mistake or accident with respect to those crimes with which a defendant is actually charged"). That inclusion of irrelevant purposes for Rule 404(b) evidence risked confusing the jury as to the *proper* purpose for which it might consider such evidence. *See United States v. Merriweather*, 78 F.3d 1070, 1076-78 (6th Cir. 1996). For that reason, we have repeatedly noted with approval jury instructions that identify the *specific* purpose for which a particular piece of "other crimes" evidence has been admitted. *See, e.g.*, *Douglas*, 482 F.3d at 601; *United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002). As a general rule, then, a proper Rule 404(b) jury instruction should identify the evidence at issue and the particular purpose for which a jury could permissibly use it, rather than providing an incomplete

description of the evidence at issue and an undifferentiated laundry list of evidentiary uses that may confuse more than it instructs.

Appellants, however, did not challenge this particular aspect of the jury instructions. Because the midtrial instructions identified with more targeted specificity and relevance the uses to which the evidence could be put, and the final instructions admonished that the evidence could *not* be employed for propensity purposes, the wrongfulness of the instruction was not plain error. *See Clarke*, 24 F.3d at 266 ("To be sure, the court's later substitution of 'intent' for 'credibility' as the purpose of allowing this testimony was confusing, but whatever error inhered in its handling of the matter was not so serious as to engender a miscarriage of justice or to seriously affect the fairness or integrity of the trial.") (internal quotation marks omitted); *see also United States v. Johnson*, 46 F.3d 1166, 1171 (D.C. Cir. 1995) (no error in failing to provide unrequested limiting instruction regarding permissible purpose for which evidence may be used).

### 2. *Prosecution's Use of Rule 404(b) Evidence in Closing Arguments*

In the government's closing arguments, the prosecutors referenced several pieces of the "other crimes" evidence, including (i) drug dealing and acts of violence committed by McGill in the 1980s, (ii) Ronald Alfred's involvement in the Kairi Ball murder and preconspiracy drug dealing and other criminal conduct, and (iii) Seegers's earlier drug-related conviction. In so doing, the government highlighted the concededly improperly admitted evidence that McGill had been involved in shooting into a house in the 1980s. That was error.

The government also argued that Ronald Alfred's preconspiracy drug dealing and Seegers's preconspiracy conviction showed that those two appellants were "ready, willing, and able to join the conspiracy." J.A. 5307-08. But the use of "other crimes" evidence to prove that appellants were "ready, willing, and able" to commit the charged crimes is a barefaced appeal to propensity-based decisionmaking, flatly forbidden by Rule 404(b). Indeed, the prosecution's formulation echoes the phrasing used to *prove* predisposition when an entrapment defense is raised. *See United States v. Burkley*, 591 F.2d 903, 916 (D.C. Cir. 1978) (establishing predisposition requires showing that the defendant is "presently ready and willing to commit the crime"); *see also id.* at 922 ("Admittedly, proving disposition to commit a crime is very close to proving 'criminal propensity,' the very type of prejudice against which the general prohibition on admission of evidence of other crimes is directed.").

The problem for appellants is that they did not raise this argument below, so it is reviewed under the exacting plain-error standard. Given (i) the district court's specific direction to the jury that it could not use "other crimes" evidence as indicating a propensity to commit the charged crimes, (ii) the instruction that counsel's arguments were not evidence, and (iii) the overwhelming weight of properly admitted and argued evidence establishing McGill's, the Alfreds', and Seegers's roles and participation in the conspiracy, appellants cannot show that wrongfully allowing the government to reference the "other crimes" evidence affected the outcome of the proceedings.

## IV. Confrontation Clause Challenges

The trial court admitted some drug analysis reports and autopsy reports accompanied only by testimony from

witnesses other than the reports' authors—a Drug Enforcement Administration ("DEA") chemist for the drug analyses and a medical examiner from the D.C. Office of the Chief Medical Examiner for the autopsy reports. Appellants argue that the admissions violated the Confrontation Clause of the Sixth Amendment, as construed in *Crawford v. Washington*, 541 U.S. 36 (2004).

At trial appellants objected on the basis of *United States v. Smith*, 964 F.2d 1221 (D.C. Cir. 1992), a decision that long antedated *Crawford* and that approved the admission of somewhat similar testimony against a hearsay objection. *Id.* at 1223. The government argues that, because appellants didn't object on Confrontation Clause grounds, the court's rulings are reviewable under plain-error standards, and appellants don't contest that view. Plain error is thus the standard.

On the merits, the government appears to "assum[e]" that the admissions clearly violated the Confrontation Clause, Appellee's Br. 118, an assumption that seems sound in light of *Moore*, 651 F.3d 30. There, reviewing convictions of appellants' coconspirators, we found Confrontation Clause violations in the admission of similar reports through the same DEA chemist and through a medical examiner who had not conducted the autopsies. *Id*. at 69-74 (citing *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011)). The government argues nonetheless that, except in one instance, appellants fall short of showing plain error in that they haven't established that the reports "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734.

The exception acknowledged by the government is Seegers's convictions for possessing with intent to distribute drugs found in his apartment. The government concedes that

those convictions depended on a specific quality and quantity of narcotics and that no evidence other than the drug analysis reports existed to establish the character and quantity of the substances in question. *See Moore*, 651 F.3d at 74. We therefore reverse Seegers's convictions relating to the drugs found in his apartment.

There is a second asserted Confrontation Clause violation that need not detain us. Seegers maintains that Dr. Gertrude Juste's testimony about Diane Luther "improperly bolstered the credibility" of Lincoln Hunter, who witnessed Luther's killing and was himself shot in the course of that incident. Appellants' Br. 165. Dr. Gertrude Juste's testimony about the report, which included a photograph of Luther's hand with intact nails, agreed with Hunter's testimony in a key detail— the view that Luther had not struggled before her murder. But the jury reached no verdict on the charges against Seegers for this murder. Accordingly, no prejudice resulted from the admission of the expert opinion or Dr. Juste's characterizations of that opinion with regard to the Luther murder. *See United States v. Williams-Davis*, 90 F.3d 490, 502-03 (D.C. Cir. 1996) (finding that no prejudice resulted from evidence relating only to counts on which the defendants were acquitted).

Seegers also suggests—obliquely in the opening brief and more clearly in the reply brief—that Dr. Juste's testimony, despite referring to Luther's death, also supported Hunter's testimony that Seegers shot *him*. Seegers was convicted of two counts related to shooting Hunter, unlike the murder of Luther, so we cannot dismiss the testimony as not prejudicial on the same basis as above. At oral argument, however, the government represented that the photograph of Luther's hand was independently authenticated by Luther's daughter, Shelly Dabney, a representation Seegers has not contested. Thus,

even assuming the bolstering argument might have had traction across murder episodes, Seegers cannot meet the burden of showing that Dr. Juste's testimony prejudiced him with respect to the Hunter shooting.

Ronald Alfred and James Alfred similarly argue that the improperly admitted autopsy reports on Thomas and Walker, and the associated testimony of Dr. Juste, "bolstered the credibility" of the cooperating witnesses who linked appellants to the killings. Appellants' Br. 165. But the defense in no way claimed that Thomas or Walker had died accidentally or otherwise than through homicide. Maurice Andrews testified that he witnessed Bernard Franklin ("Gangster") shoot Thomas ("Froggy") multiple times. Walker's brother testified that he heard a gunshot and saw his brother lying dead on the floor, and an officer described seeing Walker lying on his back with a gunshot wound to his head. The evidence of appellants' roles was of course sharply drawn into question by defense counsel. In some remote sense, of course, the autopsy reports and testimony "bolstered the credibility" of the cooperating witnesses: the persons described as having been murdered were indeed dead, and dead through gunfire. But these were not cases of the sort beloved by detective story writers, where outsiders are unsure whether there was a killing at all. The question was who did the killing, and on that the autopsies had nothing to say and the cooperating witnesses everything.

Finally, appellants argue that the erroneous admission of the drug report evidence—consisting of "DEA-7" drug analysis reports, testimony regarding the analyses, and a chart showing drugs seized from members of the conspiracy—requires vacatur of their narcotics and RICO conspiracy convictions. Appellants contend that they "were prejudiced because the nature and quantity of the drugs were elements of

the charged conspiracies," and, apart from the improperly admitted drug report evidence, "there was no tangible proof, other than testimony by highly impeached cooperating witnesses, as to the nature and scope of the conspiracies at all." Appellants' Br. 164.

As we are reviewing for plain error, the question is whether appellants have demonstrated that the improperly admitted DEA reports violated their "substantial rights." *Olano*, 507 U.S. at 734. The burden is on appellants to show "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)) (internal quotation marks omitted). *See also Olano*, 507 U.S. at 734 (in most cases, an error affected "substantial rights" if it was prejudicial, that is, if it "affected the outcome of the district court proceedings").

Appellants have not carried this burden as to any elements except (possibly) drug quantity. At trial cooperating witnesses testified to appellants' participation in the conspiracy and drug dealing in depth and at length. For example, there was testimony that Simmons engaged in drug transactions with Moore, Gray, Deon Oliver, Fleming, and James Alfred; that Ronald Alfred supplied Gray with drugs and vice-versa; that Seegers was employed as PeeWee Oliver's "overseer" or "bodyguard," J.A. 2818; that Deon Oliver sold drugs he obtained from Simmons and Moore; and that McGill assisted Gray in cooking powder cocaine into crack cocaine. Appellants argue that these cooperators were "highly impeached," Appellants' Br. 164, as indeed they were. But unless the jurors believed the cooperators (in which case they would have had little choice but to convict), the inadmissible evidence would have seemed to them to have

come from another planet, unconnected to appellants. Further, given the nature of the behavior described by the cooperating witnesses, the jurors could not have believed that appellants were going through the elaborate transactions and precautions described, and exchanged the funds described, for any reason other than conspiracy to distribute and possess narcotics.

However, we remand to the district court to determine whether the admission of the drug report evidence affected the jury's findings as to the *quantities* of drugs involved in the charged conspiracies and, if so, which counts or quantity findings (if any) must be vacated with respect to each appellant. *See United States v. Fields*, 251 F.3d 1041, 1043 (D.C. Cir. 2001) (under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), drug quantity is an element of the offense where it triggers a higher statutory maximum sentence). Here, in addition to convicting appellants of conspiracy to distribute "detectable amounts" of various drugs, the jury attributed to appellants specific quantities of drugs triggering higher statutory maximum sentences. On remand the burden will be on appellants to show, perhaps through additional briefing, that there is a reasonable probability that, but for the improperly admitted evidence, the jury's quantity findings would have been different. *See Dominguez Benitez*, 542 U.S. at 82.

In sum, we reverse Seegers's two convictions for possession with intent to distribute cocaine and heroin, and remand to the district court to determine whether appellants can demonstrate that the improperly admitted drug report evidence affected the jury's drug quantity findings. We find that the Confrontation Clause violations were not prejudicial in any other respect. On remand, depending on which counts or quantity findings (if any) are vacated with respect to each

appellant, the district court shall determine in the first instance whether resentencing is appropriate.

### V.  Stun Belt Revelation by McGill

All of the appellants except McGill object to the district court's handling of an incident in which, in the presence of the jury, McGill made reference to and displayed a stun belt that he was required to wear.  We hold that if any error occurred at all, it was not reversible.[9]

### A.

Prior to trial, the district court granted the prosecution's request that appellants all be required to wear stun belts in court, given the heightened security concerns in the case.[10] The stun belts were worn under appellants' clothes secretly and without incident for most of the trial.

On March 29, 2004, McGill engaged in a verbal dispute with the judge in front of the jury.  When the court ordered McGill's removal from the courtroom, McGill lifted his shirt to reveal his stun belt and proclaimed:

---

[9] A stun belt is a device worn under clothing around a defendant's waist that allows a courtroom security officer to remotely deliver an electric shock to disable the defendant temporarily if his or her actions pose a security risk.

[10] Among other things, appellants were involved in organized crime and acts of violence including multiple counts of murder and attempted murder; they were each facing sentences of up to life imprisonment if convicted; they had conspired to kill, attempted to kill, or participated in actually killing witnesses; and they had made belligerent comments and threats of physical violence to the U.S. Marshals.

Tell them I have a—I'm wearing a belt right here, 50,000 watts—what they're doing to us, illegal, that's what I want. Six months, you never knew it, everyday I been here, everyday. . . . Six months y'all never knew that this belt everyday 50,000 Watts because you allow it. Don't let them peoples keep lying on me. Lying, man.

J.A. 5419. The district court immediately instructed the jury, "Don't hold that outburst against any other defendant. That's solely Mr. McGill. Consider misconduct only in connection with Mr. McGill, not any other defendant." *Id.*

Following that incident, all of the appellants (except McGill) moved for a mistrial and severance from McGill's case. The district court denied the motion. The next day, over objections from Ronald Alfred and Seegers, the district court instructed the jury that:

Mr. McGill displayed and made reference to a security device that he was wearing. As you know, during the course of this trial, the Court has determined that it was necessary to take certain security precautions. However, the Court has never found it necessary to actually activate the device Mr. McGill was wearing.

I instruct you that you are not to consider Mr. McGill's outburst in any way as evidence in this case, either with respect to him or with respect to the other defendants. Further, the Court's decision to adopt certain security precautions is not evidence in this case. You may not consider these measures at all in reaching your verdicts.

*Id.* at 5454-55.

Seegers subsequently filed a motion for a new trial in part on the basis of this incident. *See Simmons*, 431 F. Supp. 2d at 71. The district court denied the motion, finding "no basis for defendant Seegers's claim that the jury assumed he was wearing a stun belt, simply because they observed defendant McGill's." *Id.*

**B.**

On appeal, appellants claim both that McGill's outburst prejudicially revealed to the jury that each Appellant was wearing a stun belt and that the revelation amounted to structural error, or at the least an error so serious as to warrant a mistrial. We review the decision not to declare a mistrial and to deny a new trial for an abuse of discretion. *See United States v. Foster*, 557 F.3d 650, 654-55 (D.C. Cir. 2009) (denial of mistrial); *United States v. Pettiford*, 517 F.3d 584, 591 (D.C. Cir. 2008) (denial of new trial).

In *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court held that a defendant's Fifth and Fourteenth Amendment rights to a fair trial "prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id.* at 629. In *Moore*, we recognized that the wearing of stun belts was the sort of inherently or actually prejudicial government practice that requires the district court to consider, for each individual defendant, whether the practice serves an essential interest in the trial. *See* 651 F.3d at 45-46.

Appellants argue that the feared revelation that they were wearing stun belts amounted to a "structural" error and thus is not subject to harmless error analysis. That is not correct. A structural error is a "structural defect[] in the constitution of the trial mechanism." *Arizona v. Fulminante*, 499 U.S. 279,

309 (1991). Where a defendant has suffered, for example, a total deprivation of the right to counsel at trial or a similar error "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," harmless error analysis is inappropriate. *Id.* at 310. Structural error involves the type of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Id.* (quoting *Rose v. Clark*, 478 U.S. 570, 577-578 (1986)). By contrast, constitutional errors that do not require automatic reversal of a conviction constitute "'trial error'—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 307-08.

Appellants cite no case, and we are aware of none, holding that the disclosure of stun belts amounts to structural error. That is unsurprising. In *Deck*, even as the Supreme Court recognized that the use of visible restraints was an "inherently prejudicial" practice, it applied harmless error analysis under *Chapman v. California*, 386 U.S. 18 (1967). *Deck*, 544 U.S. at 635. As a result, even if a restraint were visible to the jury and even if it had not been justified by a sufficient governmental interest, reversal would not be required as long as the government could demonstrate "beyond a reasonable doubt that the . . . error complained of did not contribute to the verdict obtained." *Deck*, 544 U.S. at 635 (quoting *Chapman*, 386 U.S. at 24).

Appellants do not challenge the district court's initial decision to require the use of stun belts, which was premised on the assertion that the belts would not be visible to the jury.

*See also United States v. Durham*, 287 F.3d 1297, 1305 (11th Cir. 2002) (stun belts are "not readily visible to the jury," although it is at least possible that they may be visible if they "protrude[] from the defendant's back to a noticeable degree").[11] Appellants argue instead that McGill's outburst and its supposed revelation that all the appellants were wearing stun belts changed the calculus. We disagree for three reasons.

*First*, the argument fails at the starting gate because appellants offer no meaningful answer to—and certainly identify no clear error in—the district court's factual finding that no such revelation occurred. *See Simmons*, 431 F. Supp. 2d at 71. The only suggestion in McGill's outburst that all the appellants were wearing stun belts was an elliptical reference to "what they're doing to us." J.A. 5419. The district court's instructions to the jury following the incident made specific reference only to McGill's stun belt. The record thus does not clearly compel the factual conclusion that any juror was aware that the other appellants were also wearing stun belts. *See United States v. Collins*, 109 F.3d 1413, 1418 (9th Cir. 1997) (no prejudice to due process rights where there was "no evidence the jury was aware that [the defendant] was shackled or restrained").

*Second*, and in any event, any potential prejudice arising from McGill's fleeting reference was mitigated by the district court's curative instructions. Those included both the immediate instruction to the jury following McGill's outburst not to consider that conduct with respect to any other defendant, and a further instruction the following day that the

---

[11] In the earlier *Moore* trial involving several of appellants' coconspirators, the district court acknowledged some risk that the stun belts would be visible. *See Moore*, 651 F.3d at 47.

jury should consider neither McGill's conduct nor the fact that he was wearing a stun belt to be evidence in the case. The record provides no basis for concluding that those cautionary instructions were ineffective or that the jury was otherwise not able to make individualized determinations of guilt based on the evidence presented at trial. *See United States v. Sheehan*, 512 F.3d 621, 632 (D.C. Cir. 2008) (in undertaking harmless-error analysis, a reviewing court considers, among other things, whether "effective steps were taken to mitigate the effects of the error") (quoting *In re Sealed Case*, 99 F.3d 1175, 1178 (D.C. Cir. 1996)); *see also United States v. Hall*, 610 F.3d 727, 742 (D.C. Cir. 2010) ("The jury is presumed to follow the instructions.").

*Third*, the overwhelming weight of evidence against appellants reinforces the harmlessness of any error. *See Wilson v. United States*, 344 F.2d 166, 167 (D.C. Cir. 1964) (per curiam); *see also United States v. Cazares*, 788 F.3d 956, 966 n.1 (9th Cir. 2015) ("[T]he unconstitutional shackling of a defendant results in prejudice only if the evidence of guilt is not overwhelming[.]") (internal quotation marks omitted). We thus conclude that, even assuming error occurred, it would have been harmless beyond a reasonable doubt.

For those same reasons, the district court did not abuse its discretion in declining to declare a mistrial. "A mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *United States v. McLendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004) (quoting *Clarke*, 24 F.3d at 270). No mistrial would be warranted in the absence of unfair and irremediable prejudice. To make that determination, "we consider a number of factors, including the force of the unfairly prejudicial evidence, whether that force was mitigated by curative instructions, and the weight of the

admissible evidence that supports the verdict.'" *Id.* Those factors foreclose any determination of material prejudice in this case, leaving us with the "fair assurance that the judgment was not substantially swayed by the error." *Foster*, 557 F.3d at 655 (quoting *Spinner*, 152 F.3d at 961).

## VI. References to the Convictions of Nontestifying Former Codefendants

Appellants argue that their convictions must be reversed because two government witnesses briefly referenced the convictions of codefendants that occurred in the earlier *Moore* trial. The government concedes error, but argues that the error was harmless. We agree. The two references to the outcome of the *Moore* trial should not have been made, but they were indirect and fleeting, and the government did not draw the jury's attention to them. The district court also took prompt curative measures to mitigate any potential harm. Those measures, combined with the overwhelming evidence of appellants' guilt, establish that the error was harmless beyond a reasonable doubt.

## A.

This trial commenced on October 16, 2003, and lasted nearly six months. Over fifty witnesses testified, and the transcripts of that testimony span nearly ten thousand pages. Appellants object to brief comments made by two government witnesses, Steve Graham and Frank Howard, during their testimony.[12]

---

[12] The extent to which appellants sufficiently objected below is debated by the parties. For the appellants who did not object below, we review the statements only for plain error. However, in

Steve Graham was an associate of Gray's who had previously been convicted of participating in a narcotics conspiracy in a separate trial. Following that conviction, Graham agreed to testify for the government under a cooperation agreement in the hope of reducing his sentence. During the government's direct examination, the prosecutor questioned Graham about a shooting involving Graham, Gray, and John Raynor, another member of the conspiracy who was tried separately in the *Moore* proceeding. The following exchange occurred:

> Q. Okay. And just tell the ladies and gentlemen a little bit about the statement that you gave to John Raynor's investigator about the shooting into the green Cadillac.
>
> . . .
>
> A. When I came down – I was at the jail initially, and they moved me down to Lorton, to Center, in preparation to be moved to the federal system.
>
> Q. This is after you were convicted and sentenced?
>
> A. Yes.
>
> Q. Go ahead.
>
> A. And the indictment which Kevin and them was convicted on and John Raynor was convicted on had

---

this case, the harmlessness of the error beyond a reasonable doubt resolves the issue regardless of the standard of review.

come out, or it had superseded, rather, and when it superseded, it charged the incident in there and it stated that on September 26th, A and B were in a vehicle, speaking about Kevin Gray, with an unindicted – with an unknown coconspirator – an unindicted coconspirator, and it charged them two with the September 26 event.

Q. Them two meaning?

A. Kevin and John.

J.A. 3760-61. McGill's counsel objected to the mention of the codefendants' convictions. *Id.* at 3762. The district court agreed that the reference was impermissible and asked counsel if she wanted the court to instruct the jury to disregard it. *Id.* at 3763. Counsel declined that offer, reasoning that such an instruction would only highlight the reference for the jury. *Id.* at 3763, 3768. Counsel then moved for a mistrial, which the court denied. *Id.* at 3768.

The next day, at the end of Graham's testimony and with the input of other defense counsel, the court issued the following curative instruction:

All right ladies and gentlemen, at one point during Mr. Graham's testimony he made a reference to the outcome of prior proceedings. The outcome of those proceedings has not been finally determined, and I instruct you to disregard that testimony by Mr. Graham. Motions and other proceedings still remain to be decided, so you should just ignore that testimony.

*Id.* at 3826.

The second challenged reference to codefendant convictions occurred almost a month later during the testimony of Frank Howard. *Id.* at 4174. Howard, a coconspirator, had been charged in the same indictment as appellants, but he pled guilty to RICO conspiracy and related offenses under a cooperation agreement with the government.

During Howard's cross-examination, defense counsel tried to expose Howard's self-interested motive for testifying by pressing Howard about how his testimony could benefit him in an unrelated, pending criminal proceeding in Prince George's County, Maryland. *Id.* at 4168-74. The federal prosecutors had written a letter to the Maryland prosecutors describing Howard's plea agreement and cooperation, and representing that the federal government would not be taking action for or against Howard in the Maryland case:

> Q. And [the letter] tells them that you are assisting law enforcement in the District of Columbia in a significant federal case, right?
>
> A. Right.
>
> Q. And we don't know what is going to happen in Prince George's County, the outcome of that case, right?
>
> A. Right.
>
> . . .
>
> Q. You don't think that if things don't go well in Prince George's County your defense lawyers are going to mention that?

A. I'm not even worried about Prince George's County right now. I'm worried about this.

Q. Right.

A. I'm not worried about Prince George's County.

Q. Oh, I understand that. But we are talking about the outcomes in Prince George's County.

A. We talked about that during the whole trial. You all keep on asking me the same thing. I'm repeating the same thing. Just like they tried to use that in the first trial, repeating the same thing about the Maryland case.

Mr. Daniel: Objection.

The Witness: And look what happened in the first trial.

*Id.* at 4172, 4173-74. Defense counsel again objected and moved to strike Howard's last comment. The district court ordered the comment to be struck from the record. *Id.* at 4174.

At the close of the trial, the court's final jury instructions reminded jurors of their obligation to disregard testimony and other evidentiary matters for which the court had sustained an objection because such matters "are not evidence and you must not consider them." *Id.* at 5451.

**B.**

The law is well-settled that a codefendant's guilty plea or conviction may not be introduced as substantive evidence of another defendant's guilt. *See Brown*, 508 F.3d at 1073 (quoting *United States v. Tarantino*, 846 F.2d 1384, 1404-05 (D.C. Cir. 1988)).[13] For good reason: Upon learning that one codefendant has admitted guilt or has been convicted, the jury "may possibly infer that the defendant on trial is more likely to be guilty, as well." *Johnson*, 26 F.3d at 677; *see Blevins*, 960 F.2d at 1260 ("[I]ntroduction of such [information] raises the concern that a defendant might be convicted based upon the disposition of the charges against the co-defendants, rather than upon an individual assessment of the remaining defendant's personal culpability."). As a consequence, "courts and prosecutors generally are forbidden from mentioning that a co-defendant has either pled guilty or been convicted," *Johnson*, 26 F.3d at 677, unless the information is admitted for another strictly limited purpose, such as impeaching a testifying codefendant or aiding the jury in assessing the codefendant-witness's credibility, *see DeLoach*, 34 F.3d at 1003-04; *Johnson*, 26 F.3d at 677.

Those reasons for preclusion compound when a *nontestifying* codefendant's guilty plea is introduced because the defendant on trial lacks the ability to cross-examine the codefendant who entered the plea and to probe his motivations. That, in turn, undercuts the defendant's right to have the jury's verdict based only on evidence presented in

---

[13] *See also, e.g.*, *United States v. DeLoach*, 34 F.3d 1001, 1004 (11th Cir. 1994); *United States v. Johnson*, 26 F.3d 669, 677 (7th Cir. 1994); *United States v. Blevins*, 960 F.2d 1252, 1260 (4th Cir. 1992); *United States v. Leach*, 918 F.2d 464, 467 (5th Cir. 1990), *cert. denied*, 501 U.S. 1207 (1991).

open court, subject to the truth-testing crucible of cross-examination.  *See Blevins*, 960 F.2d at 1260.

The parties agree that Graham's and Howard's references to the outcome of the *Moore* trial constituted error, and that this error was one "of constitutional dimension," *Blevins*, 960 F.2d at 1262; *accord Johnson*, 26 F.3d at 677-79.  The question then is whether that error "was harmless beyond a reasonable doubt."  *Chapman*, 386 U.S. at 24; *see Johnson*, 26 F.3d at 677 (constitutional harmless error analysis applies to the erroneous admission of a guilty plea of a nontestifying codefendant); *Blevins*, 960 F.2d at 1262 (same).  The error would not be harmless if there were a "reasonable possibility that the evidence complained of might have contributed to the conviction."  *Chapman*, 386 U.S. at 23; *see also Blevins*, 960 F.2d at 1263 ("[W]e must ask whether it is clear beyond a reasonable doubt that the jury would have returned verdicts of guilty against appellants even if the evidence concerning the co-defendants' [convictions] had not been introduced.").

There is no reasonable possibility that those two fleeting references contributed to the verdicts in this case.  First, the content of Graham's and Howard's statements was oblique, leaving unsaid who was convicted of what.  Howard did not even mention convictions; he just cryptically stated "look what happened in the first trial."  The jury thus never specifically heard that any former codefendants were convicted after trial on charges similar to those appellants faced.  Nor did the government draw attention to the statements or attempt to use them in any way.  *Cf. United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993) (error was not harmless where "the prosecution made multiple references to [the coconspirator's] conviction").

Second, the two references were fleeting and isolated, occupying a few seconds and two dozen words in a nearly six-month marathon of a trial. *See Johnson*, 26 F.3d at 679 (references to codefendant's guilty plea harmless beyond a reasonable doubt because the forbidden references were "relatively innocuous in that they occurred solely during the opening statements of a trial that produced nearly 1500 pages of testimony"); *Blevins*, 960 F.2d at 1260-65 (same conclusion where guilty pleas of six nontestifying codefendants were briefly referenced three times during a seven-day trial).

Third, the district court timely responded to the improper statements, instructing the jury to disregard Graham's statement the day after it happened (refraining from doing so earlier only at the request of defense counsel), and immediately striking Howard's statement. *See Carter v. United States*, 281 F.2d 640, 641-42 (D.C. Cir. 1960) (reference to guilty plea of codefendant was harmless in part because the trial court immediately struck the remark and instructed the jury to disregard it). The court, moreover, reinforced those specific curative measures with a general instruction at the close of trial admonishing the jury to disregard stricken testimony in reaching its verdict. We presume that juries follow the court's curative instructions unless there is reason to doubt compliance in a particular case. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *McLendon*, 378 F.3d at 1114 & n.6. There is no such reason here.

Fourth and finally, given the strength and breadth of the evidence against appellants, it is implausible that those two obscure comments made in passing had any impact at all on the jury's deliberations. *See Johnson*, 26 F.3d at 677 (The "general principle" that mention of a prior conviction is reversible error "gives way when the evidence against the

defendant(s) is so overwhelming that any error is rendered harmless beyond a reasonable doubt."); *Blevins*, 960 F.2d at 1264 (finding harmless error where the evidence was overwhelming). Accordingly, "in light of the overwhelming evidence of guilt in this case, any prejudice which may have remained despite the judge's admonition to the jury may be said to be harmless." *Carter*, 281 F.2d at 641.

Appellants argue that the error could not have been harmless because it effectively established—and thus took from the jury—the element of the existence of a criminal enterprise headed by Gray and Moore. That element was necessary for all of the appellants' RICO conspiracy convictions and for James and Ronald Alfred's convictions for the continuing criminal enterprise murder of Joseph Thomas. In support of their argument, appellants point to the jury's note during deliberations inquiring why, to convict the Alfreds of the continuing criminal enterprise murder, it needed to "determine" that Gray and Moore ran a continuing criminal enterprise. J.A. 5502. That note, appellants posit, meant that the jury was confused because it already knew that Gray and Moore had been convicted of running such an enterprise.

That vastly overreads the note. Neither Graham nor Howard mentioned the crimes for which Gray and Moore had been convicted so the jury could not have been confused by something they knew nothing about.

In short, Graham's and Howard's Delphic references to other convictions did nothing to relieve the government of its burden to prove the existence of the criminal enterprise and, on this record, those two testimonial missteps were harmless beyond a reasonable doubt.

## VII.  Right to Be Present (McGill)

After the incident in which McGill, in front of the jury, displayed the stun belt he was required to wear, *see* Part V, *supra*, the trial judge ordered that McGill be removed from the jury's presence for the remainder of the trial.  McGill argues that his continued exclusion compromised his right to be present at his trial.  Our review is for abuse of discretion, and we find that the trial judge acted within his discretion in excluding McGill from the jury's presence for the remainder of the trial.

### A.

A defendant has a right to be present at many stages of his trial.  That right springs from multiple sources:  from the Sixth Amendment's Confrontation Clause when confronting witnesses, and from the Due Process Clauses in other situations.  *See United States v. Gagnon*, 470 U.S. 522, 526 (1985).  It is also guaranteed by the Federal Rules of Criminal Procedure "at . . . every trial stage, including jury impanelment and the return of the verdict."  Fed. R. Crim. P. 43(a)(2).

That right, however, is subject to waiver.  *See id.* 43(c)(1).  For example, a defendant may waive the right by disruptive courtroom behavior.  *See Illinois v. Allen*, 397 U.S. 337, 343 (1970); Fed. R. Crim. P. 43(c)(1)(C).  The Federal Rules of Criminal Procedure provide that, should "the defendant waive[] the right to be present, the trial may proceed to completion, including the verdict's return and sentencing, during the defendant's absence."  Fed. R. Crim. P. 43(c)(2).  Waiver of the right to be present is not necessarily permanent:  "Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in

the concept of courts and judicial proceedings." *Allen*, 397 U.S. at 343.

After the incident in which McGill displayed his stun belt to the jury, the court immediately ordered him removed from the courtroom and the presence of the jury for the remainder of the trial. McGill challenges neither that initial exclusion nor his exclusion from closing arguments the following day. After closing arguments, however, McGill's counsel asked that McGill be allowed to be present for the jury instructions that same day. Counsel represented she believed that McGill would "remain entirely quiet during the course of the instructions." J.A. 5442. The court refused, stating, "I made the mistake of believing that before. I won't believe it again." *Id.* The court further observed that it "ha[d] never had a defendant in 16 years as a Judge pull what he pulled, and he's not doing it again." *Id.*

The following day, counsel renewed McGill's request. The district court again denied the motion, noting that counsel was unable to give any "assurance" that McGill "won't act improperly." *Id.* at 5478. Two weeks later, McGill's counsel again asked that McGill be permitted to observe the individual voir dires of Jurors #9, #10, and #12. *See* Part I, *supra*. The court again denied the request. After the court concluded the voir dires but before it dismissed Juror #9, McGill requested a brief audience with the judge to apologize for his previous outbursts. The judge responded that the apology could happen "at a later time," as he had "enough on [his] plate for the moment" in dealing with the potential juror dismissal. *Id.* at 5614.

Nearly two weeks later, when the jury returned its verdicts for McGill's codefendants, McGill's counsel renewed her request for McGill's return. The district court

summarily denied the motion. After another two weeks, the jury returned a verdict against McGill. McGill's counsel moved for a mistrial due to his continued exclusion, and the district court denied the motion.

**B.**

McGill argues that, at each of those junctures, he "represented [that] he would restrain himself," and that his continued exclusion therefore violated his constitutional right to be present. Appellants' Br. 182. McGill's counsel repeatedly objected to his continued exclusion, properly preserving the issue for our review. We review the district court's decision to suspend a disruptive defendant's right to be present for an abuse of discretion. *See Allen*, 397 U.S. at 343. We find no abuse of discretion here.

A district court has broad discretion to control trial proceedings and protect the "dignity, order, and decorum" of the court from "disruptive, contumacious, [and] stubbornly defiant defendants." *Id.* In exercising that discretion, the court may remove and exclude disruptive defendants as necessary. *See* Fed. R. Crim. P. 43(c)(1)(C); *accord Allen*, 397 U.S. at 344. While the court must allow an excluded defendant to return to the proceedings if he has "satisfactorily demonstrated that he would not be violent or disruptive" upon his return, that determination is committed to the court's sound discretion. *Jones v. Murphy*, 694 F.3d 225, 240-41 (2d Cir. 2012); *accord Allen*, 397 U.S. at 343. "[C]aution is appropriate in assessing the trial judge's response to" disruptive outbursts, as "a cold transcript provides no insight into tone of voice, body language, or possible overtly threatening behavior that might cast mere spoken words in a different light." *Jones*, 694 F.3d at 238. Especially given that deference, we have little trouble concluding that the district

court acted within its discretion to exclude McGill for a relatively brief period at the close of the six-month trial.

McGill argues that he is unaware of any prior case in which it was "one strike and you're out." Oral Arg. Tr. at 135. But even assuming removal for "one strike" might amount to an abuse of discretion in certain circumstances, McGill engaged in a pattern of repeated disruptions. McGill himself concedes that the stun belt incident was not his only outburst in court. Appellants' Br. 186. His own testimony in his defense was "characterized by . . . outbursts," *id.*, and he engaged in repeated back-and-forths with the judge that required the court to issue corrective instructions. The prosecutor also informed the court that McGill "would be cussing" on "a number of occasions when the Court would leave the bench," and that "this [wa]s a pattern that's been ongoing throughout this trial with Mr. McGill openly and vigorously cursing at the Court [and] at the government." J.A. 5638-39.

The pattern continued even after the court ordered McGill removed for the stun belt incident. The court observed on the record that, when the marshals removed McGill from the courtroom, "he was making so much noise" in the holding cell behind the courtroom by "screaming and hollering" that "the Court next door was disrupted." *Id.* at 5445. And following the court's ruling dismissing Juror #9—which came *after* counsel's representation that McGill would "remain entirely quiet," *id.* at 5442—McGill created yet another disturbance: depending on the account, he either threw his chair and swore at the judge, or he knocked over his chair as he quickly stood up to complain about the unfairness of the trial. Neither would be consistent with the "dignity, order, and decorum" of the courtroom. *Allen*, 397 U.S. at 343.

McGill also argues that the district court abused its discretion because "it did not afford him the opportunity to reclaim his right to be present by either accepting counsel's representations" that he would behave or "directly inquiring as to his intentions." Appellants' Br. 188. We discern no error. McGill's long pattern of misbehavior was sufficiently egregious to permit the district court to conclude that any apology or subsequent promise to behave would be of little value. *See United States v. Munn*, 507 F.2d 563, 568 (10th Cir. 1974). His actions throughout the trial indicated that he had little ability to control himself.

Additionally, McGill's behavior left the trial judge with no perfect options. Allowing McGill to return to the courtroom without reliable assurances of future good behavior could have risked a mistrial—indeed, his codefendants had already moved for a mistrial following the stun-belt revelation. *See* J.A. 5425-26. McGill's conduct put the trial court in the position of having to balance the competing constitutional rights of McGill and his codefendants. We perceive no abuse of discretion in the court's resolution of that balance in favor of a continued suspension of McGill's presence in the courtroom.

## VIII. Voice-Identification Expert (McGill)

McGill argues that the district court erred by failing to conduct a *Daubert* hearing and make findings under Federal Rule of Evidence 702 before excluding McGill's proffered voice-identification expert. We find no reversible error.

### A.

The government introduced into evidence three wiretapped phone calls that, according to a government witness, contained McGill's voice. During McGill's defense

case, the district court was informed for the first time that McGill intended to call an expert in voice-spectrographic analysis to contradict the testimony identifying McGill's voice as to two of the three calls. The government made clear its opposition to the use of voice-spectrographic analysis, arguing that such testimony would be inadmissible under our court's decision in *United States v. McDaniel*, 538 F.2d 408, 413 (D.C. Cir. 1976). The judge asked counsel whether she had a "contrary cite" to counter the government's reliance on *McDaniel*, to which counsel responded "not yet" and asked for "some time to check on the case law." J.A. 4881.

A few days later, the district court again brought up the subject of McGill's proffered expert and asked McGill's counsel to "[t]ell [him] more about what this is about." *Id.* at 4911. Counsel told the court that she had not had time to research the admissibility issue after the government's objection the previous week, but that she would like to prepare the expert for a *Daubert* hearing. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). In response to the judge's questions, counsel outlined the expert's credentials and requested a *Daubert* hearing because "it ha[d] been a very long time since [voice-spectographic] analysis ha[d] been examined in this jurisdiction." *Id.* at 4912-15. The government reiterated its view that any such testimony would be inadmissible in this circuit.

Roughly three weeks later, on March 10, 2004, counsel for McGill asked the court when the expert should be ready to testify at a *Daubert* hearing. The court refused to hold a *Daubert* hearing and told counsel that it wanted a written proffer of the expert's testimony by the next day, together with case law supporting its admissibility. The court explained its aversion to "stop[ping] a trial in the middle of it [to] have a Daubert hearing" "on something that's been

settled for years," *id.* at 5096-97, adding that McGill's counsel "has not given me [the expert's] proposed testimony, . . . she has not given me anything. She just comes up and says I want a hearing. I don't stop a trial for a hearing like that." *Id.* at 5098. Instead, the court stated, "Once [counsel] gives me something, I'll look at it." *Id.* Counsel promised to file a written proffer.

Five days later, on March 15—with one defense witness left to testify—McGill's counsel told the court that she had filed a motion in limine that morning addressing the admissibility of voice-identification testimony. That motion is not in the appellate record. But defense counsel's responses to the court's questioning indicate that McGill's filing contained no proffer of the substance of the expert's testimony—counsel instead "t[ook] the position that the best person to articulate the [ins] and outs of the science is the expert," and she said that the expert would "testify as to the methodology" at an in-court hearing. *Id.* at 5125. The district court again expressed opposition to stopping the trial "to spend my time listening to [the expert] when she hasn't even written it down," especially because holding a hearing would require the court to "send the jury home and . . . waste all this time." *Id.* at 5126. The court denied McGill's motion to admit the expert's testimony. Counsel again promised to produce a written proffer, but the court said that it was "too late." *Id.* Two days later—after the government had concluded its rebuttal case—counsel filed a motion for reconsideration, this time containing a written proffer of the expert's testimony. The court denied the motion.

## B.

The district court has a gatekeeping responsibility to ensure that any expert testimony is based on "scientific

knowledge" that "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592 (quoting Fed. R. Evid. 702). When faced with a request to admit expert testimony, the court therefore must undertake "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-93.

We review a district court's decision to admit or exclude expert testimony for an abuse of discretion. *United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008). Courts have "considerable leeway . . . about how to determine reliability" and their "ultimate conclusion[s]" in that regard. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see* Fed. R. Evid. 702, advisory committee's note to 2000 amendment (Rule 702 imposes "no . . . procedural requirements for exercising the trial court's gatekeeping function"). The proponent of the expert testimony bears the burden to establish the admissibility of the testimony and the qualifications of the expert. *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001).

McGill argues that the district court erred in rejecting his expert's testimony without conducting any hearing. But the court excluded McGill's expert because defense counsel, despite the court's clear request, failed to timely produce a written proffer of the expert's testimony. *See Simmons*, 431 F. Supp. 2d at 74 (district court explaining that "McGill's failure to make a proffer upon request of this Court itself justified denial of the testimony"). In light of the government's identification of circuit case law holding that voice-identification expert testimony was inadmissible, *see McDaniel*, 538 F.2d at 413, and the long duration of the trial to that point, the district court was understandably reluctant to

send the jury home and convene a hearing to explore an issue of questionable merit. The court acted well within its discretion in insisting on seeing a written proffer of the expert's testimony and the legal basis for its admissibility before any hearing. When McGill failed to provide one, the court decided it would not consider the matter further. That is a trial-management decision that we are loathe to disturb on appeal.

McGill's arguments to the contrary are unpersuasive. First, he contends that the government did not disclose the existence of the calls containing McGill's voice until after the trial commenced. The government disputes that representation, maintaining that it provided all of the wiretapped recordings to the defense years before trial. Regardless, there is no dispute that McGill knew of the calls' existence at least as of October 2003. *See* J.A. 1817. Yet McGill told the court that he intended to offer expert testimony only months later, in mid-February, and even then only after the *government* brought the matter to the court's attention. Although the district court appeared open to considering a proffer of the expert's testimony even at that late date, McGill offered no written response to the government's concerns about admissibility until mid-March and, even then, his motion failed to include a proffer. No proffer was filed until the district court had already ruled the expert's testimony inadmissible and the government had completed its rebuttal. McGill's failure to make a timely proffer thus cannot be excused on grounds that he was caught off guard. McGill notes that he put the government on notice that he intended to call the voice expert and passed along the expert's reports to the government. But the fact that McGill made information about his expert available *to the government* is not determinative of whether he made an adequate and timely proffer *to the court*—and the court bears

responsibility to assure that the expert's testimony is based on scientific knowledge and will assist the trier of fact.

Even if we did not sustain the district court's decision on those timeliness grounds, we can say with fair assurance that any error was harmless because it "did not have a 'substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Powell*, 334 F.3d 42, 45 (D.C. Cir. 2003) (quoting *Kotteakos*, 328 U.S. at 776). The government introduced three wiretapped calls purportedly containing McGill's voice. While McGill took the stand and denied that he was speaking on two of the calls, he acknowledged that he was speaking on the remaining call. We therefore agree with the government that, in light of the undisputed identification of McGill's voice on one call and the five days the jurors spent listening to McGill while he testified at trial, the jurors were in a very good position to determine for themselves whether McGill truthfully denied speaking on the other recordings. "Voice identification . . . does not depend on specialized expertise. Juries may listen to an audiotape of a voice and determine who is speaking even though the voice has been authenticated only by a lay witness rather than an expert." *Tyson v. Keane*, 159 F.3d 732, 738 (2d Cir. 1998). The testimony of McGill's expert also would have been subject to extensive cross-examination by the government about the science of voice-spectrographic analysis—as the government made clear during bench discussions of the subject—further diluting the testimony's persuasive value. *See United States v. Drones*, 218 F.3d 496, 504 (5th Cir. 2000).

For those reasons, we reject McGill's claim of reversible error based on the court's exclusion of his voice-identification expert.

## IX.  Joinder (McGill)

McGill next asserts that the district court erred in joining his case with the other five appellants for trial.  We reject McGill's argument.

### A.

In November 2000, the grand jury returned the indictment charging seventeen individuals—including the five appellants here—with numerous offenses.  The trial of the Group One defendants began on March 1, 2001.  On January 30, 2002, a defendant-turned-cooperator, Frank Howard, testified before the grand jury.  Two days later, on February 1, 2002, McGill was indicted for tampering with a witness by killing and felon in possession of a firearm.  A superseding indictment filed on March 13, 2002, added further counts against McGill, including drug conspiracy, RICO conspiracy, and violent crime in aid of racketeering activity.

The superseding indictment named Group One codefendants Kevin Gray and Rodney Moore as the heads of the RICO conspiracy in which McGill allegedly participated.  The indictment also alleged that McGill joined the enterprise in 1996, distributed cocaine on Gray's behalf, and committed acts of violence—including the attempted murder of a witness—in order to further the purposes of the enterprise.  On March 18, the government moved to join McGill's indictment with the broader indictment and to try McGill with the Group Two defendants (appellants here).  The government's motion stated that the evidence at trial would show that "McGill was part of the identical drug and racketeering conspiracy as was engaged in by Gray and his co-defendants."  J.A. 700.

Meanwhile, the Group One trial continued. On July 17, 2002, Howard testified in the Group One trial about McGill's participation in the overarching conspiracy—specifically, about how Gray supplied McGill with cocaine between 1996 and 1999 and how McGill shot a government witness (named Charles Shuler) because McGill believed Shuler was responsible for Gray's arrest. The government made Howard's testimony available to the district court in responding to McGill's opposition to joinder. On November 8, 2002, after holding a hearing on the matter, the district court granted the government's joinder motion.

**B.**

Under Federal Rule of Criminal Procedure 13, a district court "may order that separate cases be tried together as though brought in a single indictment . . . if all offenses and all defendants could have been joined in a single indictment" pursuant to Federal Rule of Criminal Procedure 8. Fed. R. Crim. P. 13; *see Burkley*, 591 F.2d at 918-19. Rule 8(b), in turn, allows charging defendants together if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "Rule 13 is permissive rather than mandatory," and in deciding whether to consolidate cases for trial, "the court should weigh the efficiency and convenience of a single trial against the risks of prejudice to the defendant from a single proceeding." 1A Charles Alan Wright et al., *Federal Practice and Procedure* § 216, at 558-59 (4th ed. 2008); *see* Fed. R. Crim. P. 14.

In determining whether joinder is appropriate, district courts in our circuit may consult the indictment along with any pretrial submissions offered by the government. *United States v. Wilson*, 26 F.3d 142, 153 (D.C. Cir. 1994). The

government therefore satisfied its Rule 8 burden by explaining, in its motion to join the indictments, that "McGill is a participant in the same narcotics and racketeering conspiracy" alleged in the broader indictment, J.A. 699, and by offering Howard's testimony from the Group One trial.

In objecting to the joinder, McGill relies heavily on the fact that the government did not indict him until after Howard testified before the grand jury. McGill claims that "he [wa]s shoehorned into a massive drug conspiracy at the last minute on the questionable claims of a desperate cooperator." Appellants' Br. 196. Howard's credibility, however, is beside the point. "[T]he Government need merely allege, not prove, the facts necessary to sustain joinder." *United States v. Gooch*, 665 F.3d 1318, 1334 (D.C. Cir. 2012). And in ruling on the motion pretrial, the district court must assume the truth of all the facts in the superseding indictment. *See Moore*, 651 F.3d at 69. Moreover, the Group Two trial began well over a year after the government moved to join McGill's trial with the other defendants—his inclusion was hardly an eleventh-hour development. Because McGill offers no other reasons that prejudice concerns should have counseled against joinder, and because "[j]oint trials are favored in RICO cases," *United States v. Richardson*, 167 F.3d 621, 624 (D.C. Cir. 1999), we uphold the district court's decision to consolidate the trials.

## X. Impeachment with Prior Bad Acts (McGill)

McGill took the stand at trial. He now argues that the district court erred by permitting the government to introduce evidence of prior instances of his misconduct to impeach him during cross-examination. Our review is for abuse of discretion. *See United States v. Edwards*, 388 F.3d 896, 899 (D.C. Cir. 2004); *United States v. Baylor*, 97 F.3d 542, 544 (D.C. Cir. 1996). We find that any error was harmless.

McGill first takes issue with the government's introduction of evidence relating to two prior Maryland convictions. Both cases involved robberies that took place in April 1989. The first case went to trial in 1989. McGill was found guilty of assault with intent to rob and use of a handgun in the commission of a felony, but he was acquitted of robbery with a deadly weapon. The second case went to trial in 1990. McGill was found guilty of theft and robbery with a deadly weapon, though he was acquitted of assault and battery of the robbery victim and attempted murder and assault of a police officer at the scene.

McGill concedes that the government could cross-examine him about the fact that he had been convicted of the Maryland crimes under Federal Rule of Evidence 609, which enables a party to introduce evidence of a witness's prior conviction to attack the witness's character for truthfulness. *See* Fed. R. Evid. 609(a)(1)(B). But McGill argues that the government delved too deeply into the facts surrounding those earlier crimes. Specifically, he maintains that the government was wrongly permitted to introduce: (i) a statement by McGill denying any involvement in the first April 1989 robbery; (ii) witness testimony from a Prince George's County police officer about a statement made by McGill's accomplice, William Little, regarding the second April 1989 robbery; (iii) the entire transcript from the 1990 trial of the second robbery; and (iv) the Maryland Court of Appeals judgment affirming McGill's 1990 conviction. Those admissions, McGill contends, contravened the understanding that, "when evidence of a prior conviction is admitted for purposes of impeachment, cross-examination is usually limited to the essential facts rather than the surrounding details of the conviction." *Baylor*, 97 F.3d at 544.

McGill is correct insofar as he argues that the prosecution may not dwell on the facts of a defendant's prior unrelated convictions just for the sake of it. But "under certain circumstances details concerning a conviction may be elicited." *Id.* at 544. One such circumstance is when the defendant "open[s] the door" to impeachment about the details of his convictions "by attempting to minimize" his misconduct in his testimony. *Id.* at 545; *see United States v. Butler*, 924 F.2d 1124, 1130 (D.C. Cir. 1991); *United States v. White*, 222 F.3d 363, 370 (7th Cir. 2000).

Here, the government offered each of the above items of evidence in order to contradict self-serving portions of McGill's testimony. For instance, McGill testified that he had readily admitted his participation in the first April 1989 robbery and pleaded guilty, but that the Maryland prosecutor refused to make a plea deal unless he also pleaded guilty to a second robbery. In response to McGill's claim that he had admitted the first robbery, the government introduced his statement denying his involvement. McGill also told the jury that he did not participate in the second robbery, and his counsel emphasized his claims of innocence by asking McGill how he felt about being wrongly imprisoned for a crime he did not commit. In addition, McGill testified that he was implicated in the second robbery because the Maryland police officers tricked his codefendant, Little, into falsely confessing that McGill was his accomplice, and further testified that the Maryland prosecutor and the trial judge prevented Little from testifying as to McGill's innocence. In response, the government introduced testimony from the Prince George's County police officer about Little's statement to establish that investigators had not, in fact, tricked Little into implicating McGill, and the government also introduced the transcript from the 1990 trial to show that McGill's attorney never made that argument in McGill's defense or attempted to call Little

to the stand. Similarly, because McGill claimed that the 1990 trial court had made its ruling barring Little from testifying off the record, the government introduced the Maryland Court of Appeals judgment to demonstrate that McGill's attorney never made an argument to that effect in appealing McGill's convictions. McGill also testified that his 1990 robbery trial was a farce that lasted "twenty minutes," with a transcript that was "like four sentences, three pages." J.A. 4957; *see id.* at 5040. The government then introduced the 1990 trial transcript to establish that the trial and jury deliberations had actually lasted three days.

McGill next argues that the district court wrongly allowed the government to introduce extrinsic evidence of three other alleged incidents of wrongdoing for which McGill was not convicted. Specifically, the government inquired into, and offered extrinsic evidence of, McGill's participation in two additional Maryland thefts—at a Walmart and a Zales jewelry store—in 2001. In addition, McGill challenges the government's introduction of documents showing that he had been accused of forging his GED certificate while in prison in 1994, including the certificate itself. He argues that Federal Rule of Evidence 608(b) prohibits a party from introducing extrinsic evidence of a witness's prior bad acts in order to attack the witness's character for truthfulness, even if the witness denies the acts during questioning.

McGill is right that, under Rule 608(b), the government could not resort to extrinsic evidence of specific instances of misconduct in order to attack McGill's character for truthfulness. *See* Fed. R. Evid. 608(b). But Rule 608(b)'s bar against extrinsic evidence does not apply when the evidence is used to contradict a statement made by a witness during her testimony. *See United States v. Fonseca*, 435 F.3d 369, 374-75 (D.C. Cir. 2006). Such "impeachment by contradiction" is

subject only to the constraints of Federal Rules of Evidence 401, 402, and 403. *Id.* at 375; *see* Fed. R. Evid. 608, advisory committee's note to 2003 amendment. "And evidence that would contradict [a witness's] trial testimony, even on a collateral subject" is relevant under Rule 401 "because it would undermine her credibility as a witness regarding facts of consequence." *Fonseca*, 435 F.3d at 375. Accordingly, as long as the evidence was used to contradict McGill's testimony, the only issue is whether the district court erred in determining that the probative value of the evidence of McGill's alleged participation in the 2001 Maryland thefts and the GED forgery was not "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time." Fed. R. Evid. 403; *see Fonseca*, 435 F.3d at 375.

The evidence at issue here was introduced in response to McGill's contrary statements during his testimony. McGill testified at length about the college-level courses he took and the accreditations he acquired while in prison for the Maryland convictions. His counsel introduced several of McGill's course certificates into evidence. McGill also testified about how he had been living a clean, hardworking, and generally commendable life since his release. The government introduced evidence of McGill's multiple run-ins with the law in 2001 in order to contradict McGill's testimony that he had been a model citizen since his release and had forsaken all criminal endeavors. And to mitigate McGill's account of all the college courses he had taken while in prison, the government offered evidence that he was charged with a prison infraction for forging his GED certificate to take those courses.

Some of the admitted evidence, however, pushed the limits of acceptability. "The open door does not give the

prosecution license to dwell on the details of the prior conviction and shift the focus of the current trial to the defendant's prior bad acts," and "the prosecution's response must be tailored to the statements made by the defendant." *White*, 222 F.3d at 370. In that regard, introducing the entire transcript from the second Maryland trial may have been overkill, especially because that trial also concerned conduct of which McGill was acquitted. And even the government admits that evidence about the GED-certificate forgery "did not contradict any specific statement" that McGill made during his direct testimony. Appellee's Br. 173 n.145.

Even if the government's impeachment should have been kept within tighter bounds, however, we find that any error was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Powell*, 334 F.3d at 45 (quoting *Kotteakos*, 328 U.S. at 776). McGill was an extremely difficult witness whose testimony proved more belligerent and incoherent than informative. He persistently refused to answer the government's questions, instead volunteering inadmissible information and accusing the government of illegality in rambling speeches. He similarly ignored the district court's repeated admonitions to stop bringing up extraneous information and answer properly. In addition, he often contradicted himself from one sentence to the next, evaded giving answers to questions obviously designed to catch him in a contradiction, and generally used his time on the stand to fight with the prosecutor and the court rather than answer questions.

We see no reasonable possibility that limiting the government's impeachment of McGill regarding past misconduct could have caused the jury to think he was credible, especially considering that much of the evidence the

government used against him was unquestionably legitimate impeachment evidence.  We therefore find no reversible error in the government's cross-examination.

## XI.  Sentencing (McGill)

The district court sentenced McGill on the following six counts:  (i) Count One, conspiracy to distribute narcotics; (ii) Count Two, RICO conspiracy; (iii) Count Three, assault with intent to commit murder; (iv) Count Four, violent crime in aid of racketeering; (v) Count Five, tampering with a witness or informant by killing; and (vi) Count Six, unlawful use of a firearm.  The court sentenced McGill to four concurrent sentences of life imprisonment on Counts One, Two, Four, and Five; a concurrent term of thirty years to life on Count Three; and a consecutive term of ten years on Count Six.

McGill lodges various challenges to those sentences. Because we find merit in certain of McGill's challenges, we vacate his sentences on Counts One, Two, Four, and Five and remand for resentencing consistent with this opinion.  We note that other appellants summarily purport to join McGill's sentencing arguments.   But those appellants give no indication in their opening brief of which arguments are applicable to them, include no explanation of how their individual sentences would be affected by McGill's arguments, give no record citations concerning their sentences, and include no documents or transcripts pertaining to their sentences in the appellate record.  Those appellants' woefully underdeveloped arguments are forfeited.  *See Moore*, 651 F.3d at 93.

## A.

McGill first raises several challenges to the district court's application of the Sentencing Guidelines.   Those

arguments affect his sentencing only as to Counts One, Two, Four, and Five. The Sentencing Guidelines did not affect McGill's sentence on Count Three (assault with attempt to commit murder under the D.C. Code, a nonfederal offense). The Guidelines also did not affect his sentence on Count Six (unlawful discharge of a firearm), which carries a mandatory minimum term of ten years served consecutively to any other term. 18 U.S.C. § 924(c)(1)(A)(iii). The district court imposed the minimum sentence of ten years. Any errors in the application of the Guidelines would therefore be harmless as to his sentences on Counts Three and Six.

With regard to the remaining counts, the Presentence Report (PSR) applied the 2000 edition of the Guidelines. No party challenges the PSR's use of the 2000 Guidelines. And, while the record is unclear on the issue, all parties present their arguments under the assumption that the district court adopted the PSR's Guidelines calculation. We therefore proceed on the understanding that the district court relied on the PSR in imposing McGill's sentence. *See United States v. Kennedy*, 722 F.3d 439, 442 (D.C. Cir. 2013).

The PSR calculated a combined base offense level of 32 for Counts One, Two, Four, and Five. J.A. 1641-43. From that base level of 32, the PSR added two levels pursuant to U.S.S.G. § 2D1.1(b)(1) (2000), "because the defendant possessed a dangerous weapon" in the commission of the offense. J.A. 1643. The PSR then added another two levels for obstruction of justice under U.S.S.G. § 3C1.1 (2000), bringing McGill's adjusted offense level to 36. The PSR then applied the career offender provisions set out in U.S.S.G. § 4B1.1 (2000), under which McGill qualified as a "career offender," meaning that his total offense level was at least 37. *Id.* Using the career offender provisions, the PSR also assigned McGill a criminal history category of VI. J.A. 1644;

*see* U.S.S.G. § 4B1.1 (2000). Based on an offense level of 37 and a criminal history category of VI, the Guidelines provided for an imprisonment range of 360 months to life on Counts One, Two, Four, and, Five. *See* U.S.S.G. Ch. 5 (2000), Pt. A.

### *1.*

At sentencing, McGill asked the district court to depart from the Guidelines in its application of the drug quantity guidelines, U.S.S.G. § 2D1.1(c)(4) (2000), and also to depart from the applicable career offender guidelines, U.S.S.G. § 4B1.1 (2000). He argued for a departure based on the disparity in sentencing for crack and powder cocaine and based on his objections to the application of career offender status. The district judge did not directly respond to either of those arguments. We find error.

While "a court of appeals may apply a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines," *Rita v. United States*, 551 U.S. 338, 347 (2007), "[t]he [district] court, at the time of sentencing," must "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). We do not "insist[] upon a full opinion in every" sentencing, but "[t]he appropriateness of brevity or length, conciseness or detail, when to write, [and] what to say, depends upon circumstances." *Rita*, 551 U.S. at 356. Although a court issuing a sentence within the Guidelines range need not give any "lengthy explanation," it may be required to do more if a party "argues that the Guidelines reflect an unsound judgment . . . or argues for departure." *Id.* at 356-57.

While our review is for abuse of discretion, based on the record here, we cannot tell that the district court "considered the parties' arguments and ha[d] a reasoned basis for

exercising [its] own legal decisionmaking authority," or that it "listened to each argument" or "considered the supporting evidence." *Id.* at 356, 358. That is not to say that the court did not, in fact, do so, but the government provides no record citations or arguments to that end on appeal. Accordingly, we agree with McGill that his sentences on Counts One, Two, Four, and Five should be vacated and remanded for resentencing.

*2.*

McGill additionally challenges the application of a two-level increase for firearms possession under U.S.S.G. § 2D1.1(b)(1). He argues that he was already subject to a separate mandatory minimum sentence for use of the same firearm under Count Six and that such a double penalty runs afoul of the Guidelines. Because McGill failed to raise that objection at trial, our review is for plain error. *See Wilson*, 605 F.3d at 1034.

We agree with McGill that the application of the two-level increase constituted error. Section 2D1.1(b)(1) of the Guidelines provides that, "[i]f a dangerous weapon (including a firearm) was possessed" during the commission of the offense, the offense level increases by two levels. U.S.S.G. § 2D1.1(b)(1) (2000). But Application Note 2 (Note 4 in the current version of the guidelines) of Guidelines Section 2K2.4 (2000) further provides that, if a sentence under 18 U.S.C. § 924(c) "is imposed in conjunction with a sentence for an underlying offense," the court is "*not* [*to*] *apply any specific offense characteristic* for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense." U.S.S.G. § 2K2.4 n.2 (2000) (emphasis added). Application Note 2 aims to prevent double-counting, as § 924(c)'s special mandatory minimum

sentences—which run consecutively to the sentence for the underlying offense, *see* 18 U.S.C. § 924(c)(1)(A)—already "account[] for any explosive or weapon enhancement for the underlying offense." U.S.S.G. § 2K2.4 n.2 (2000).

Here, the PSR added a two-level, specific-offense characteristic for firearms possession to the calculation of McGill's offense level for Counts One, Two, Four, and Five. Because McGill was sentenced on Count Six—a § 924(c) firearms offense—at the same time and for the same conduct, Application Note 2 forbids that additional two-level enhancement.

The government argues that the Count Six sentence was based on the underlying conduct embodied in Counts Four and Five only, whereas the two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for a dangerous weapon was imposed only in connection with Count One. That is incorrect. The PSR assigned a *combined* offense level for Counts One, Two, Four, and Five. While Count One, as the most serious offense, served as the starting point for that calculation, "[t]he other counts determine whether and how much to increase the offense level" from Count One. *See* U.S. Sentencing Comm., An Overview of the Federal Sentencing Guidelines at 2. http://www.ussg.gov/sites/default/files/pdf/about/overview/O verview_Federal_Sentencing_Guidelines.pdf. So while Count One was the starting point, the offense-level calculation reflected Counts One, Two, Four, and Five *in combination*.

The government further argues that any error was not "plain" for purposes of the plain-error standard. We disagree. The government contends that our court upheld the use of the § 2D1.1 enhancement in similar factual circumstances in *United States v. Thomas*, 114 F.3d 228 (D.C. Cir. 1997). But

the defendant in that case—unlike McGill—was not convicted of a separate § 924(c) firearms offense. *Id.* at 237, 270. As we have observed elsewhere, "an enhancement under § 2D1.1(b)(1) and sentencing on a § 924(c) conviction are mutually exclusive." *United States v. Rhodes*, 106 F.3d 429, 432 (D.C. Cir. 1997).

Under the plain-error standard, an appellant must demonstrate prejudice to his "substantial rights," and that the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Bolla*, 346 F.3d 1148, 1152 (D.C. Cir. 2003) (quoting *United States v. Cotton*, 535 U.S. 625, 631 (2002) (brackets omitted). "[O]ur application of plain error review in the sentencing context allows a somewhat relaxed standard for showing prejudice under the third prong of the plain error test." *Id.* (citing *United States v. Saro*, 24 F.3d 283, 288 (D.C. Cir. 1994)). We have explained that "it is a miscarriage of justice to give a person an illegal sentence that increases his punishment, just as it is to convict an innocent person," and that "leaving in place an error-infected sentence that would have been materially different absent error and that could be readily corrected would 'seriously affect the fairness, integrity[,] or public reputation of judicial proceedings.' Indeed, it would seriously affect all three." *United States v. Coles*, 403 F.3d 764, 767 (D.C. Cir. 2005) (quoting *United States v. Paladino*, 401 F.3d 471, 483 (7th Cir. 2005); *United States v. Williams*, 399 F.3d 450, 461 (2d Cir. 2005)) (internal citations and brackets omitted).

That understanding applies here. Following the two-level upward adjustment under § 2D1.1(b)(1) (and the two-level upward adjustment for obstruction of justice under U.S.S.G. § 3C1.1), McGill's adjusted offense level stood at 36. The PSR then applied the career offender provisions, which

stipulated that McGill's adjusted offense level could be no less than 37.  *See* U.S.S.G. § 4B1.1 (2000).  If the district court properly applied the career offender provisions, McGill then suffered no prejudice resulting from the erroneous, two-level upward adjustment based on § 2D1.1(b)(1)—his adjusted offense level would still be 37, regardless of that error.  But we have already held that we must remand for the district court adequately to explain its decision to hew to the career offender provisions.  While the district court might well continue to apply the career offender provisions—earning McGill an adjusted offense level of 37, regardless of the application of § 2D1.1(b)(1)—we can be confident that the court's application of § 2D1.1(b)(1) did not prejudice McGill only if the court chooses to persist in applying the career offender provisions and adequately explains its decision.  Accordingly, we find that McGill has shown a reasonable likelihood that the error affected the outcome of his sentencing, *see Wilson*, 605 F.3d at 1032, and we remand for resentencing on Counts One, Two, Four and Five in a manner consistent with our decision.

### B.

The district court sentenced McGill to life imprisonment on Counts Four and Five.  As the government concedes, however, the maximum sentence available under Count Four is ten years, and, at the time of McGill's sentence, the maximum sentence available under Count Five was 20 years.  We have already vacated McGill's sentence on Counts Four and Five.  On remand, the district court can correct these errors as well.

### C.

The district court sentenced McGill to a term of ten years on Count Six for violating 18 U.S.C. § 924(c)(1)(A).  That

provision mandates a five-year minimum sentence for carrying a firearm, but it increases the penalty to a ten-year mandatory minimum if the firearm is discharged in the commission of the crime. 18 U.S.C. § 924(c)(1)(A)(i), (iii). In *Alleyne v. United States*, 133 S. Ct. 2151 (2013), the Supreme Court held that "any fact that increases the mandatory minimum" applicable to a crime "must be submitted to the jury." *Id.* at 2155. McGill argues on appeal that the district court's ten-year sentence on Count Six ran afoul of *Alleyne* because the jury did not find that the firearm was, in fact, discharged. Because McGill failed to raise that *Alleyne* objection before the district court, our review again is for plain error.

The verdict form represents the facts found by the jury, *see United States v. Fields*, 242 F.3d 393, 396, and those forms did not require the jury to find that McGill discharged a firearm. The language of the jury verdict asked the jury to find only that McGill had "use[d]" a firearm. J.A. 1151. We therefore agree with McGill that there was an *Alleyne* error. But to qualify for relief under the plain-error standard, that error must also have "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Henderson*, 133 S. Ct. at 1130.

Our decision in *United States v. Johnson*, 331 F.3d 962 (D.C. Cir. 2003) demonstrates that McGill cannot make that showing. In *Johnson*, the district court failed to submit an element of the offense—that the conspiracy involved at least 50 grams of cocaine base—to the jury, in violation of the rule in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Johnson*, 331 F.3d at 966-67. Nevertheless, we explained, the appellant had "offered the jurors no scenario under which they could have convicted him of unlawful possession with intent to distribute cocaine base"—which they did—"yet found that the

quantity involved was less than 50 grams." *Id.* at 969. As a result, we found that any error did not affect the fairness, integrity, or public reputation of the judicial process. *Id.* at 968 (citing *Cotton*, 535 U.S. at 632-33).

The same is true here. Count Four charged that McGill, "while armed with a firearm, attempted to murder Witness #6." J.A. 695. Count Five alleged that McGill "attempt[ed] to kill Witness #6 by shooting Witness #6 with a firearm." *Id.* And Count Six charged that McGill "carr[ied] and possess[ed] a firearm" in connection with "Counts Four and Five." *Id.* at 696. Witness #6 (Charles Schuler) was shot, and McGill was convicted on Counts Four and Five in connection with that shooting. McGill offered no defense beyond, "I didn't do it." The logical implication of those facts is unavoidable: if the jury found McGill guilty on Counts Four and Five—which it did—the jury necessarily found that a firearm was discharged in connection with Counts Four and Five. McGill therefore is not entitled to relief from his sentence on Count Six under the plain-error standard. *See Johnson*, 331 F.3d at 968; *accord United States v. Webb*, 255 F.3d 890, 901-02 (D.C. Cir. 2001).

## D.

By this point, we have vacated McGill's sentences on Counts One, Two, Four, and Five, and we have identified errors in those sentences for correction on remand. Because McGill's sentence is yet to be determined, we do not reach his challenges to the overall reasonableness of his sentence under 18 U.S.C. § 3553(a) at this time. *Cf. United States v. Locke*, 664 F.3d 353, 357 & n.3 (D.C. Cir. 2011).

McGill urges us to instruct the district court that it should conduct its resentencing analysis on remand *de novo*. Consistent with our usual practice, we decline to issue that

instruction. *See United States v. Whren*, 111 F.3d 956, 959-60 (D.C. Cir. 1997); *see also United States v. Taylor*, 937 F.2d 676, 684 (D.C. Cir. 1991). "*De novo* resentencing is in essence a license for the parties to introduce issues, arguments, and evidence that they should have introduced at the original sentencing." *Whren*, 111 F.3d at 959. We therefore remand for the district court to "consider only such new arguments or new facts as are made newly relevant by [our] decision—whether by the reasoning or by the result," *id.* at 960, in addition to any "facts that did not exist at the time of the original sentencing," *United States v. Blackson*, 709 F.3d 36, 40 (D.C. Cir. 2013).

## XIII. Cross-Examination (Oliver)

Oliver claims that the district court erred in allowing the prosecution, on cross-examination, to read to him testimony of government witnesses and ask him for his position on the events recounted. Oliver's theory is that the government's procedure forced him to state that government witnesses were lying and to explain why they would lie, contrary to the rule that a prosecutor may not "induce a witness to testify that another witness, and in particular a government agent, has lied on the stand." *United States v. Boyd*, 54 F.3d 868, 871 (D.C. Cir. 1995); *see also United States v. Schmitz*, 634 F.3d 1247, 1268 (11th Cir. 2011). Although courts have found such questions objectionable on several grounds, perhaps the most obvious are that they ask the defendant-witness to speak on a matter of which he has no personal knowledge and that they may put him in a position, unless he is verbally agile, where he must either call another witness a liar or be seen as accepting that witness's account. *See id.* at 1268-69.

Oliver mischaracterizes the government's line of questioning, and, to the extent that he did comment on other

witnesses' veracity, he did so on his own initiative, in answers broader than what the government's questions had invited. We therefore reject his challenge.

The government did not pose "were-they-lying" questions of the type prohibited by *Schmitz* and *Boyd*, but instead read (or summarized) other witnesses' accounts of events and asked for Oliver's account. For example, a prosecutor summarized Cheryl Pinkard's testimony that Oliver was present at the shooting of Richard Simmons, and then asked Oliver whether he was indeed at the scene; Oliver responded, "No, sir." J.A. 4692. Similarly, the prosecutor summarized Frank Howard's testimony that he and Kevin Gray had come over from Southeast Washington to Northeast to engage in drug dealing with Oliver and asked Oliver whether such a thing had happened, to which he responded, "No way." *Id.* at 4698.

The questioning here falls on the permissible side of the line we and other courts have drawn. While we have held that asking a defendant "point-blank" why witnesses would "'make up' a story about him" is improper, we have distinguished such questioning from "unobjectionable" examination designed to compare the defendant's factual account with other witnesses' and allow jurors to draw their own conclusions. *Boyd*, 54 F.3d at 871-72. It is likewise permissible to "focus a witness on the differences and similarities between his testimony and that of another witness," so long as "he is not asked to testify as to the veracity of the other witness." *Schmitz*, 634 F.3d at 1269. The government's questioning met these standards.

Insofar as Oliver did comment that certain witnesses were lying or speculate as to their motives, he did so spontaneously, of his own accord. For example, in response

to the government's presentation of Pinkard's testimony placing him at the scene of the Simmons shooting, the testimony of Walter Fleming ("Biggums") that he shared a stash house with Simmons, and Victoria Robles's testimony that Oliver and Timothy Handy had come into the apartment with guns, Oliver claimed they were all "lie[s]." J.A. 4747, 4787-88, 4756. Oliver also volunteered a theory as to why Robles would lie—namely, that the government agreed, in exchange for her cooperation, not to prosecute her for killing her daughter.

### XIV. Evidence Regarding Murder of Green (Oliver)

Deon Oliver (we'll henceforth call him simply "Oliver," reserving the complete given name and family name for his cousin Taron Oliver) argues that the government deceived the jury by telling it that certain evidence supported Oliver's involvement in the Richard Simmons murder despite knowing that the evidence actually related to a different murder, that of Demetrius Green. Though framing the issue mainly as a matter of prosecutorial misconduct, the defense also indirectly claims district court error in admission of the evidence and failure to correct the misconduct.

The evidence in question was Robles's grand-jury testimony, introduced at trial during Robles's direct examination. The government initially used the grand-jury testimony to refresh Robles's recollection that she had testified about hearing Timothy Handy ("Dog") and Oliver discuss a murder. When Robles said her recollection was not refreshed, the government then moved to admit the testimony. The defense objected, but evidently not on any ground other than illegitimate intermingling of the two murders, the issue we now address. (In a pre-*Crawford* case we said that "the Confrontation Clause is not violated by admitting a

declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." *Powell*, 334 F.3d at 45 (quoting *California v. Green*, 399 U.S. 149, 158 (1970)).)

Before the grand jury Robles said that she had overheard Handy and Oliver discuss Handy's having shot and killed a "little boy" in front of his mother, and that Oliver had said, "You got to get her, too. Because she will snitch." J.A. 1706-07. Robles also told the grand jury that the "little boy" was 15 or 16 years old, and that the murder occurred on Forrester Street.

If Robles's account to the grand jury was a story of a single murder, it didn't very well match the killing of Simmons, specifically as to the victim's age and the site of the murder. First, Oliver testified that Simmons was "not a little boy," J.A. 4805, and the government doesn't contest defense counsel's claim at trial that Simmons was "in his twenties or thirties," Appellee's Br. 197, and thus not a "little boy" in ordinary parlance, let alone a little boy of 15 or 16. Second, the government does not claim that the Simmons murder occurred on Forrester Street. In fact, Demetrius Green, a boy of 15 or 16, was murdered on Forrester Street, and Handy has been convicted for that murder. *See Moore*, 651 F.3d at 98.

The trial court admitted the elements of Robles's grand-jury testimony that were logically consistent with the Simmons murder but excluded those portions that were flatly at odds with that murder and in fact seemed to link Robles's account to the Demetrius Green murder. Though on appeal Oliver does not highlight his objection at trial to the admission of this truncated testimony, that admission is of course temporally prior and logically necessary to the alleged later prosecutorial abuse.

The court initially questioned whether admitting the grand-jury testimony "would do anything other than confuse the jury." J.A. 3367-68. But the government advanced a theory linking the testimony to the Simmons murder. The prosecutor candidly acknowledged that Robles "may very well be mixing a couple of different conversations" and that the reference to "Forrester Street" was incorrect (as to the Simmons murder). *Id.* at 3368-69. The prosecutor nonetheless argued that the conversation must have related at least in part to the Simmons murder, because other than the street name, the evidence "smack[ed]" of that murder. *Id.* at 3367. Specifically, the prosecutor said, Simmons's mother had witnessed her son's murder, consistent with Robles's testimony. The parties agree that *a* mother was also present at the scene of the Green murder, though they dispute whether it was the victim's mother or a bystander's. Oliver testified that Green's mother witnessed Green's murder, but Oscar Veal testified that Scorpio Phillips and his mother Phyllis were witnesses to that murder. Additionally, Robles testified that Oliver had spoken as if he had been "actually present" at the murder, *id.* at 3374, and Oliver does not suggest that he was involved in the Green murder.

After the government explained its theory, the court agreed to change its ruling and admit a version of the grand-jury testimony omitting the references pointing to the Green murder (the victim's age and the murder site). Given the court's concern with jury confusion, it may be that it reasoned that the material specific to the Green murder was irrelevant. Of course, since Robles delivered that material as part of an integrated account of a single conversation that she said she overheard, its omission before the jury greatly enhanced the apparent force of the government's theory. The jury confusion of the sort that the trial court evidently feared

would have arisen from Robles's apparent confusion between the two murders.

The government's inference was highly contestable and the admitted excerpt one-sided. But Oliver had an opportunity to offer the missing portion of grand-jury testimony under the rule of completeness. *See United States v. Washington*, 12 F.3d 1128, 1137-38 (D.C. Cir. 1994). Why he failed to do so is unexplained. Introduction of only the inculpatory part of a statement is not error so long as the defendant is able to "present the allegedly exculpatory material during cross-examination," *United States v. Washington*, 952 F.2d 1402, 1404 (D.C. Cir. 1991), as Oliver was here. Oliver's counsel cross-examined Robles about the specifics of the conversation she had heard. Robles acknowledged that she had heard from people she knew that a 15- or 16-year-old had been killed and that his mother had witnessed the murder, but she claimed not to remember being told the location of the murder. Counsel did not confront her with the omitted grand-jury testimony.

Oliver's direct examination also put his theory before the jury: he testified that Robles, Handy, and Taron Oliver (Deon Oliver's cousin) had all discussed (in Deon's presence) a "little dude" named Demetrius Green who was 15 or 16 years old and who was murdered on Forrester Street with his mother as an eyewitness. J.A. 4807-08. Oliver said that this was the incident about which Robles had testified. Oliver also confirmed that Simmons was not a "little boy." *Id.* at 4805. Given Oliver's opportunities to correct mistaken inferences from the partial submission, and the existence of a theory under which the Robles testimony was probative, we cannot say that the trial court abused its discretion. *See Mahdi*, 598 F.3d at 891-92 (citing *Gartmon*, 146 F.3d at 1020).

Oliver maintains that the government intentionally misled the jury: it knew that Robles had been referring to the Green murder and "tailor[ed]" the testimony to "leave out" the facts relevant only to Green and not to Simmons. J.A. 3368. Oliver sees the offense as compounded by the government's argument in closing that Robles's grand-jury testimony supported its claim that Oliver participated in the Simmons murder.

A prosecutor's failure to correct a witness's misrepresentations during cross-examination may warrant a new trial, *United States v. Iverson*, 637 F.2d 799, 803 (D.C. Cir. 1980), and closing arguments must be confined to "facts which are in evidence and the reasonable inferences therefrom," *United States v. Jones*, 482 F.2d 747, 753 (D.C. Cir. 1973). But the prosecutor may "draw inferences from evidence that support the government's theory of the case so long as the prosecutor does not intentionally misrepresent the evidence." *Moore*, 651 F.3d at 53. The government drew such an inference here.

The government fully vetted the potential ambiguity, explained its reasoning before the district court, and suggested that the dispute would be an area "ripe for cross-examination and argument." J.A. 3369. Its theory—that Robles overheard at least one conversation about the Simmons murder and confused two conversations when testifying before the grand jury—is not such a stretch as to support an inference of misrepresentation. We therefore find that the government's behavior in cross-examination and closing was within bounds.

A final note: during a break in summations, Oliver's counsel protested that the jury had not heard anything about the Green murder, such that the jury was unequipped to decide which murder was the subject of Robles's testimony.

As the district court responded, however, Oliver's counsel had had the opportunity to put before the jury whatever he wanted to clarify that issue—in addition to what he had raised during Robles's cross-examination and Oliver's direct examination. Oliver has no answer to that.

## XV.  Floyd Murder Conviction (Oliver)

Oliver next claims that his conviction for the Floyd murder under the D.C. Code must be reversed because the evidence linking him to the murder—testimony that he provided the gun used by Raynor to kill Floyd—was insufficient.  We review the evidence *de novo* and consider it in the light most favorable to the government, and we will affirm a guilty verdict where "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (emphasis in original).

Much of Oliver's argument is directed at whether the evidence sufficed on an aiding-and-abetting theory of liability.  But even assuming sufficiency of the evidence, the district court's use of a "natural and probable consequence" instruction for aiding and abetting was plain error for a D.C. Code violation.  *See Moore*, 651 F.3d at 91 (quoting *Wilson-Bey v. United States*, 903 A.2d 818, 835-39 (D.C. 2006) (en banc)).  The jury therefore was not entitled to convict Oliver of the Floyd murder on that theory.

But the jury was also instructed on a *Pinkerton* theory, under which it was required to find that Raynor killed Floyd "in furtherance of the conspiracy" and that the murder was "reasonably foreseeable" to Oliver.  *Gordon v. United States*, 783 A.2d 575, 582 (D.C. 2001) (citing *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946)).  On that basis, the evidence was adequate under D.C. law.

First, a rational jury could find that Floyd's murder was "in furtherance of the conspiracy," *Gordon*, 783 A.2d at 582, specifically the conspiracy's goal—as charged in the indictment and shown through trial evidence—to promote and enhance the reputation and standing of the enterprise and its members. Floyd had challenged Raynor to fight; Raynor was angry and told Andrews and Gray that he wanted to kill Floyd because he was embarrassed that the much-younger Floyd had "chumped John [Raynor] up" in front of others, including drug dealers working for Raynor. J.A. 2101-02. The next day, Raynor murdered Floyd. Andrews testified that Raynor killed Floyd "because he [Raynor] said Little Willie [Floyd] disrespected him," and that Raynor demonstrated to other members of the conspiracy that "nobody around there can mess with him [Raynor]. You mess with me, you get killed. That's the reason he killed Little Willie [Floyd]." *Id.* at 2300-01. This evidence—especially the evidence that Floyd had embarrassed Raynor before men who worked for him—supported the conclusion that Raynor murdered Floyd to protect his reputation and to further the conspiracy.

Citing *United States v. Roshko*, 969 F.2d 1, 7 (2d Cir. 1992), Oliver maintains that the murder did not further the conspiracy's "principal objective," which was narcotics trafficking and racketeering, not promoting Raynor's image. But as in *Moore*, the indictment and evidence support a finding that "killing to enhance the conspiracy's power [and] protect the reputation of the conspiracy and its members" was among the major purposes of the conspiracy. 651 F.3d at 94 ("[T]he superseding indictment and evidence at trial make clear that one of the principal goals of the drug conspiracy was. . . ."). In any event, all that D.C. law requires is that the act be "in furtherance of the *conspiracy*," not necessarily of its principal objective. *Gordon*, 783 A.2d at 582 (emphasis added). Although Oliver points to Andrews's testimony that

Floyd's shooting was the result of personal pique rather than a benefit to Gray's group, Andrews said of his associates, "All of us was one big family. . . . [I]f one of us had a problem, all of us had a problem." J.A. 2108. Viewed in the light most favorable to the government, that evidence was enough to find that the shooting was in furtherance of the conspiracy. *See Wahl*, 290 F.3d at 375.

On the second prong of *Pinkerton*, the evidence was also sufficient that Raynor's shooting of Floyd was "reasonably foreseeable" to Oliver. *Gordon*, 783 A.2d at 582. After the murder, Raynor told Andrews that Oliver had given Raynor the gun, and Oliver himself confirmed to Robles that he had given Raynor the gun; Oliver could thus have foreseen the use of that gun. Oliver could also have foreseen the specific crime: Robles testified that on the night of the murder Oliver told her that Raynor shot Floyd because

> A. . . . [T]he younger boys around there was playing with him [Raynor] and they wouldn't stop playing with him.

> Q. Playing with him how?

> A. Like I guess disrespect, like when you tell somebody "Stop playing with me."

J.A. 3361-62. There was also testimony that Raynor watched Floyd ("Willy") and his friend Albino Buck "for a few minutes" "ducking," "flashing like they had something," and "putting their hands down their pants, you know, like they was pulling guns out," apparently at approximately the time that Oliver handed Raynor a gun. *Id.* at 3728-29. To be sufficient, the evidence "need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Maxwell*,

920 F.2d 1028, 1035 (D.C. Cir. 1990). A rational jury could thus infer that Oliver had seen these events and that the murder of Floyd was reasonably foreseeable to him when he gave Raynor the gun. (Although the "pulling guns out" testimony might have supported a claim that the killing was in self-defense, that possibility did not preclude the jury from finding a purpose to advance the conspiracy's goal of promoting its reputation.)

Oliver claims that reversal is nevertheless necessary since a verdict must "be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States*, 354 U.S. 298, 312 (1957), overruled on other grounds, *Burks v. United States*, 437 U.S. 1 (1978). Oliver contends that we cannot tell whether the jury convicted him by following the improper aiding-and-abetting instruction or by following the *Pinkerton* instruction, which he does not challenge. We need not address this argument, however, because Oliver forfeited it by raising it only in his reply brief. *See Moore*, 651 F.3d at 93 n.22 (dismissing the same *Yates* argument, which was raised there without citation in a footnote of the opening brief); *United States v. Van Smith*, 530 F.3d 967, 973 (D.C. Cir. 2008) (dismissing an argument raised in the reply brief).

## XVII.  Prosecutorial Misconduct During Closing and Rebuttal Arguments

Appellants claim that they are entitled to a new trial because of improper prosecutorial remarks during closing and rebuttal arguments. While we strongly disapprove of the prosecution's theme in its rebuttal closing argument, we ultimately find no reversible error.

We review improper prosecutorial argument for substantial prejudice if defendants objected, and review only for plain error if they did not. *See Moore*, 651 F.3d 50. Under either standard, the question whether improper prosecutorial argument caused sufficient prejudice to warrant reversal turns on: "(1) the closeness of the case; (2) the centrality of the issue affected by the error; and (3) the steps taken to mitigate the error's effects." *Id.* at 50-51 (quoting *United States v. Becton*, 601 F.3d 588, 598 (D.C. Cir. 2010)). "When, as here, the alleged prosecutorial misconduct forms the basis for an unsuccessful motion for a mistrial, our review of the district court's denial of that motion is for abuse of discretion." *Moore*, 651 F.3d at 50.

"The sole purpose of closing argument is to assist the jury in analyzing the evidence[.]" *Moore*, 651 F.3d at 52 (quoting *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997)). Accordingly, counsel may not make factual assertions during closing argument if there is no evidentiary basis for them. *See, e.g.*, *United States v. Maddox*, 156 F.3d 1280, 1282 (D.C. Cir. 1998) ("[I]n closing argument counsel may not refer to, or rely upon, evidence unless the trial court has admitted it.") (collecting similar cases).

Counsel also may not offer personal opinions on which witnesses are telling the truth or on the defendants' guilt or innocence; those matters are solely for the jury to determine from the evidence. *See Brown*, 508 F.3d at 1075; *see also* MODEL RULES OF PROFESSIONAL CONDUCT R. 3.4(e) (2013) (lawyers may not "allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or

innocence of an accused"). Nor may counsel "make comments designed to inflame the passions or prejudices of the jury." *Moore*, 651 F.3d at 51 (quoting *United States v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000)).

Appellants complain about numerous prosecutorial statements made during closing and rebuttal arguments. We find deeply troubling one significant aspect of the government's rebuttal argument—what it dubs "the 'playbook' theme[.]" Appellee's Br. 221. We find no merit to the other challenges that appellants raise.

**A.**

The prosecutor who presented the government's closing rebuttal argument made up the "playbook theme" by referring to letters found in the cell of Patrick Andrews, a defense witness for Ronald Alfred. J.A. 5372, 5373. Those letters discussed ways to distort and falsify evidence in a criminal prosecution. The prosecutor implied that appellants, their counsel, and certain defense witnesses had consulted those letters—the "playbook"—to collude on presenting a false defense in this case:

> What [Andrews] showed you through his letters were a series of propositions that helped defendants put together false defenses, and I'm going to use this as a guide, and hopefully we're going to talk about how it is a number of the defendants and some of the defense attorneys took advantage of Patrick Andrews' playbook on how to put together a false defense.

*Id.* at 5372.

After that aspersion of the defense's entire courtroom effort, the prosecutor repeatedly read from more of Andrews's letters, calling them "chapters" in appellants' "playbook" that were purportedly manifested in the defense's efforts. According to the prosecutor, those "chapters" covered, among other topics, intimidating witnesses, deliberately misleading the jurors, and following a false script. *See, e.g.*, *id.* at 5372 ("Chapter one. . . . What's the goal regarding you folks, the jurors?  Well, the playbook tells us, 'It's all about convincing them twelve people that it could have been anybody but you.'"); *id.* at 5373 ("Chapter two.  It's about identifying who the cooperating witnesses are."); *id.* at 5374 ("Here's chapter three . . . [:]  'I want you to know, if you cross me [by cooperating], it's not ever going to be over.  I'm warring with your family and my family is warring with you,' close quote.  That's what you tell the cooperating witnesses."); *id.* at 5377 (reading from the "playbook" and arguing that the playbook's strategy was seen in this case); *id*. at 5378 ("false script"); *id.* at 5380 ("I pulled out this page from the playbook.").

The government's rebuttal argument lasted three hours, circling back a number of times to the defendants-are-putting-on-a-false-defense narrative. *Id.* at 5394-95 (arguing about a witness memorizing a false script and pointing to a "circle of collusion" resulting from "[f]ollowing the play book"); *id.* at 5401-02 (arguing that a witness was following a script and stating:  "Sort of brings us right to the play book doesn't it, brings us right to the play book. . . . Right to the play book. . . . Talk about the play book."); *id.* at 5409 ("Of course, Deon actually wrote his own chapter in the play book didn't he."); *id.* at 5414 ("That's Deon Oliver taking a chapter out of Patrick Andrews' play book. . . . [T]aking Chapter III out of the play book, Patrick Andrews' play book[.]"); *id.* at 5416 ("Tried that, tried to follow the play book, but again, lies are

easy to expose."); *id.* at 5417 ("He took a page right out of the play book didn't he.").

The government now concedes that the playbook theme's implication "that appellants, their counsel, or the defense witnesses had consulted the letters seized from Andrews' cell in formulating the defense strategy . . . was without any factual basis," Appellee's Br. 221-22, and the argument was "in some respects, ill-advised," *id.* at 221.

"Ill-advised" indeed. The prosecution's argument theme and statements were entirely improper, unprofessional, and wholly unbefitting of those who litigate in the name of the United States of America. There was no evidentiary basis for even inferring, let alone repeatedly trumpeting, that appellants knew anything about Andrews's letters. *See United States v. Valdez*, 723 F.3d 206, 209 (D.C. Cir. 2013) (prosecutor's remarks were improper where there was "no factual basis" for them). Worse still, under our Constitution, prosecutors have no business in gratuitously maligning as lies, falsehoods, and corruption, without any evidentiary basis, the defendants' exercise of their Fifth and Sixth Amendment rights to present a defense in court. *Cf. United States ex. rel. Macon v. Yeager*, 476 F.2d 613, 615 (3d Cir. 1973) (prosecutor may not seek to raise in the jurors' mind an inference of guilt from the defendant's exercise of his Sixth Amendment rights).

Prosecutors "ha[ve] an obligation 'to avoid making statements of fact to the jury not supported by proper evidence introduced during trial,'" *Moore*, 651 F.3d at 51 (quoting *Gaither v. United States*, 413 F.2d 1061, 1079 (D.C. Cir. 1969)), and this court expects prosecutors to litigate with the recognition that they represent "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all," *Berger v. United States*, 295 U.S.

78, 88 (1935). A just outcome obtained through a fair, even-handed, and reliable process should be the government's goal; it is *not* to win at any cost.

District courts, too, must remain vigilant. While counsel may be afforded a long leash in closing argument, they should not be given free rein. Courts must stand in the gap to protect defendants and the judicial process from abusive arguments like this. That did not happen here. Appellants repeatedly objected, and "[w]hy the district court refused to sustain the defense objection[s] is beyond us," *Maddox*, 156 F.3d at 1283. "When a prosecutor starts telling the jury" that the defendants, their lawyers, and some of their witnesses all consulted the same letters—a so-called playbook for a false defense—without any factual basis to support that argument, "it is time not merely to sustain an objection but to issue a stern rebuke and a curative instruction, or if there can be no cure, to entertain a motion for a mistrial." *Id.* Instead, the district court wrongly, and without explanation, denied appellants' repeated objections to this blatantly impermissible closing argument.

While we find the closing argument to be deeply troubling, we cannot conclude on the record of this case that it actually resulted in substantial prejudice. "[T]here was overwhelming evidence of appellants' guilt," *Moore*, 651 F.3d at 53; the "case was not close," *Becton*, 601 F.3d at 599. In addition, the playbook theme was not mentioned in the government's initial closing argument, and was primarily confined to the first hour of the three hour rebuttal argument. The misconduct was thus limited "to relatively small portions of lengthy . . . closing [and rebuttal] arguments." *Moore*, 651 F.3d at 54. Just as a short and simple trial can make a "prosecutor's improper remarks all the more potent," *Maddox*, 156 F.3d at 1283, here the length of the trial (nearly

six months) and the relatively cabined nature of the improper conduct mitigated any possible prejudice to appellants.

Finally, the district court specifically instructed the jury right before it began deliberating that "[t]he opening statements and closing arguments of counsel are also not evidence," J.A. 5450; *see Moore*, 651 F.3d at 53-54. Such an instruction "is usually a strong ameliorative consideration" when evaluating "prosecutorial misconduct during . . . closing argument[.]" *Id*. at 54 (citations omitted).

**B.**

Appellants challenge several other statements made during the government's closing and rebuttal arguments. Those challenges fall into three general categories.[14]

First, appellants point to several statements that they claim were designed to inflame the passions and prejudices of the jury. The prosecutor, for example, began closing argument by describing one alleged victim as having "his whole life ahead of him," J.A. 5256, while another was unaware "that these are the last steps he will ever take," *id.* at

---

[14] Appellants objected to most, but not all, of the statements that they challenge on appeal. We would ordinarily review the unobjected-to statements only for plain error. But because prejudice is required to warrant reversal under either substantial-prejudice or plain-error review, and the absence of prejudice is dispositive here, we need not differentiate between those two standards to resolve this case. *See Moore*, 651 F.3d at 50–51 (factors guiding prejudice inquiry under either standard are (i) the closeness of the case, (ii) the centrality of the issue affected by the error, and (iii) the steps taken to mitigate the error's effects).

5257. Later in the closing argument, the prosecutor referred to the incalculable "devastation and grief" appellants had caused "[i]n their relentless pursuit of money and power," including the "[k]ilos and kilos of poison being released onto the streets." *Id.* at 5311. Those "days of power and money," the prosecutor declared, "are over[.]" *Id.*

Second, appellants contend that the prosecutors impermissibly opined on key issues by vouching for a witness and offering personal views on who actually shot Lincoln Hunter. In particular, the prosecutor who gave the government's closing argument commented on the credibility of Eugene "Weetie" Williams, a cooperating witness who testified against Seegers, by stating that "[y]ou know . . . Weetie was telling you the truth." *Id.* at 5272-73. And the prosecutor who gave the government's rebuttal argument stated: "We all know . . . [w]ho shot Lincoln. Loud mouth knuckle head that he is Franklin Seegers." *Id.* at 5407.

Third, appellants object to the prosecutor's improper comments on defense tactics, such as the assertion during rebuttal that defense counsel's vigorous cross-examination of cooperating witnesses evidenced appellants' fear of those witnesses. *Id.* at 5367-69. They also object to that same prosecutor's statement that the PowerPoint slide show used during closing argument by Seegers's counsel was a "slick" presentation designed to divert the jury's attention from the evidence. *Id.* at 5401.

Even assuming all of those statements were improper, they do not warrant reversal even when viewed cumulatively alongside the improper playbook theme. Most of the statements were fleeting, and few touched on issues central to the case. The district court instructed the jury that the arguments of counsel are not evidence. *Id.* at 5450. The

lengthy deliberations suggest that the jury took that instruction to heart and weighed the evidence, unswayed by whatever passions and prejudices the prosecutors' statements might have attempted to stoke. And, as we have noted before, the evidentiary case against appellants was truly overwhelming. We are confident beyond any reasonable doubt that appellants did not suffer substantial prejudice from the alleged prosecutorial misconduct, and for that reason, the district court did not abuse its discretion in denying their motion for a new trial.

## XVIII. *Brady/Giglio* Disclosures (Seegers)

The Constitution's "fair trial guarantee," *United States v. Ruiz*, 536 U.S. 622, 628 (2002), requires the prosecution to timely turn over any information in the government's possession that is materially favorable to a criminal defendant, *Brady v. Maryland*, 373 U.S. 83 (1963), including evidence that could be used to impeach government witnesses, *Giglio v. United States*, 405 U.S. 150 (1972). Whether the government violated its obligations under *Brady* or *Giglio* is a question of law that we review *de novo*. *See Johnson*, 519 F.3d at 488 (*Brady*); *United States v. Celis*, 608 F.3d 818, 836 (D.C. Cir. 2010) (*Giglio*).

Seegers requested pretrial that the government disclose all *Brady/Giglio* information. The government, however, did not disclose seventeen-year-old copies of a psychological evaluation and a prison disciplinary report for a key government witness, Lincoln Hunter. Hunter testified against Seegers for the crimes of assault with intent to murder Hunter and of murdering Diane Luther. Seegers discovered the records during the trial, but after Hunter had testified. In Seegers's view, those undisclosed documents evidence that Hunter was a violent man and a threat to society. Seegers

argues that that information was important to the jury's assessment of his defense that Hunter murdered Luther and that Seegers shot Hunter in self-defense while trying to break up that fight. Seegers contends that the government's failure to disclose the impeachment evidence violated *Brady* and *Giglio*.

The district court initially denied Seegers's motions for a mistrial, to reopen Hunter's cross-examination, and to call Hunter as a defense witness without any accompanying explanation. On Seegers's motion for reconsideration, the district court explained that the documents were not admissible because the psychological report's "probative value is totally outweighed by the danger of unfair prejudice," and the dated disciplinary report was "not evidence of a trait or character; it's just a specific instan[ce]." J.A. 4909-10. Accordingly, those reports "would not be admissible." *Id.* at 4910.

To prevail, Seegers must demonstrate "a reasonable probability that an earlier disclosure" of the records "would have changed the trial's result." *United States v. Bell*, 795 F.3d 88, 101-02 (D.C. Cir. 2015) (quoting *United States v. Andrews*, 532 F.3d 900, 907 (D.C. Cir. 2008)). Seegers has failed in that task for two reasons.

First, the government's failure to disclose the records could not have had any effect on the outcome of the criminal trial because the district court ruled that the records were inadmissible under Federal Rule of Evidence 403. Seegers has not challenged that evidentiary ruling on appeal or presented any argument that would demonstrate either an abuse of discretion or plain error in the district court's determination that the reports were inadmissible. *United*

*States v. Mejia*, 597 F.3d 1329, 1334 (D.C. Cir. 2010) ("We review admissibility rulings for abuse of discretion.").[15]

Second and in any event, the nondisclosure could not have resulted in any cognizable prejudice. To begin with, the jury was unable to reach a verdict on Seegers's alleged role in Luther's murder, so there is no conviction to overturn for that charge. With respect to the charge of assault with intent to murder Hunter, the nearly two-decades-old reports were far too stale to have any probative bearing on the issue of Hunter's aggressive character, J.A. 4909-10, and at best would have been "merely cumulative" of the more potent and contemporary evidence of Hunter's jealous and violent character that Seegers did introduce, *United States v. Brodie*, 524 F.3d 259, 269-70 (D.C. Cir. 2008). *See United States v. Oruche*, 484 F.3d 590, 599 (D.C. Cir. 2007) (same, where witness was "thoroughly impeached" at trial).

## XIX.  Motions for Severance and Mistrial (Seegers, J. Alfred)

Seegers argues that the district court erred in refusing before trial to sever his case from that of his codefendants.

---

[15]  At most, Seegers mentions in passing in his reply brief that the reports would have been admitted had they been disclosed earlier. Appellants' Reply Br. 112. That will not suffice to preserve the argument for appellate review. *See DiBacco v. United States Army*, 795 F.3d 178, 193 (D.C. Cir. 2015) ("We do not ordinarily consider arguments raised for the first time in a reply brief, and we see no good reason for doing so here."); *Payne v. District of Columbia Government*, 722 F.3d 345, 354 (D.C. Cir. 2013) (mentioning the First Amendment in a brief's table of authorities and argument heading, and in a single sentence describing claims in district court, did not preserve a First Amendment claim for review).

Together with James Alfred, Seegers also argues that the court erred in denying subsequent motions for severance filed during trial following the misbehavior of their codefendants.[16]

## A.

Prior to trial, Seegers moved to sever his case from his codefendants, citing the allegedly limited nature of his participation in the charged conspiracy. While the district court denied severance, the court did divide appellants into two groups for trial, with the leaders of the conspiracy tried separately in the *Moore* proceeding. In the court's view, that division was "a reasonable compromise between the competing interests." *United States v. Gray*, 173 F. Supp. 2d 1, 18 (D.D.C. 2001).

At trial, McGill, Simmons, Ronald Alfred, and Oliver all engaged in various courtroom conduct that Seegers and James Alfred cite as unfairly prejudicing them. That conduct included inappropriate comments before the jury, testimony and allegedly one-sided interactions suggesting that the other defendants knew Seegers and James, verbal disagreements with the district court's rulings, alleged witness intimidation by Oliver, and the March 29th outburst that led to McGill's

---

[16] To the extent Seegers purports to adopt additional arguments made only in his district court briefs, we reject that effort and conclude that any such argument made on appeal without citations to the record or relevant authority is forfeited. *See Moore*, 651 F.3d at 97. For similar reasons, we reject the conclusory efforts by Simmons, Ronald Alfred, and Oliver to adopt Seegers's and James Alfred's severance and misjoinder arguments, particularly since the arguments addressed in this section rely on the specific charges brought and evidence presented against Seegers and James Alfred and their own nondisruptive behavior at trial.

forcible removal from the courtroom. Seegers and James Alfred both renewed their motions for severance at trial on multiple occasions, which the district court denied.

In the final jury instructions, jurors were specifically directed not to consider McGill's outburst in their deliberations. The district court also instructed them that:

> Unless I have instructed you otherwise, you should consider each instruction that the Court has given to apply separately and individually to each defendant on trial. Likewise, you should give separate consideration and render separate verdicts with respect to each defendant. Each defendant is entitled to have his guilt or innocence of the crime for which he is on trial determined from his own conduct and from the evidence that applies to him, as if he were being tried alone. The guilt or innocence of any one defendant should not control or influence your verdict as to the other defendants. You may find any one or more of the defendants guilty or not guilty on any one or more of the counts in the indictment. At any time during your deliberations, you may return your verdict of guilty or not guilty with respect to any defendant on any charge, after which you will resume your deliberations as to the other remaining defendants and charges.

J.A. 5456.

The district court denied Seegers's posttrial motion repeating his argument that a mistrial and severance should have been granted based on his codefendants' misbehavior. The court held that its instructions cured any prejudice and further noted that ordering a new trial on such a basis would allow defendants, through their misbehavior, to prevent joint

trials from ever going forward. *See Simmons*, 431 F. Supp. 2d at 69-70.

**B.**

We review the denial of a motion for severance or a mistrial for abuse of discretion. *Moore*, 651 F.3d at 95; *McLendon*, 378 F.3d at 1112. "The trial court has great discretion in severance matters," though, "with the balance generally to be struck in favor of joint trials." *United States v. Slade*, 627 F.2d 293, 309 (D.C. Cir. 1980) (internal quotation marks omitted). The presumption in favor of joinder "is especially strong where the respective charges require presentation of much the same evidence, testimony of the same witnesses, and involve . . . defendants who are charged, *inter alia*, with participating in the same illegal acts." *Richardson*, 167 F.3d at 624 (quoting *United States v. Ford*, 870 F.2d 729, 731 (D.C. Cir. 1989)) (ellipses omitted). A district court's refusal to grant a severance will "be affirmed even if the circumstances are such that a grant of severance would have been sustainable.'" *United States v. Brown*, 16 F.3d 423, 427 (D.C. Cir. 1994).

No abuse of discretion occurred here. The Federal Rules, it bears noting, expressly countenance that joinder may result in *some* prejudice to a defendant; severance becomes mandatory only "where the failure to sever denies the defendant a fair trial." *United States v. Wright*, 783 F.2d 1091, 1095 (D.C. Cir. 1986). Severance may also be warranted when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Carson*, 455 F.3d at 374 (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

Otherwise, "[a]bsent a *dramatic* disparity of evidence, any prejudice caused by joinder is best dealt with by instructions to the jury to give individual consideration to each defendant." *Moore*, 651 F.3d at 95 (quoting *Slade*, 627 F.2d at 309); *see also id.* at 96 ("[W]hen there is 'substantial and independent evidence of each defendant's significant involvement in the conspiracy,' severance is not required.") (brackets omitted) (quoting *Tarantino*, 846 F.2d at 1399).

Seegers first argues that the district court should have granted his pretrial motion for severance. We disagree. Seegers participated in the same narcotics and RICO conspiracies for which all six defendants were charged. In fact, the evidence presented at trial suggested that, for at least some time period in 1996, Seegers served as an "overseer" within the conspiracy. J.A. 2818. That active participation in the jointly charged conspiracy "functioned as the 'connective tissue'" that made joinder appropriate. *See Richardson*, 167 F.3d at 625. Seegers stresses the violent nature of the conspiracy generally. But that argument overlooks that Seegers himself was charged with murder and was convicted of attempted murder for his own actions within the conspiracy.

In addition, much if not all of the evidence introduced in this case would also have been admissible even had Seegers been tried individually because it could have been used to demonstrate the nature of the conspiracy he joined. *See United States v. Gbemisola*, 225 F.3d 753, 761 (D.C. Cir. 2000) (no prejudice resulting from joinder because "[a]ll of the evidence admitted at the joint trial could properly have been admitted at a separate trial to show the nature of the drug distribution scheme in which [the defendant] was an active participant"); *see also Mathis*, 216 F.3d at 26 (noting the "considerable leeway" the government has to offer evidence

of other offenses in conspiracy cases). As we explained in *Moore*, whatever the differential between the number of crimes Seegers was charged with and the extent of his involvement in the conspiracy, the disparity in the evidence was not so great as to mandate severance. *See* 651 F.3d at 96.

Furthermore, the district court gave the same instructions that we upheld in *Moore*, directing the jury to undertake an individualized consideration of the guilt of each defendant. *See Moore*, 651 F.3d at 96; *see also Mejia*, 448 F.3d at 446 (no abuse of discretion in denying severance where "jury could reasonably compartmentalize the evidence introduced against each individual defendant") (quoting *United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991)). And the jury must have heeded that instruction because it did not convict Seegers of Diane Luther's murder. *Cf. United States v. Chandia*, 514 F.3d 365, 375 (4th Cir. 2008) (verdict acquitting defendant on one substantive count "suggests that the jury conducted a rational evaluation of the evidence in reaching its verdict and was not misled by emotion").

Seegers and James Alfred also challenge the denial of severance or a mistrial as the case progressed and, in their view, as actual prejudice manifested itself. They are correct in arguing that, even if severance is properly denied pretrial, the district court has "a continuing duty at all stages of the trial to grant a severance if prejudice does appear." *United States v. Perry*, 731 F.2d 985, 992 (D.C. Cir. 1984) (quoting *Schaffer v. United States*, 362 U.S. 511, 516 (1960)). But they are not correct that severance was later required in this case.

To a large extent, Seegers's and James Alfred's arguments echo those made for a mistrial based on McGill's conduct. But the "single most important consideration in

ruling on a motion for a mistrial is the extent to which the defendant was unfairly prejudiced." *McLendon*, 378 F.3d at 1112. The relevant factors include "the force of the unfairly prejudicial evidence, whether that force was mitigated by curative instructions, and the weight of the admissible evidence that supports the verdict." *Id.* Those factors favor the district court's judgment here.

Both the nature of McGill's outburst and the prompt curative instructions dissipated any potential prejudice from that incident. The other instances of misconduct by codefendants, such as speaking out of turn, were far less disruptive than McGill's outburst and often were followed by an instruction to the jury to disregard the misconduct. In one instance, a codefendant's testimony introduced inadmissible facts, including that some coconspirators were potentially facing the death penalty. The references, however, were fleeting. In any event, only McGill objected—and there certainly was no plain error as to Seegers and James Alfred.[17]

Seegers and James Alfred also object to the impression of familiarity that Oliver's one-sided interactions with them in front of the jury might have created. But severance is rarely required even when codefendants pursue conflicting defenses. *See Zafiro*, 506 U.S. at 538 ("Mutually antagonistic defenses

---

[17] To be clear, in some circumstances, a codefendant's misbehavior could be so extreme as to give rise to prejudice that could not be mitigated by curative instructions, and then a mistrial or severance would be required. *See United States v. Mannie*, 509 F.3d 851, 857 (7th Cir. 2007) (prejudice warranting mistrial resulted from a jury's exposure to a codefendant "garbed in prison attire verbally assaulting his attorneys, a campaign of intimidation by members of the gallery, [and] a violent courtroom brawl"). Nothing so likely to produce incurable prejudice happened here.

are not prejudicial *per se*."); *see also id.* at 540 ("A defendant normally would not be entitled to exclude the testimony of a former codefendant if the district court did sever their trials."). So those conflicting atmospherics will not suffice either.

Finally, Seegers and James Alfred argue that they were prejudiced by the introduction of evidence of Oliver's attempts to intimidate a witness (Willie Fears) that Seegers had called at trial. Oliver's unilateral misconduct, in other words, impeached one of Seegers's witnesses. The problem with this argument is that, once the intimidation occurred, the witness's testimony was impeachable on that basis no matter who presented it and in which trial. There is thus no basis for concluding that the impeachment would have been different had Seegers been tried separately.[18]

In short, while their codefendants' misbehavior was unfortunate, the incidents complained of were just a small part of a long trial, in which overwhelming evidence of James Alfred's and Seegers's guilt was presented. The addition of curative and limiting instructions prevented any remaining prejudice from rising to the high level required to warrant a mistrial or severance.

---

[18] While Seegers and James Alfred add an objection to the "playbook themed" government rebuttal argument in their reply brief, that argument duplicates appellants' joint challenge to the government's closing argument. Any severance-specific dimension to the argument is forfeited by the failure to present it in the opening brief. *See Van Smith*, 530 F.3d at 973.

## XX.  Conspiracy and Attempted Murder Convictions
## (Seegers)

Seegers also argues that the evidence introduced at trial was insufficient to convict him of narcotics conspiracy, RICO conspiracy, and three charges relating to the attempted murder of Lincoln Hunter.  We disagree.

The parties have a preliminary argument over what evidence is relevant on the sufficiency issue.  The government, though conceding that evidence of drugs found in Seegers's home was admitted in violation of the Confrontation Clause, nonetheless maintains that in reviewing sufficiency we must consider all admitted evidence, regardless of whether its admission was error.  For this it cites *United States v. Alexander*, 331 F.3d 116, 128 (D.C. Cir. 2003), which in turn cites *Lockhart v. Nelson*, 488 U.S. 33, 39-42 (1988).  But the observation in *Alexander* was clearly dictum*,* as we expressly held that the evidence in question had been properly admitted.  *See id.*

We do not, however, read *Lockhart* as addressing whether erroneously admitted evidence may be considered on a standalone insufficiency claim.  It considered a nuance of jurisprudence under the Double Jeopardy Clause.  The Court had already held that the clause permits retrial where a court of appeals has overturned a conviction for a garden-variety trial error such as mistakenly admitting evidence.  *United States v. Tateo*, 377 U.S. 463, 466 (1964).  In *Burks v. United States*, 437 U.S. 1 (1978), the Court limited that principle, declining to allow retrial where the trial error was failure to grant a motion for judgment of acquittal for insufficiency of evidence.  *Lockhart* considered whether, in drawing the line between these two situations, a case where the evidence *would have been* insufficient in the absence of erroneously

admitted evidence should be treated as an insufficiency case, where retrial would be impermissible. The Court held that it should not: even if the erroneously admitted evidence was essential to put the government over the top, retrial is allowed. *Lockhart*, 488 U.S. at 40-42. There was no discussion of whether in reviewing a claim of insufficient evidence we may consider erroneously admitted evidence.

Here, disregard of the erroneously admitted evidence does not leave the prosecution's case so weak that a jury could not reasonably convict. In such a case, the distinction drawn in *Lockhart* makes no difference. Accordingly we do not reach the issue. (We note, however, that if sufficiency is decided without the erroneously admitted evidence, then the two instances distinguished in *Lockhart* tend to merge: where disregard of erroneously admitted evidence leaves the government's case insufficient, there has been *both* error and insufficiency.)

Here, completely disregarding the material admitted in violation of the Confrontation Clause, we find the evidence sufficient to convict Seegers of the narcotics and RICO conspiracy charges. Seegers argues that the evidence linked him to the conspiracy only *before* 1996, whereas the indictment charged him with joining the conspiracies *in* 1996. For example, Williams testified that Seegers would come to Williams's home to assist in dealing drugs in "late '95." J.A. 2817-18. Other parts of Williams's testimony, however, linked Seegers to the conspiracy in 1996. For instance, Williams testified that Seegers was serving as PeeWee Oliver's "enforcer or overseer" when Luther was killed in "October or November" of 1996, *id.* at 2820-21, and said that Seegers was selling drugs supplied by Moore after Luther's murder. (Because this evidence placed Seegers in the conspiracy in the fall of 1996 and later, the parties' dispute

over whether the evidence must reflect his membership in "1996" as in the indictment, *id.* at 1832, or in "November 1996" as in the jury instructions, *id.* at 5453, is irrelevant.)

We also find that a rational jury could convict Seegers of the charges relating to the attempted killing of Hunter. Hunter testified that Seegers shot him. Seegers provides what he says are reasons to doubt Hunter's credibility, such as medical records supposedly contradicting Hunter's testimony and Hunter's grand-jury testimony absolving Seegers of responsibility for the Luther shooting. But it is the jury's responsibility to determine credibility and weigh the evidence, not ours. *United States v. Clark*, 184 F.3d 858, 863 (D.C. Cir. 1999). The jury here apparently credited Hunter's testimony in convicting Seegers, and we do not disturb its finding.

## XXII. Narcotics Conspiracy Conviction (Simmons)

Appellant Kenneth Simmons challenges his narcotics conspiracy conviction. (We will refer to appellant Simmons by his last name; when we mean to refer to one of the conspiracy's victims, Richard Simmons, we will so specify.) Simmons argues that, although the indictment charged him with participation in a single, large narcotics conspiracy, the evidence at trial at most established the existence of multiple, *ad hoc* conspiracies rather than one overarching conspiracy.

Whether the prosecution's evidence at trial proves a single conspiracy or multiple conspiracies is a question of fact for the jury. *Carson*, 455 F.3d at 375. Here, the jury concluded that a single conspiracy existed. Our role therefore is limited. We review the evidence in the light most favorable to the government and ask only whether "*any* rational trier of fact" could have found the elements of a single conspiracy beyond a reasonable doubt. *United States v. Graham*, 83 F.3d

1466, 1471 (D.C. Cir. 1996) (quoting *Washington*, 12 F.3d at 1135). We find that standard satisfied.

The jury found Simmons guilty of narcotics conspiracy in violation of 21 U.S.C. § 846. Simmons argues that, while "the indictment alleged a single overarching conspiracy in which [he] was claimed to have played a major role over a long period of time," the evidence at trial instead "established multiple *ad hoc* conspiracies composed of different members playing different roles over different periods of time and with differing purposes." Appellants' Br. 253. According to Simmons, he was "sometime[s] a member of these varied conspiracies," but "at other times he was a competitor." *Id.* To secure reversal of his conspiracy conviction under that line of argument, Simmons would need to show both (i) that the evidence introduced at trial established *only* multiple conspiracies rather than the one conspiracy alleged in the indictment, and (ii) "that because of the multiplicity of defendants and conspiracies, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another." *Tarantino*, 846 F.2d at 1391. We reject Simmons's challenge at the first step.

"In determining whether a single conspiracy existed, as opposed to separate unrelated activities or multiple conspiracies, we look for several factors, including whether participants shared a common goal . . . ; interdependence between the alleged participants in the conspiracy; and, though less significant, overlap among alleged participants." *Graham*, 83 F.3d at 1471. Considering those factors in this case, we conclude that the government introduced ample evidence from which the jury could infer the existence of the single, large conspiracy charged in the indictment.

As alleged in the indictment and supported by the evidence at trial, one purpose of the conspiracy was to "obtain money and other things of value" through the distribution of illegal drugs. J.A. 482. All of the allegedly "*ad hoc*" conspiracies Simmons identifies shared that same purpose: "possession and distribution of narcotics for profit," *Graham*, 83 F.3d at 1471 (quoting *Tarantino*, 846 F.2d at 1393). And the testimony at trial showed significant overlap and interdependence among those ostensibly separate conspiracies. Although Simmons argues that he and Fleming combined to form their own separate conspiracy, the jury heard evidence that Simmons engaged in an interlocking web of drug transactions geared toward the common purpose of possession and distribution of narcotics for profit with other key players. For example, at various times Simmons bought and sold drugs to or from Moore, Gray, James Alfred, and Oliver. The government's evidence also showed that Simmons owned a store that acted as a meeting place for the large conspiracy's drug deals: Fleming testified that drug transactions occurred in the store "[b]asically every day," and that "[e]verybody used to come through" the store, including Moore, Gray, Oliver, and Fleming. J.A. 2992-93. From that evidence, the jury could reasonably infer that those players and transactions were part of one larger conspiracy.

Simmons argues, however, that the foregoing evidence indicates only that he was an occasional buyer or seller of controlled substances from the larger conspiracy, rather than a member of that conspiracy. Of course, an agreement to participate in the larger conspiracy is necessary to sustain Simmons's conspiracy conviction, *see Graham*, 83 F.3d at 1471, and "[t]he relationship of buyer and seller *absent any prior or contemporaneous understanding beyond the mere sales agreement* does not prove a conspiracy," *United States v. Kimmons*, 917 F.2d 1011, 1016 (7th Cir. 1990) (quoting

*United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir. 1978)). But the jury was presented with sufficient evidence from which to infer that Simmons agreed to join the large conspiracy, as opposed to engaging in a series of unconnected, *ad hoc* transactions.

We have previously observed that evidence of two deliveries of wholesale quantities of drugs suffice to sustain a conspiracy conviction because the pattern "suggest[s] a continuity of relationship between [the buyer and seller] and support[s] the inference that [the defendant] knew that the organization to which he was delivering such a sizeable amount of drugs must involve a substantial distribution network." *United States v. Childress*, 58 F.3d 693, 714 (D.C. Cir. 1995). That sort of evidence exists here. Fleming testified that Simmons served as his intermediary with Moore and frequently brokered transactions between Moore and Fleming. The evidence showed that those transactions involved wholesale quantities, with street values just shy of $30,000 apiece. Evidence that Simmons facilitated multiple transactions of wholesale drug quantities "permits an inference that [he] had knowledge of the conspiracy and intended to join." *United States v. Miranda-Ortiz*, 926 F.2d 172, 176 (2d Cir. 1991). That is enough to permit a rational jury to find a single conspiracy.

## XXIII. RICO Conspiracy Conviction (Simmons)

Simmons also challenges the sufficiency of the evidence supporting his RICO conspiracy conviction. "The RICO statute, 18 U.S.C. § 1962(d), makes it unlawful to conspire to violate § 1962(c), which, in turn, provides that it is unlawful for anyone 'employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.'" *United States v. Eiland*, 738 F.3d 338, 360 (D.C. Cir. 2013) (quoting 18 U.S.C. § 1962(c)).

Simmons raises two arguments for reversal of his RICO conspiracy conviction. First, he contends that the government failed to prove the existence of a RICO "enterprise." Second, he argues that the government's evidence failed to demonstrate the requisite "pattern of racketeering activity." We ask only whether any rational trier of fact could have found those elements beyond a reasonable doubt. *See Graham*, 83 F.3d at 1471. Applying that standard, we conclude that neither of Simmons's arguments has merit.

## A.

A RICO conspiracy conviction requires the existence of an "enterprise," defined by the statute to include "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "An association-in-fact enterprise must have three structural features: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Eiland*, 738 F.3d at 360 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)).

We understand Simmons to argue that the government produced insufficient evidence of the first two structural features—i.e., common purpose and relationships among the associated coconspirators. We disagree. We note that "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Boyle*, 556 U.S. at 947 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). This is such a case.

### *1.*

With regard to common purpose, both economic and noneconomic motives may form the requisite common purpose for a RICO association-in-fact. *See United States v. Perholtz*, 842 F.2d 343, 354 (D.C. Cir. 1988) (economic motives sufficient); *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 257-58 (1994) (noneconomic motives sufficient). The evidence at trial indicated both sorts of motives here.

In terms of economic motive, the jury could readily conclude that one of the enterprise's "purpose[s] was to distribute drugs for profit." *Eiland*, 738 F.3d at 360. The same interlocking web of drug transactions supporting Simmons's narcotics conspiracy conviction, *see* Part XXIII, *supra*, also supports the jury's finding of a RICO enterprise.

In terms of noneconomic motive, as we have explained in sustaining Oliver's convictions, *see* Part XV, *supra*, the evidence supports a finding that the conspiracy's purposes included killing to preserve the conspiracy's power and reputation and to protect its members. One witness testified that members of the enterprise were "like a real family. I mean, basically, if one of us had a problem, we all had a problem. You know, if one of us get [sic] into something, we all got in it. That's how we dealt with each other." J.A. 1951. That witness also stated that Kevin Gray's reputation meant that people working with Gray "knew they had Kevin behind them, so basically they could do whatever they wanted to do and when they wanted to do it. It wasn't going to be no problem [sic] because they knew we deal with Kevin." *Id.* When an individual joined the group, others thus became "more scared" of him and approached him with "more fear." *Id.* That evidence allowed the jury to infer the alleged

common purpose of providing the mutual protection necessary to promote and enhance the reputation and standing of the enterprise and its members.

### 2.

We also have little trouble finding that there was sufficient evidence of the requisite relationships between the associated coconspirators. Individuals acting "*independently and without coordination*" do not form a RICO enterprise. *United States v. Hosseini*, 679 F.3d 544, 558 (7th Cir. 2012) (quoting *Boyle*, 556 U.S. at 947 n.4). But individuals form a RICO enterprise when they "organize[] themselves so each w[ill] carry out a separate role in the distribution chain, with [certain parties] overseeing the operation." *Eiland*, 738 F.3d at 360. There was considerable evidence of such an organization here.

Witnesses testified that Moore was the "head man" of the organization and that Gray was the "second man." J.A. 1952. Raynor served as Gray's "lieutenant." *Id.* at 3691. Moore supplied Pee Wee Oliver, and Pee Wee Oliver employed Seegers as a bodyguard. Ronald Alfred supplied Gray, who in turn supplied James Alfred. Moore, Gray, and several associates were described as "one big family," with Moore giving orders and Gray carrying them out. *Id.* at 1951-52. Moore, Raynor, PeeWee Oliver, and Derrick Moore would "strategiz[e]" about "tak[ing] over the neighborhood." *Id.* at 2810. And Simmons acted as a supplier to Gray, served as broker for Moore, and hosted Moore and Gray (among others) at his store for their drug transactions. Indeed, while a group "need not have a hierarchical structure or a 'chain of command'" to count as an association-in-fact, *Boyle*, 556 U.S. at 948, the evidence here was suggestive of an organization approaching that sort of structure.

In light of the web of interconnectivity, we conclude that the government presented sufficient evidence of a RICO enterprise. Simmons makes no claim that the jury was improperly instructed, but he claims that there was insufficient evidence from which the jury could find an enterprise. But while Simmons argues that the structure could also resemble multiple enterprises instead of a single enterprise, it is not our function on appellate review to "parse the enterprise's numerous and wide-ranging activities in an effort to decide whether we subjectively consider those activities to be more properly consistent with a finding of one, two, or three distinct enterprises." *Perholtz*, 842 F.2d at 355. Rather, especially when there is no claim that the jury was improperly charged, we must remain "mindful of the jury's inquiry into the existence of the enterprise, and the deference to be accorded to the results of that inquiry," *id*., and ask only whether "substantial evidence, viewed most favorably to the prosecution," *id.*, would allow a reasonable jury to conclude that appellants' conduct "was neither independent nor lacking in coordination," *Hosseini*, 679 F.3d at 558. The answer to that question here is yes.

**B.**

A conviction under RICO also requires proof of the existence of a "pattern of racketeering activity." *Turkette*, 452 U.S. at 583; *see* 18 U.S.C. § 1962(c). Such a pattern requires "two or more related predicate acts of racketeering within a 10-year period." *United States v. Crosby*, 20 F.3d 480, 481 (D.C. Cir. 1994) (quoting *Alexander v. United States*, 509 U.S. 544, 562 (1993)). There was sufficient evidence of such a pattern here.

Simmons was charged with (and the jury found) three predicate racketeering acts: (i) the murder of Richard

Simmons; (ii) conspiracy to commit the murder of a man known as Rah-Rah; and (iii) conspiracy to commit the murder of Thomas Walker. Only two of those racketeering acts are necessary to sustain Simmons's conviction, *see id.*, and we affirm based on the first and third.

Simmons does not dispute that there was sufficient evidence that he solicited the murders of Richard Simmons and Thomas Walker. Instead, he characterizes those murders as isolated acts unconnected to the enterprise or to each other. It is true that isolated acts of racketeering do not constitute a "pattern" within the meaning of RICO. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985). But we find that the government presented sufficient evidence for the jury to infer the necessary connection to form a pattern.

The murder of Richard Simmons and attempted murder of Walker were related to each other and to the enterprise. The jury heard evidence that Simmons solicited Richard Simmons's murder because he thought that Richard Simmons was spreading rumors that Simmons's business partner, Fleming, was cooperating with the police. Testimony indicated that a "rumor like that" would "affect [Simmons] and his business." J.A. 3019. The jury thus could infer that Simmons solicited Richard Simmons's murder in order to protect the profits of the narcotics enterprise. With regard to Walker's attempted murder, the jury heard testimony that Simmons "wanted [Walker] dead" because Walker "beat [Simmons] up kind of bad" in an altercation. *Id.* at 2012. Simmons then solicited Gray to murder Walker. That evidence, coupled with testimony establishing that members of Gray's group were feared because they had Gray's protection, would allow the jury to infer that Simmons's solicitation of Walker's murder related to the enterprise's

noneconomic goals of mutual protection and status enhancement.

The jury could thus conclude the predicate acts were related by the "nature of the acts" (both murders), their "temporal proximity" (both occurring between 1997 and 1999), and their common "purpose" (both to further the enterprise's goals). *Eiland*, 738 F.3d at 360-61. That constitutes a pattern of racketeering activity.

### XXIV. Section 924(c) Firearms Conviction (Simmons)

Simmons argues that there was insufficient evidence supporting his convictions on firearms charges under 18 U.S.C. § 924(c), which makes it a crime to "use[] or carr[y] a firearm" "during and in relation to any crime of violence." We find that a rational jury could have found Simmons guilty of that offense.

The government obtained convictions under § 924(c) against Simmons in connection with the murder of Richard Simmons and the attempted murder of Walker. While both sides agree that Simmons was not the triggerman in either murder, the government introduced evidence that Simmons solicited the killings. To show a violation of § 924(c) for solicitation, the government must establish that the defendant "knew to a practical certainty" that those he solicited to commit the crime of violence would use a firearm in committing that crime. *United States v. Powell*, 929 F.2d 724, 729 (D.C. Cir. 1991); *accord United States v. Harrington*, 108 F.3d 1460, 1471 (D.C. Cir. 1997). We find that the government produced sufficient evidence for the jury to make that finding.

As we have explained, "evidence of the prevalence of guns in a particular context" is one factor allowing the jury to

make that inference. *Powell*, 929 F.2d at 729. And here, the government introduced abundant evidence to that end. Testimony showed that Simmons and his associates regularly carried guns, and that shootings were the common modus operandi for the group's murders. Indeed, the trial record is replete with shootings, and, as far as we can tell, contains no evidence of a murder committed or attempted in any other way. It was therefore reasonable for the jury to infer that, when Simmons solicited the murders of Richard Simmons and Walker, Simmons "knew to a practical certainty" that those crimes would involve the use of a firearm. *Id.* We therefore sustain Simmons's convictions under 18 U.S.C. § 924(c).

## XXV.  Violent Crime in Aid of Racketeering Conviction (Simmons)

Simmons challenges the sufficiency of the evidence supporting his two convictions for Violent Crime in Aid of Racketeering (VICAR) under 18 U.S.C. § 1959(a), in connection with the murder of Richard Simmons and the attempted murder of Walker. We again find that a rational jury could find Simmons guilty of those offenses.

The VICAR statute applies to defendants who commit murder related to racketeering

> with one of three motives: (1) "as consideration for . . . anything of pecuniary value" from such an enterprise, (2) "as consideration for a promise . . . to pay" something of value from such an enterprise, or (3) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."

*Carson*, 455 F.3d at 369 (quoting 18 U.S.C. § 1959(a)) (alterations in original). At issue here is whether Simmons acted with the third of those motives. A jury can reasonably infer that a defendant acted to maintain his position in an enterprise when he "commits the crime 'in furtherance of' enterprise membership or . . . 'knew it was expected of him by reason of his membership in the enterprise.'" *Gooch*, 665 F.3d at 1337-38 (quoting *Carson*, 455 F.3d at 369).

The jury could reasonably infer that Simmons, as a member of a violent narcotics enterprise with a track record of killing (or attempting to kill) those who threatened its business, was expected to solicit actions necessary to protect the enterprise's profits. As noted, the evidence showed that Simmons solicited the murder of Richard Simmons after Richard Simmons spread a rumor that Fleming (Simmons's friend and business partner) was cooperating with the police. Any such rumor would threaten the enterprise's narcotics business, as "snitching clearly posed a threat to the gang." J.A. 1338. The jury thus could infer that Simmons acted as would be expected of him—he sought to contain the threat. *See id.*; *see also Carson*, 455 F.3d at 369-70; *United States v. Dhinsa*, 243 F.3d 635, 671-72 (2d Cir. 2001).

Additionally, the jury could reasonably infer that each member of the enterprise was expected to solicit actions necessary to protect its reputation for violence, a reputation "essential to maintenance of the enterprise's place in the drug-trafficking business." *Carson*, 455 F.3d at 370 (quoting *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996)); *accord Moore*, 651 F.3d at 94. The evidence showed that Simmons solicited Walker's murder after Walker had bested Simmons in an altercation. The jury thus could infer that Simmons solicited Walker's murder because it was expected of him as part "of the enterprise's policy of treating affronts to

any of its members as affronts to all, of reacting violently to them and of thereby furthering the [enterprise's] reputation for violence." *Tipton*, 90 F.3d at 891; *see Gooch*, 665 F.3d at 1338.

### XXVI.  Simmons's Pro Se Trial Motions and Appellate Brief

Simmons's appellate counsel argues that the district court wrongly ignored Simmons's posttrial pro se motions requesting substitution of counsel and raising ineffective-assistance-of-trial-counsel claims without holding an evidentiary hearing.  Simmons has also filed his own pro se briefs in this court in which he argues he was denied the effective assistance of counsel at trial.  Simmons asserts, *inter alia*, that his trial attorneys failed to call particular witnesses on his behalf, prevented him from taking the stand at trial, and often refused to sit with him at the defense table, and that one attorney physically struck him in the courtroom in the jury's presence.  (Simmons's last allegation is corroborated by that attorney's admission on the record.  J.A. 3382-83.)

We have no need to determine whether the district court erred in its handling of Simmons's posttrial requests for substitution of counsel.  Any error was effectively harmless, as Simmons received new counsel—before sentencing—once the district court granted his attorneys' motions to withdraw.  As for Simmons's claims that his counsel rendered constitutionally ineffective assistance during the trial itself, we remand those claims for an evidentiary hearing before the district court, consistent with our usual practice.  *See United States v. Rashad*, 331 F.3d 908, 909-10 (D.C. Cir. 2003).

## XXVIII.  Conspiracy Conviction (J. Alfred)

James Alfred claims that insufficient evidence linked him to the murders of (1) Thomas, whom Franklin killed at the behest of Ronald Alfred, James's brother, and (2) Cardoza, whom Veal killed at the behest of Gray.

First we should explain why, if James Alfred's conviction for the Thomas murder is valid, we need not discuss that of Cardoza.  The indictment charged James with the Thomas murder as a predicate for the RICO conspiracy offense and also as the basis for substantive offenses.  But it charged the Cardoza murder *only* as a RICO conspiracy predicate act.  Only two predicate racketeering acts are necessary for a RICO conviction, and James makes no claim of insufficient evidence as to one of the ones charged—the narcotics conspiracy.  Thus, if the evidence against James Alfred for the Thomas murder was sufficient (as we find below), we needn't consider the evidence as to Cardoza.

Under both federal and D.C. law, *Pinkerton* requires a jury finding that the Thomas murder was "in furtherance of the conspiracy" and "reasonably foreseeable" to James Alfred.  *Washington*, 106 F.3d at 1011 (citing *Pinkerton*, 328 U.S. at 647-48); *Gordon*, 783 A.2d at 582.  The evidence against James Alfred met these standards.

Thomas was "tight" with Kairi Ball, who had an ongoing conflict with Ronald Alfred.  J.A. 1986.  This conflict led to a decision to murder Ball, in which Ronald was involved.  Ball's associates, including Thomas, then began following Ronald and shooting at him in retaliation for Ball's murder.  Andrews testified that James was "involved in" the conflict between his brother and Ball's associates.  *Id.* at 1977-78.  Specifically, James Alfred would report to Ronald Alfred if he saw one of Ball's associates, including Thomas, "trying to

get at" Ronald. *Id.* Andrews testified that Ronald Alfred told his associates that he wanted to kill Thomas ("Froggy") and would pay for the murder, though Andrews did not say that James was present for that statement. (Andrews did testify more generally that James participated in conversations about Thomas with Ronald, Andrews, and others.) After Thomas was killed, James gathered with others to discuss and celebrate the murder. Andrews testified that James was "smiling" and "happy" that Thomas had been killed, and that he asked for details of the murder. *Id.* at 2004-05. Omar Wazir also testified that James later told him, "*We* got Gangster [Franklin] to hit Froggy [Thomas]" (emphasis added), and explained that he understood "we" to refer to both Alfred brothers. *Id.* at 2385.

This evidence supported the jury's conviction on a *Pinkerton* theory. The jury could reasonably find that Thomas's murder was committed "in furtherance of" the conspiracy's goal to protect and promote its members' reputation and standing, because Ronald Alfred perceived Thomas as threatening retaliation against him for Ball's murder. The jury could also find that the murder was "reasonably foreseeable" to James, as he reported to Ronald from time to time on the sighting of persons who needed to be dispatched in light of the killing of Ball.

James Alfred complains that the government did not properly raise the *Pinkerton* theory of guilt, saying that the government did not raise it before appeal, and a theory "presented for the first time on appeal ordinarily will not be heard on appeal." *Jones v. Horne*, 634 F.3d 588, 603 (D.C. Cir. 2011). But the district court gave the jury a proper *Pinkerton* instruction, whose language James does not contest. That general instruction—though it does not explicitly refer to the Thomas incident, to the crime of

murder, or to any specific defendant—is enough to sustain the conviction. In *Washington* we approved an instruction that the jury "may find *each* defendant guilty of [a firearms offense] if *any* of their fellow co-conspirators committed this offense" in furtherance of the conspiracy, because each member is "responsible for *any offense* committed by a co-conspirator" that the defendant could have reasonably expected. 106 F.3d at 1011 (emphasis added).

In another critique of the relation between the evidence and instructions, James Alfred claims that the government's argument to the jury was solely based on aiding and abetting; he assumes that the evidence was inadequate by those standards, a matter we address below. But the transcript pages he cites narrate the relevant facts without referring to a particular legal theory. And while the district court did say in its denial of James Alfred's motion for acquittal that his liability was "based on aiding and abetting," J.A. 1524, that ruling does not preclude the jury from finding the evidence sufficient on another theory. *See Wahl*, 290 F.3d at 375 (explaining that we affirm a guilty verdict where any rational factfinder could have found the essential elements of the crime). Insofar as affirming on *Pinkerton* grounds rather than aiding and abetting might pose a problem under *Yates*, 354 U.S. at 312, James forfeited any such argument because he didn't raise it until his reply brief. *See Moore*, 651 F.3d at 93 n.22; *Van Smith*, 530 F.3d at 973.

In any event, the evidence was sufficient to sustain the federal convictions—though not the D.C. Code conviction for first-degree murder—on an aiding-and-abetting theory. The district court gave the jury a "natural and probable consequence" instruction for an aiding-and-abetting theory of liability. This was plain error vis-à-vis the D.C. Code violation. *See Wilson-Bey*, 903 A.2d at 835-39; *see also*

*Moore*, 651 F.3d at 91 (quoting *Wilson-Bey*). But for federal aiding-and-abetting offenses we have approved an instruction allowing the jury to hold a defendant responsible as an aider and abettor for the "natural and probable consequences" of the execution of a "common design" shared with the perpetrator. *United States v. Walker*, 99 F.3d 439, 443 n.2 (D.C. Cir. 1996); *see also Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 190-91, 197 (2007) (citing *Walker* as indicating that the circuit adheres to the "natural and probable consequences" standard); *Moore*, 651 F.3d at 92. Thus, even with that instruction, the jury was entitled to convict James Alfred of the two federal offenses based on aiding and abetting the Thomas murder.

The evidence was sufficient to convict James on that theory. Aiding and abetting requires (1) his specific intent to facilitate the commission of the crime; (2) his guilty knowledge (3) that someone else was committing the crime; and (4) his assisting or participating in committing the crime. *Gaviria*, 116 F.3d at 1535; *see also Moore*, 651 F.3d at 91 (requiring "proof of some shared intent" between the defendant and the principal actor). James contends that no evidence shows that he knew that Ronald wanted to have Thomas killed, let alone that James intended to help bring about the murder. As we said in *United States v. Teffera*, 985 F.2d 1082 (D.C. Cir. 1993), "general knowledge of criminality afoot" is not enough. *Id*. at 1086-87. But viewed in the light most favorable to the government, the evidence described above—particularly James's reports to his brother about Thomas's whereabouts and his statement that "we" had Thomas killed—was sufficient.

## XXX.  Individual Challenges by Ronald Alfred

Ronald Alfred raises a number of individual challenges, none of which succeeds.

### A.

In addition to the general Rule 404(b) challenges pressed by appellants, *see* Part III, *supra*, Ronald Alfred challenges the admission of evidence concerning two preconspiracy crimes that he was alleged to have committed and the limits placed on cross-examination with respect to one of those incidents.  More specifically, the indictment in this case listed as overt acts of the charged conspiracy Alfred's alleged possession in 1989 of approximately one kilogram of cocaine with intent to distribute and his possession in 1991 of a loaded firearm.

### *1.*

At trial, the government called Richard Egan, a police officer involved in a 1989 traffic stop of Ronald Alfred.  Egan testified that a sizeable amount of cocaine was found in Alfred's car.  During cross-examination, Alfred's counsel attempted to elicit from Egan the fact that Alfred had been acquitted in the ensuing trial.  The district court barred that line of inquiry, allowing Alfred's counsel only to ask whether Egan had a "particular axe to grind" with Alfred.  J.A. 2527.  The government also presented testimony from George DeSilva, the officer involved in Alfred's 1991 arrest, and a certified copy of the resulting firearms conviction.

Following Egan's testimony, the district court instructed the jury that:

Again, you heard evidence of one of the defendant's alleged conduct prior to the time period with which he's charged with joining the alleged conspiracy. Again, the testimony was admitted to explain why and how the defendants joined the alleged conspiracy and their relationships with other members of the alleged conspiracy. To find the defendant guilty of the charge[d] conspiracy, you must find that he participated in the conspiracy during the time period charged in the indictment. The conspiracy is alleged to have begun in 1988. The Defendant Ronald Alfred is alleged to have joined the conspiracy sometime after May 15th, 1995. The Defendant Ronald Alfred is not charged in the indictment with the acts that allegedly occurred on or before May 15th, 1995; therefore, you will not be asked to return verdicts as to this act if you find that it occurred.

*Id*. at 2531-32.[19]

When giving the jury its final instructions and explaining how it might consider evidence of prior bad acts, the court specifically referenced the 1989 drug possession and the 1991 firearm charges as examples of evidence that should be used only to help determine whether Alfred became a member of the charged conspiracy. The district court also noted that, while a section of Count One of the indictment was titled "Overt Acts,"

[p]roof of an overt act is not an element of the charge of a narcotics conspiracy. The government is not

---

[19] There is no indication in the record that Alfred requested a similar instruction following the testimony of DeSilva.

> obliged to prove any particular one or more of the overt acts beyond a reasonable doubt, although it must prove beyond a reasonable doubt the existence of the conspiracy itself and a defendant's knowing and wil[l]ful participation in it[.]

*Id.* at 5461.

At the same time, the court rejected a renewed effort by Alfred's counsel to delete from the indictment the two paragraphs describing the 1989 drug possession and 1991 firearm charges as overt acts of the conspiracy. The court then provided the indictment to the jury, instructing the jury that it was only providing them "those overt acts that directly relate to the charges against" appellants. *Id.* at 1000. The district court underscored that "indictments are not evidence" and should not be used by the jurors "for any purpose other than informing [them]selves of the charges [they were] to consider." *Id.* at 5450.

### 2.

We review for an abuse of discretion the limits placed by the district court on cross-examination. *See Thomas*, 114 F.3d at 249. The trial court's decision whether to strike surplus language from the indictment is reviewed under the same standard. *See Edmond*, 52 F.3d at 1112. We have noted, however, that "[t]he scope of a district court's discretion to strike material from an indictment is narrow," *United States v. Oakar*, 111 F.3d 146, 157 (D.C. Cir. 1997), and "[m]aterial that can fairly be described as 'surplus' may only be stricken if it is irrelevant and prejudicial," *id.*

### *3.*

As the district court correctly instructed the jury below, the government was not required to prove the occurrence of any overt act to convict a defendant of narcotics conspiracy under 21 U.S.C. § 846. *See United States v. Shabani*, 513 U.S. 10, 11, 15-17 (1994). The indictment's listing of preconspiracy conduct as overt acts thus constituted nothing more than "excess allegations in an indictment that do not change the basic nature of the offense charged . . . and should be treated as mere surplusage," *United States v. Pumphrey*, 831 F.2d 307, 309 (D.C. Cir. 1987).

The government concedes that the description of Ronald Alfred's alleged conduct as overt acts of the conspiracy was inaccurate. And rightly so. Since the two incidents preceded Alfred's entry into the conspiracy by several years, the government had no plausible basis for labeling them overt acts in furtherance of that conspiracy. *Cf. United States v. Ortiz-Torres*, 449 F.3d 61, 80 (1st Cir. 2006) (offenses committed prior to joining conspiracy properly treated as prior offenses for sentencing purposes rather than overt acts in furtherance of the charged conspiracy).

The government contends, however, that the incidents were still relevant and admissible under Rule 404(b). The Second Circuit has previously approved the listing of a preconspiracy incident in the indictment as an overt act under similar circumstances. *See United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996); *United States v. Montour*, 944 F.2d 1019, 1026-27 (2d Cir. 1991).

The problem for the government is that these two incidents were too remote in time to qualify as legitimate Rule 404(b) evidence. They thus were irrelevant, serving only as forbidden propensity evidence. *See* Part III(C)(3), *supra*.

But the offenses should only have been stricken if they were both irrelevant *and* prejudicial, and it is on that latter prong that Alfred's argument founders. The district court repeatedly instructed the jury about the limited use permitted for the "prior bad acts" evidence, including through a midtrial jury instruction following Officer Egan's traffic stop testimony. That instruction emphasized that Alfred was "not charged in the indictment with the acts that allegedly occurred on or before May 15th, 1995." J.A. 2532. In addition, the court's final jury instruction on the Rule 404(b) evidence specifically referenced the evidence of the 1989 cocaine possession charge and the 1991 firearms conviction as "admitted only for [the jury's] consideration in determining whether Ronald Alfred . . . then became [a member] of the Kevin Gray-Rodney Moore drug distribution and RICO conspiracies." *Id.* at 5452. Finally, the district court instructed the jury that the indictment itself was not evidence and was offered simply to inform the jury of the charges against appellants.

Alfred points out that, in providing the indictment to the jury, the district court said that the listed overt acts were those that "directly relate to the charges" against appellants. *Id.* at 1000. The district court made that statement, however, to explain why several acts involving coconspirators who were not defendants in the case were omitted from the indictment provided to the jury. The cited language thus clarified for the jury that the listed acts were those that specifically involved Alfred and his codefendants.

To be sure, some risk of prejudice remained, and it would have been well within the district court's discretion to have stricken the acts from the indictment. We hold only that Alfred has not demonstrated the type of substantial prejudice required for reversal, given the offsetting jury instructions and

the overwhelming evidence of violence and criminal activities by Alfred. *See Edmond*, 52 F.3d at 1112-13.[20]

### *4.*

Ronald Alfred's challenge to the district court's limitation on cross-examination of Officer Egan fares no better. Alfred's argument that he should have been able to introduce evidence that he was acquitted of the alleged prior bad act certainly has some logical appeal, but unfortunately for Alfred the case law is solidly against the argument. That is because, to consider the prior act as relevant evidence of the alleged crime, the jury need only reasonably conclude that it happened. The acquittal, on the other hand, just says that the act was not proven beyond a reasonable doubt. *See Dowling v. United States*, 493 U.S. 342, 348-50 (1990). Accordingly, when prior-bad-act evidence is introduced, "[i]t is settled that a criminal defendant ordinarily may not introduce evidence at trial of his or her prior acquittal of other crimes," and the "hearsay, relevance, and more-prejudicial-than-probative rules generally preclude the admission of evidence of such prior acquittals." *United States v. Williams*, 784 F.3d 798,

---

[20] Alfred suggests in his reply brief that his RICO conspiracy conviction alters this analysis. That is because, to show the "pattern of racketeering activity" required for the RICO conviction, the government had to prove "at least two acts of racketeering activity." 18 U.S.C. § 1961(5); *see also, e.g.*, *United States v. Hoyle*, 122 F.3d 48, 50 (D.C. Cir. 1997). But the incidents at issue here were not listed as racketeering acts in the indictment, and Alfred's conviction on the RICO conspiracy count was predicated on the jury's express finding that Alfred had committed four other actions that *were* described as racketeering acts in the indictment, including three first-degree murders.

803 (D.C. Cir. 2015); *see also Thomas*, 114 F.3d at 249-50 (same).

That rule, it bears noting, is not inflexible. If a jury might otherwise reasonably think that the defendant had been convicted of the alleged bad act, the defendant may be able to introduce evidence to rebut that inference. *See Williams*, 784 F.3d at 803 (citing *United States v. Bailey*, 319 F.3d 514, 518 (D.C. Cir. 2003)). Alfred argues that the testimony regarding his 1989 arrest for cocaine possession could have given rise to just such speculation by the jury. But that risk was minimal because the jury had been presented with either a certified copy of the conviction or a transcript of the guilty plea for two of Alfred's previous convictions. The absence of any such evidence of a cocaine-related conviction following the 1989 arrest thus was notable.[21]

In any event, any probative value associated with the evidence of acquittal would have been outweighed by the unfair prejudice resulting from "the risk that the jury might overread acquittal to signify innocence rather than merely failure of the government to show guilt beyond a reasonable doubt." *Bailey*, 319 F.3d at 518.

Alfred is also correct that this court left open the possibility in *Thomas* that evidence of acquittal could be relevant to establish a witness's bias or motivation for testifying. The theory of bias—that the arresting officer was presenting biased testimony against Alfred in the instant trial

---

[21] The jury was also aware that a previous trial had taken place in which the arresting officer had had the opportunity to identify Alfred. To the extent that fact may have increased jury speculation as to the outcome of that trial, we note that it was Alfred's own counsel who drew out that information.

because Alfred beat the earlier charge—is decidedly strained. Indeed, Alfred does not dispute that the arrest happened or that Officer Egan testified consistently in the two trials, so it is hard to imagine how Egan's testimony about that arrest could have been biased by an after-the-arrest acquittal over a decade earlier. Accordingly, the district court did not abuse its discretion in pretermitting this line of inquiry.[22]

Moreover, the limitation on cross-examination was decidedly harmless even if viewed through the demanding lens of constitutional (Confrontation Clause) error. *See Wilson*, 605 F.3d at 1014 (noting more stringent *Chapman* standard applies in assessing effect of a Confrontation Clause violation while *Kotteakos* applies to an evidentiary abuse of discretion under the Federal Rules of Evidence). Any link between Alfred's acquittal and the truthfulness of an officer who had already testified as to the same facts *before* the supposedly bias-producing acquittal borders on implausible, and thus could not have outbalanced the overwhelming strength of the government's case against Alfred.

---

[22] Three other circuits have rejected similar bids to introduce such bias evidence. *See United States v. Lyons*, 403 F.3d 1248, 1256 (11th Cir. 2005) ("exceedingly marginal" relevance in showing bias outweighed by prospect of jury confusion); *United States v. Smith*, 145 F.3d 458, 462–463 (1st Cir. 1998) (defendant precluded from arguing that several witnesses were testifying against him only because they knew he had been acquitted in an earlier case and so was facing less harsh penalties, in part given the concern that "the jury would have had to sort through the meaning of a legal judgment of acquittal"); *United States v. Kerley*, 643 F.2d 299, 301 (5th Cir. 1981) (any relevance of state court acquittal on charges arising out of the same incident was outweighed by the possibility of jury confusion given the charges' different elements).

**B.**

Ronald Alfred's second argument is that the district court abused its discretion in admitting into evidence a photograph taken during the execution of a search warrant at his residence that showed a ziplock bag alleged to contain crack cocaine. We hold that any error in admission of the photograph was harmless.

*1.*

The photograph was introduced into evidence during the testimony of the agent who oversaw a search of Ronald Alfred's home in July 2000. Alfred's counsel objected when the officer was asked to highlight the "crack cocaine" or "suspected crack cocaine" in the picture. J.A. 4029. Counsel also moved to strike the photograph on the basis that there was no evidence that any chemical analysis had been conducted on the substance beyond a field test at the scene. The district court refused to strike the photograph, but did bar the government from asking the agent about the results of the field test.

At the conclusion of evidence, Alfred again moved to strike evidence relating to the ziplock bag and to redact the photograph. The government agreed not to argue that there was crack cocaine in the ziplock bag and to stipulate that it had not been submitted to the DEA for analysis. The district court accepted the stipulation and, accordingly, rejected both Alfred's motion to strike and his request for a jury instruction advising that the substance pictured in the bag should not be considered as evidence. The record does not reflect whether the jury actually received the government's stipulation.

*2.*

We ordinarily would review the district court's evidentiary rulings for an abuse of discretion. *See United States v. Whitmore*, 359 F.3d 609, 616 (D.C. Cir. 2004). But in this case, we need not decide the propriety of the district court's rulings because, even were the admission error, it was harmless, having no "substantial and injurious effect or influence in determining the jury's verdict," *Johnson*, 519 F.3d at 483 (quoting *United States v. Linares*, 367 F.3d 941, 952 (D.C. Cir. 2004)).

Ronald Alfred is wrong to assert that the government breached its agreement not to argue that the pictured ziplock bag contained crack cocaine. Alfred points to the testimony of a DEA chemist referenced in the government's closing argument. But that testimony said only that those narcotics included on a chart provided to the jury—a list that did *not* include the substance in the ziplock bag—were found to be illegal substances. Alfred, moreover, did not object to that portion of the closing argument, and his counsel highlighted the absence of DEA testing of the ziplock bag's contents in his own closing argument. Beyond that, whatever weight the jury might have given to a portion of a single photograph, we are confident beyond any reasonable doubt that it was far outweighed by the wealth of other testimonial evidence establishing Alfred's guilt.

## C.

Ronald Alfred next asserts that the district court violated Federal Rule of Evidence 610 and abused its discretion by permitting a government witness, Oscar Veal, to testify about his religious beliefs. We again hold that any error in the introduction of that evidence was harmless.

## *1.*

Veal was a significant witness in the government's case against Alfred. He testified that Alfred provided material assistance in the murders of Carlos Cardoza, Jr. and Anthony Watkins, and discussed in detail Alfred's role in those crimes. The jury found Alfred guilty of both murders. Near the beginning of Veal's testimony—and over Alfred's objection—the prosecutor prompted Veal to discuss his religious beliefs and, in particular, his recent conversion to Islam while in prison. Two days later, Veal returned to the subject, explaining that his decision to cooperate with the government was motivated in part by his conversion and the concomitant need for him to make amends for his past wrongdoing.

## *2.*

Rule 610 of the Federal Rules of Evidence provides that "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." Fed. R. Evid. 610. A 1972 Advisory Committee Note clarifies that, while Rule 610 "forecloses inquiry into the religious beliefs or opinions of a witness for the purpose of showing that his character for truthfulness is affected by their nature, an inquiry for the purpose of showing interest or bias because of them is not within the prohibition." Fed. R. Evid. 610 Advisory Committee Notes to 1972 Proposed Rules. We review the district court's rulings applying Rule 610 for an abuse of discretion. *See United States v. Sampol*, 636 F.2d 621, 666 (D.C. Cir. 1980).

## *3.*

The government argues that the testimony it elicited did not use religion to enhance Veal's credibility, but to explain

Veal's motivation for testifying and to rebut charges of bias based on Veal's cooperation agreement with the government. In *Moore*, the government introduced the same evidence from the same witness. We left open the question of whether such testimony was properly admitted, finding that any error was harmless given the brevity of the testimony about Veal's religion, the government's omission of any reference to Veal's religion from its opening and closing arguments, the absence of any urging that the jury credit Veal's testimony because of his religious convictions, and the overwhelming evidence of guilt. *See Moore*, 651 F.3d at 76.

That same answer governs here. As in *Moore*, the testimony regarding Veal's religious conversion and beliefs took up only a few transcript pages during testimony that stretched over seven trial days. The government made no mention of this testimony in its opening or closing arguments, nor did it argue or even suggest to the jury that Veal's religious beliefs bolstered his credibility. Finally, the testimony implicating Alfred in the Cardoza and Watkins murders was fully corroborated by another cooperating witness, Maurice Andrews. We thus cannot conclude that any error in the admission of this evidence substantially swayed the jury's verdict.

### D.

Ronald Alfred also raises a number of claims of ineffective assistance of counsel, asserting that several of his attorneys below either had a conflict of interest in their representation of him or provided deficient representation.

To present a viable claim of ineffective assistance of counsel on direct appeal, "a defendant must present 'factual allegations that, if true, would establish a violation of his Sixth Amendment right to counsel.'" *Williams*, 784 F.3d at

803 (quoting *United States v. Mohammed*, 693 F.3d 192, 202 (D.C. Cir. 2012)). A plausible claim requires a showing of both deficient representation and prejudice. *See id.* But if the defendant can show that his representation was infected by an actual conflict of interest, prejudice is presumed. *Thomas*, 114 F.3d at 252.

When a colorable claim of ineffectiveness is made, this court "remand[s] for an evidentiary hearing unless the 'record alone conclusively shows that the defendant either is or is not entitled to relief.'" *Mohammed*, 693 F.3d at 202 (quoting *United States v. Burroughs*, 613 F.3d 233, 238 (D.C. Cir. 2010)). As a result, while "we do not 'reflexively remand,' we also do not 'hesitate to remand when a trial record is insufficient to assess the full circumstances and rationales informing the strategic decisions of trial counsel.'" *Williams*, 784 F.3d at 804 (quoting *Mohammed*, 693 F.3d at 202).

Alfred challenges on appeal the performance of his attorneys before trial, during trial, and at sentencing. We conclude that he has raised colorable claims of ineffective assistance concerning the performance of his counsel before and during trial and remand those claims to the district court. Alfred, however, has not made out a colorable claim of ineffective assistance at sentencing, and so we reject that claim on the merits.

### 1. *Pretrial Counsel*

Thomas Abbenante was Alfred's first attorney in this case, commencing his representation on July 28, 2000. Long before that (starting in early 1992), Abbenante took on the representation of Alberto Martinez, a cooperating witness who would ultimately testify against Alfred. Abbenante continued to represent Martinez through trial in this case. He

withdrew from representing Alfred on October 6, 2000, citing the potential conflict between the two representations.

Prior to withdrawing as Alfred's counsel, Abbenante arranged a meeting between Alfred and Omar Wazir, who was cooperating with the government and who ultimately testified against Alfred. Some details regarding that meeting were subsequently used against Alfred at trial. At trial, Alfred sought to bar Martinez from testifying on the basis of Abbenante's initial dual representation. Alfred asserted that it was only after Abbenante had begun representing him that Martinez indicated to the government that he could provide information against Alfred. The government represented that this assertion was false and produced records purportedly showing that, by the early 1990s, Martinez had already named Alfred as someone to whom he had supplied cocaine. After examining those records and providing them to Alfred's trial counsel, the district court rejected Alfred's request to exclude Martinez's testimony.

Under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), one way a defendant can establish ineffective assistance of counsel is by demonstrating: "(1) that his lawyer acted under 'an actual conflict of interest' and (2) that the 'conflict had some negative effect upon his defense (defined as "an actual lapse in representation").'" *Thomas*, 114 F.3d at 252 (quoting *United States v. Shark*, 51 F.3d 1072, 1075-76 (D.C. Cir. 1995)). The first prong requires a showing that counsel "actively represented conflicting interests." *Cuyler*, 446 U.S. at 350. If an attorney's joint representation of conflicting interests was unknowing, it does not give rise to a claim. *See United States v. Taylor*, 139 F.3d 924, 930 (D.C. Cir. 1998).

Alfred has raised colorable factual questions about the timing of the dual representations, the timing of Abbenante's

withdrawal, and whether Abbenante might have used information learned from Alfred in his representation of Martinez—questions that we cannot resolve on the existing record. *See United States v. Hernandez-Garcia*, 215 F.3d 1312 (Table), 2000 WL 231251, at \*1 (1st Cir. Feb. 15, 2000) (declining to resolve "fact-intensive" ineffective assistance claim alleging, *inter alia*, a conflict of interest arising out of counsel's previous representation of a cooperating witness on direct appeal).

In addition, while there are indications that Abbenante's decision to have Alfred meet with cooperating witness Wazir was a tactical one, *see* J.A. 4548, the fact that Abbenante at least potentially could have been laboring under a conflict of interest at that time calls into question whether the decision to set up the meeting can be described as just "a strategic choice by defense counsel." *United States v. Weaver*, 281 F.3d 228, 234 (D.C. Cir. 2002).

We accordingly remand this claim to the district court.

### 2. *Trial Counsel*

During Ronald Alfred's own defense case, his new trial counsel called eleven witnesses. His counsel tried to call others, some of whom, counsel asserted, had been belatedly identified by Alfred. Specifically, near the end of trial, Alfred's counsel attempted to subpoena Darrell Darby, who allegedly would have been able to testify that Alfred had a legitimate income in 1996 and that he may have been in Atlanta at the time that Joseph Thomas was murdered in the District of Columbia. Another witness, Kimberly Rice, was expected to say that Alfred had been with her the night that Carlos Cardoza, Jr. was murdered. The district court

ultimately excluded the testimony of both witnesses because counsel was unable to effect timely service.[23]

Alfred argues that his trial counsel's failure to locate and present those and other witnesses amounted to ineffective representation.[24] The record shows unequivocally that the failure to call those witnesses at trial was a failure of timing, and not a considered strategic decision by Alfred's counsel. But the record casts no light on who was at fault for that belated timing, Alfred or his counsel.

Given the ambiguities in the record, there is at least a colorable claim that trial counsel failed to obtain potentially important witness testimony in a timely fashion. *See United States v. Mitchell*, 216 F.3d 1126, 1130-33 (D.C. Cir. 2000); *United States v. Debango*, 780 F.2d 81, 423 (D.C. Cir. 1986). In addition, "[t]he current record . . . does not allow a conclusive determination that [the missing witnesses'] testimony was immaterial or cumulative such that it defeats a colorable prejudice claim." *Moore*, 651 F.3d at 88. For example, Alfred alleges that Darby and Rice each could have provided an important alibi, testifying that Alfred either was not in the District of Columbia or was with someone else the nights that Thomas and Cardoza were murdered. While that testimony would not necessarily foreclose the government's argument that Alfred had commissioned the murder or aided

---

[23] Alfred's vague and conclusory assertion that another witness, Rodman David Lee, could have offered "a strong defense to the Narcotics conspiracy," Appellants' Br. 304, is far too thin a reed on which to hang a colorable claim of error or prejudice.

[24] Near the end of his case, Alfred's counsel informed the district court that he wished to secure testimony from at least twenty-six additional witnesses. *See* J.A. 4435-44, 4918-49, 5118.

in the search for the victim, the testimony (if delivered as Alfred predicts) could at least have cast doubt on aspects of the government's case and could have undermined the testimony of government witnesses. The record thus supports a colorable claim of prejudice as well. We remand for further exploration of this claim.[25]

### 3.    *Sentencing Counsel*

At sentencing, Alfred was represented by yet another attorney. That new counsel requested a full sentencing hearing, but the district court denied the request. The attorney then reminded the court that Alfred's trial counsel had raised several objections to Alfred's presentence report, and the new attorney added one more objection. Counsel also conceded that Alfred faced three mandatory life sentences and stated that, as a result, he would not be making an argument for a reduced sentence based on the sentencing factors set out in 18 U.S.C. § 3553, because it could have no practical effect.

Alfred's argument that sentencing counsel was ineffective does not get out of the starting gate. In particular,

---

[25]    Alfred separately argues that one of his trial attorneys—Idus Daniel—undertook conflicting representations. Specifically, Alfred argues that the docket in *United States v. Wallace*, No. 99-cr-215, shows that, in an earlier trial, Daniel represented Melvin Wallace, who then became a government witness in Alfred's trial. That argument fails because the same docket sheet reflects that the entry to which Alfred refers was a clerical error. *See* Attorney Appearance, Dkt. No. 17, *United States v. Wallace*, No. 99-cr-215 (D.D.C. filed Aug. 11, 1999). Daniel in fact represented a different defendant altogether in that proceeding. *See* Notice of Attorney Appearance, Dkt. No. 105, *United States v. Wallace*, No. 99-cr-215 (D.D.C. filed Jan. 23, 2007).

Alfred fails to identify any prejudice that could have arisen from sentencing counsel's alleged deficiencies.

First, Alfred argues that his sentencing counsel failed to object to a sentence that was premised on the discharge of a firearm in the commission of murder even though there was no specific jury finding that the gun was discharged. That argument did not work for McGill, *see* Part XI(C), *supra*, and it does not work here either. There was no prejudice because there is no conceivable factual scenario in which the jury could have convicted Alfred (as it did) of the first-degree murder of three individuals—each of whom was *shot* to death—without necessarily finding that the firearm was discharged. That Alfred was not the alleged shooter is beside the point because a conviction under 18 U.S.C. § 924(c) may be premised on either an aiding-and-abetting or *Pinkerton* theory of liability, *see Pinkerton*, 328 U.S. 640, both of which the jury was instructed on here. *See* Part XXI, *supra*.

Second, Alfred argues that counsel should not have conceded that he was subject to a mandatory life sentence for his murder in aid of racketeering charges and the particular RICO conspiracy and predicate offenses alleged. But Congress has explicitly mandated life sentences under 18 U.S.C. §§ 1959(a) and 1963(a)(1) for those crimes. *See United States v. Franklin*, 663 F.3d 1289, 1289-90 (D.C. Cir. 2011). No prejudice can arise from counsel's failure to dispute what is legally indisputable.

Finally, Alfred's fleeting references to counsel's failure (i) to challenge an allegedly above-Guidelines sentence on the narcotics conspiracy, (ii) to present mitigating factors under 18 U.S.C. § 3553(a), (iii) to object in some fashion to the government's 21 U.S.C. § 851 notice regarding sentence enhancement, or (iv) to make other unidentified "obvious

objections," are all presented in such a vague and conclusory fashion that they do not raise any colorable claim of error or prejudice. *See United States v. Williams*, 488 F.3d 1004, 1010 (D.C. Cir. 2007) ("We 'ha[ve] never held that *any* claim of ineffective assistance of counsel, no matter how conclusory or meritless, automatically entitles a party to an evidentiary remand,' . . . and, accordingly, we need not remand here.") (quoting *United States v. Poston*, 902 F.2d 90, 99 n.9 (D.C. Cir. 1990)).

## E.

Alfred's final objection is to the sufficiency of the evidence to support his convictions for (i) murdering a government witness, Carlos Cardoza, Jr., to prevent his further communication with law enforcement, (ii) conspiring to murder Andre Sanders, and (iii) participating in a crack-cocaine conspiracy. None of those objections succeeds.

This court "reviews challenges to the sufficiency of the evidence 'de novo, viewing the evidence in the light most favorable to the government, and affirming a guilty verdict where any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Eiland*, 738 F.3d at 356 (quoting *United States v. Littlejohn*, 489 F.3d 1335, 1338 (D.C. Cir. 2007)).

### 1.

Alfred was convicted, among other things, of two conspiracy counts and several substantive counts relating to the murder of Carlos Cardoza, Jr., including an aiding-and-abetting conviction for killing a witness to prevent communication with law enforcement. *See Sampol*, 636 F.2d at 676-77 (affirming defendants' "responsibility as principals in the murder . . . which flows from aiding and abetting that

crime"). To prove the murder of a witness to prevent communication with law enforcement under 18 U.S.C. § 1512(a)(1)(C), the government must show "(1) a killing or attempted killing, (2) committed with a particular intent . . . (a) to 'prevent' a 'communication' (b) about 'the commission or possible commission of a Federal offense' (c) to a federal 'law enforcement officer or judge.'" *Fowler v. United States*, 131 S. Ct. 2045, 2049 (2011).[26] To establish aiding-and-abetting liability, the government must "prove: '(1) the specific intent to facilitate the commission of a crime by another; (2) guilty knowledge (3) that the other was committing an offense; and (4) assisting or participating in the commission of the offense.'" *United States v. Wilson*, 160 F.3d 732, 738 (D.C. Cir. 1998) (quoting *Gaviria*, 116 F.3d at 1535). The government does not dispute that, to prove aiding and abetting liability under Section 1512(a)(1)(C), the government must show knowledge both that a murder was planned and of the statutorily specified reason for the murder. Appellee's Br. 308.

Sufficient evidence supported the jury's finding that Alfred had the requisite intent and guilty knowledge to aid and abet the murder of Cardoza to prevent his communication with law enforcement about federal crimes. Lionel Nunn commissioned Cardoza's murder precisely because Cardoza "was supposed to be cooperating with the law." J.A. 2052. Evidence showed that Nunn solicited Kevin Gray to murder Cardoza and told Gray why. Additional evidence established that Gray told Ronald Alfred that he was looking for Cardoza

---

[26] "[N]o state of mind need be proved with respect to the circumstance that . . . the law enforcement officer is an officer or employee of the Federal Government[.]" 18 U.S.C. § 1512(g)(2); *see also United States v. Rodriguez-Marrero*, 390 F.3d 1, 25 (1st Cir. 2004).

and was "out to kill" him.  Alfred subsequently told Gray when he saw Cardoza and loaned him his van to search for Cardoza.  Alfred also supplied Gray with the gun that was ultimately used to commit the murder.

A jury could reasonably infer from that evidence that, before Alfred interjected himself into the search for and murder of Cardoza, he would have been told not just that Gray was looking to kill Cardoza, but also why.  "A man just does not surrender to his friends possession of his gun, a deadly weapon, without taking more than a casual interest in its intended employment."  *United States v. Harris*, 435 F.2d 74, 89 (D.C. Cir. 1970); *see also id.* ("And the legitimate inference that appellant loaned his gun to the robbers tends at least slightly to support the further inference that appellant knew the purpose for which the gun would be used.").

### 2.

We need not address Ronald Alfred's challenge to his conviction for conspiracy to murder Andre Sanders.  That is because Alfred was not convicted of any substantive counts associated with that conspiracy.  Instead, participating in the conspiracy to murder Sanders was just part of one of the four racketeering acts that the jury specifically found Alfred had committed as predicate offenses for the RICO conspiracy charge.  Those four racketeering acts are two more than what was required to sustain his RICO conspiracy conviction.  *See* 18 U.S.C. § 1961(5).  Accordingly, even if there had been error in the finding as to Sanders, it could not have had any effect on the RICO judgment because at least two unchallenged convictions for predicate acts remained regardless.  *See United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991) (evidentiary error affecting three counts of racketeering activity was harmless where each defendant was

also found to have committed at least two other acts of racketeering activity); *United States v. Madrid*, 842 F.2d 1090, 1097 (9th Cir. 1988) (jury instruction issue affecting one count was harmless where two other racketeering acts were also established).

### 3.

Finally, Alfred argues for an absolute requirement of "lab evidence" (Appellants' Br. 307) to sustain a conviction for a narcotics conspiracy involving crack cocaine. But he provides no authority for that proposition, and we have found none. Instead, laboratory analysis is just one of many ways in which involvement with narcotics can be proven; circumstantial evidence alone can also suffice. *See United States v. Baugham*, 449 F.3d 167, 171-72 (D.C. Cir. 2006) (testimony and recordings documenting crack cocaine transactions alone provided sufficient evidence to support conviction for conspiracy to distribute crack cocaine); *see also United States v. Turner*, 709 F.3d 1187, 1195 (7th Cir. 2013) (similar), *cert. denied*, 134 S. Ct. 2660 (2014).

Here, sufficient evidence supported Alfred's conviction even without lab analysis. Testimony was presented showing that Alfred's close associates were involved in trafficking crack cocaine, including his brother James, who was said to be Ronald Alfred's middleman in drug transactions. Evidence also showed that the conspiracy as a whole participated in crack cocaine transactions. Such evidence, along with the wealth of testimony regarding Alfred's own drug trafficking, supports the jury's attribution of 50 or more grams of trafficked crack cocaine to Ronald Alfred as a reasonably foreseeable part of the conspiracy he joined. *See United States v. Law*, 528 F.3d 888, 906 (D.C. Cir. 2008) ("Here, the conspiracy was dealing drugs, and thus the entire

sum of the drugs within the conspiracy constituted a single conspiracy violation.").

## XXXI. Cumulative Error

Finally, appellants argue that the cumulative effect of these errors requires reversal. It is true that even where individual errors are insufficiently prejudicial to warrant reversal, "the total effect of numerous small missteps may deprive a defendant of a fair trial," provided that appellants can demonstrate prejudice resulting from the various errors taken together. *Celis*, 608 F.3d at 847 (citing *Egan v. United States*, 287 F. 958, 971 (D.C. Cir. 1923)).

With the few exceptions we have described, however, we have found no error at all. And appellants have not established that the cumulative effect of the few errors— including where the government has conceded prejudice (e.g., the admission of the drug analysis reports against Seegers)— was sufficiently prejudicial to require a new trial. The government mounted a strong case based on overwhelming evidence and the district court used limiting instructions throughout the trial, both of which mitigated any cumulative prejudice caused by the errors. *See Brown*, 508 F.3d at 1076.

\* \* \* \* \*

We vacate McGill's sentence and remand for the district court to resentence him. We remand for the district court to hold an evidentiary hearing on Simmons's ineffective-assistance-of-counsel claim and Ronald Alfred's ineffective-assistance-of-counsel claims concerning his counsel before and during trial. We also remand for the district court to determine whether the Confrontation Clause violations affected appellants' substantial rights with regard to their conspiracy convictions, and to resentence them accordingly if

necessary.  We reverse Seegers's convictions for possession with intent to distribute cocaine and heroin.  In all other respects, we affirm.

*So ordered.*